UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BASSEM YOUSSEF,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        C.A. No. 1:03CV01551 (CKK)
                                         )
FEDERAL BUREAU OF                        )
INVESTIGATION, *et al.,*                 )
                                         )
                    Defendants.          )
_____)

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE PURSUANT TO
RULES 16 AND 37**

Plaintiff, by and through counsel, hereby files his Reply to Defendants' Opposition to Plaintiff's Motion to Strike Pursuant to Rules 16 and 37 ("Def. Opp."), filed by the FBI on July 6, 2006. For the reasons set forth below, as well as those set forth in Plaintiff's original memorandum, Plaintiff's Motion to Strike should be granted.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    DEFENDANTS' OPPOSITION IS WITHOUT MERIT AS IT IS BASED ON
       INACCURATE, IMMATERIAL AND INCORRECT FACTUAL ASSERTIONS**

Defendants' entire argument is predicated on two inaccurate factual assertions. First, Defendants argue that Mr. Youssef's ITOS claims constitute an "entirely new claim." Def. Opp., p. 1. Second, Defendants assert that "plaintiff's employment history" was "not relevant to the discrimination and retaliation claims" and justified their non-production of various information in discovery that Defendants belatedly provided for the first time during the midst of summary judgment briefing. *Id.* As set forth below, both of Defendants' positions are radically flawed.

A. **The FBI Cannot Supplement its Discovery Responses Related to the ITOS Transfer Matter Because the ITOS Transfer was a Part of Plaintiff's Retaliation and Discrimination Claims, and Was the Subject of Numerous Discovery Requests and Two Orders of the Magistrate Judge, Which Unquestionably Required that the FBI Fully Disclose All Facts Related to that Decision During Discovery.**

The FBI cannot argue, in good faith, that the ITOS transfer decision was not part of this case during discovery.   As set forth below, the ITOS claim was *not* a "new claim" and the FBI could not have been surprised that Mr. Youssef made the ITOS personnel decision a central part of his case-in-chief.  Moreover, regardless of the FBI's subjective opinion as to the merits of the ITOS claim, or whether that claim was a "retaliation" or a "discrimination" claim, the FBI answered direct discovery responses about that decision, and made representations to the Magistrate Judge that it had provided full and complete answers to Mr. Youssef's discovery requests on the ITOS transfer issue.

In fact, Mr. Youssef had filed a motion with the Magistrate Judge requesting that the FBI be *required* to more fully answer its discovery responses related to the ITOS transfer decision. The Magistrate Judge, based on the FBI's representations, held, nearly one year before the FBI's attempt to re-create a new explanation for the ITOS transfer matter, that the FBI had provided Mr. Youssef with "as much information as was available to them" regarding the ITOS assignment when the FBI initially answered Mr. Youssef's interrogatories related to that decision. Memorandum and Order, p. 19 [Docket No. 69].

The facts surrounding the ITOS claim are as follows: On January 9, 2003, during the administrative review of Mr. Youssef's claims, the FBI EEO division identified a potential retaliation claim related to the failure of the FBI to transfer Mr. Youssef into the counterterrorism division in June-July, 2002.  *See* Plaintiff's Motion for Partial Summary Judgment, Ex. 39, pp. 2-3 (March 13, 2006) [Docket No. 82].  The FBI EEO set forth its understanding of Mr. Youssef's

claim and explained that Mr. Youssef understood that he had been transferred into the Counterterrorism Division in June 2002, but that the transfer had somehow been blocked or otherwise not implemented in July 2002.  The FBI EEO Division identified this allegation as a "reprisal" allegation.  *Id.* at 2.

The FBI EEO investigated this allegation.  As part of the FBI EEO's administrative review, the FBI EEO officer obtained a copy of the executed ITOS directed transfer memo and included that memo as a formal exhibit to the Youssef FBI-EEO report. Plaintiff's Motion for Partial Summary Judgment, Ex. 30 to Plaintiff's Statement of Material Facts (March 13, 2006) [Docket No. 82].

The FBI EEO investigator also questioned witnesses about the ITOS directed transfer, including Mr. Pasquale D'Amuro.  On August 19, 2003 Mr. D'Amuro executed a sworn affidavit about the ITOS transfer, in which he purportedly provided the EEO investigator with all of the material facts related to the Youssef matter.  Ex. 1, Sworn Statement of Pasquale D'Amuro, pp. 4-5, 8 (August 19, 2003).

In regard to the ITOS transfer memo, Mr. D'Amuro explained his entire role as participating in one "short conversation" in a hallway and in seeing the ITOS transfer memo, "date unknown."  As sworn to by Mr. D'Amuro in August, 2003:

> I had a . . . short conversation, in the hall outside EAD Watson's office with both he and Assistant Director (AD) David Szady. AD Szady suggested that SSA Youssef be permanently assigned to the CT Division based on his language ability. Everyone concurred that SSA Youssef should be transferred to the CT. Following that meeting, I recall initially an Electronic Communication (EC) date unknown, authorizing the permanent transfer of SSA Youssef from NCIX, CI Division to the CT Division based on the needs of the FBI.

*Id.,* pp. 4-5

The FBI voluntarily produced information about the ITOS transfer in its Rule 26(a) initial

disclosures, including a copy of the executed directed transfer memo and Mr. D'Amuro's sworn statement.

In his initial complaint and in his First Amended Complaint, Mr. Youssef raised both national origin discrimination claims and retaliation claims. Because retaliation and discrimination are often intertwined, the complaint reflected the overlapping nature of the issues. For example, although Count I of the Amended Complaint was entitled "National Origin Discrimination," it clearly incorporated a theory of discrimination based on reprisals and retaliation. *See* First Amended Complaint, ¶ 101 (decision reversing Mr. Youssef's transfer to the counterterrorism division in July 2002 was "both discriminatory and taken in reprisal"); ¶ 111 ("As a direct and proximate result of defendants' discriminatory and retaliatory acts, plaintiff has suffered substantial harm . . ."). If there was any doubt about the overlapping nature of discrimination and reprisal claims, Count II of the First Amended Complaint explicitly incorporated Count I into the body of the allegation, and was entitled "reprisal." Count III of the First Amended Complaint incorporated all of the allegations of Counts I and II, and was entitled "Reprisal/Discrimination."

The June 28, 2002 meeting in Congressman Wolf's office between Mr. Youssef and Mr. Mueller was directly referenced as an example of protected activity in both Mr. Youssef's federal court complaint, First Amended Complaint at ¶ 113, and before the FBI-EEO division during the administrative investigation. Ex. 2, ¶¶ 20 and 31 (Youssef EEO Statement) ("On June 28, 2002, I advised Director Mueller of the fact that the FBI did not utilize my Counterterrorism experience and background since the 9/11 attacks . . . . three weeks later I began to experience retaliation for coming forward . . . ." "Director Mueller and I personally met in the office of Congressman Frank Wolf and discussed the way I was treated by the FBI." Also, in his sworn

statement, Mr. Youssef set forth examples of the post-June 28, 2002 meeting retaliation he was aware of at the time he wrote his sworn statement, including the allegation that Mr. Youssef was informed that he had been transferred to Counterterrorism in June 2002, that Mr. D'Amuro, in a July 16th telephone conversation, had accused Mr. Youssef of "trashing" the program "to people on the Hill," and that by July 26, 2002 the alleged "transfer" of Mr. Youssef had not occurred. Ex. 2, Youssef EEO Statement ¶ 21.

If there was any confusion whatsoever about the interrelationship between the national origin complaint and a retaliation complaint incorporated into Count I of Mr. Youssef's initial or amended complaints, that matter was fully resolved when Mr. Youssef filed his Supplemental Statement of the Case on June 18, 2004. In that statement, Mr. Youssef stated that Count I of the complaint alleged that the "Defendants have discriminated against him [Mr. Youssef] in his employment on the basis of his National Origin (Middle Eastern: Egyptian) *and in retaliation for engaging in protected EEO activity*." p. 1 (emphasis added) [Docket No. 11].

The FBI also engaged in discovery related to the scope of Mr. Youssef's complaint. For reasons that are unclear, the FBI did not ask any interrogatory questions concerning the basis for Mr. Youssef's allegation that he was subject to retaliation or reprisal.

The closest the FBI came to seeking information from Mr. Youssef about the ITOS transfer decision was FBI Interrogatory Questions Nos. 9 and 15. In Interrogatory Question No. 9, Mr. Youssef was specifically questioned about one specific paragraph in his complaint (paragraph 52), which alleged that he had been excluded from "working in counterterrorism." In response to that interrogatory, Mr. Youssef identified the ITOS transfer decision: "Moreover, although his directed transfer should have resulted in his placement in the ITOS section (a section for which he was qualified to work), he was improperly assigned to the documents

section."   Ex. 3, p. 10 (Plaintiff Bassem Youssef's Response to Defendants' First Set of Interrogatories to Plaintiff).

Interrogatory Question No. 15 is similar to No. 9, except that it tied the question to ¶ 110 of Mr. Youssef's complaint, which alleged that Mr. Youssef, in his "current position" "does not perform work directly related to his expertise and background."   Once again, in response to this question, Mr. Youssef identified the ITOS transfer decision.   *Id.* at 13 (Youssef was "improperly prevented from transferring into ITOS . . . . Bassem Youssef was kept away from CT operational matters).   Additionally, in answering this question, Mr. Youssef explicitly referred the FBI to his response to Interrogatory Question No. 3.

Interrogatory No. 3 asked Mr. Youssef for the basis of his allegation that Mr. Dale Watson had "engaged in discriminatory conduct."   *Id.* at 3.   In response to that question, Mr. Youssef also identified the ITOS transfer decision:

> In a memorandum dated on April 30, 2002, the Counterintelligence Division requested the direct placement of Youssef . . . to the International Terrorism Operations Section [ITOS] effective immediately.   The document requesting Plaintiff's transfer . . . noted that Mr. Youssef's transfer to this Section would be valuable to the FBI, '[g]iven SSA Youssef's knowledge relative to overseas operations . . . coupled with the Arabic speaking ability.   However, despite the fact that the FBI admittedly had an immediate need for Agents with Mr. Youssef's skills and expertise in its ITOS Section, Mr. Youssef instead transferred into an operations support position in the Document Exploitation Unit . . . [which] did not require the use of his language skills, extensive knowledge of Middle Eastern culture, or extensive knowledge and experience in conducting operational counterterrorism investigations."

*Id.* at 6.

On June 23, 2004, Mr. Youssef commenced a series of document and interrogatory requests directly related to the June 28th Mueller-Youssef meeting and the June-July 2002 transfer decisions.   These discovery requests did not state whether the discovery was related to retaliation or discrimination claims.   Instead, they were standard discovery requests requesting

information about employment-related matters relevant to numerous claims in the case.

In his very first document request, Mr. Youssef requested the production of numerous documents related to the June 28th meeting and/or the June-July 2002 transfer decisions.   For example, Mr. Youssef's sought the production of all documents related to his "transfer of assignments" from Counterintelligence to Counterterrorism in the 2002 timeframe. *See* Ex. 4, Plaintiff Youssef's Request for Production of Documents (June 2004), Document Request No. 47.   Likewise, request No. 53 sought "all documents" related to the "meeting between Director Mueller, Congressman Frank Wolf, and Bassem Youssef…." *Id.*

In addition to document requests, Mr. Youssef questioned the three major signatories on the ITOS transfer memo about the transfer.   These witnesses were the Director of the FBI (the final decision maker) and the two responsible Assistant Directors (i.e. the AD from Counterintelligence and the AD from Counterterrorism).   All but one witness had no recollection about the ITOS transfer. *See* Ex. 5, David Szady Deposition, Tr. 89, lines 18-22 and Tr. 90, lines 1-3 (no recollection of ITOS transfer memo; D'Amuro Deposition, Ex. 6,  Tr. 153, line 22 through Tr. 154, line 13 (no recollection of ITOS discussions).[1]

The Director of the FBI, who was the final decision maker, testified that he was unaware that Mr. Youssef had *not* been transferred to ITOS.[2]

---

[1] Additionally, Mr. Youssef also relied upon the testimony that Mr. Dale Watson, the Executive Assistant Director of the FBI, gave during the EEO investigatory process.   Although he did not identify the ITOS transfer decision, Mr. Watson did recall at least one conversation with other managers in which there was a consensus that Mr. Youssef should be in a position which actually utilized his language skills and his knowledge of operational counterterrorism and the Middle East.   Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Exh. 80 (May 15, 2006) [Docket No. 100].

[2] Q Do you know why [the April 30, 2002 memo] was never implemented?
MS. WELLS: Object to the form.
A (BY MUELLER):  I did not know it was not implemented.
BY MR. KOHN:

In order to ensure that there was no ambiguity about the basis for the FBI not implementing the directed transfer of Mr. Youssef, Plaintiff submitted a set of interrogatories to Defendants. Now, Defendants claim that "Plaintiff's interrogatory [No. 2] did not ask why plaintiff was not assigned to ITOS under an April 30, 2002, memorandum." Def. Opp. Strike at 6 [Docket No. 117]. However, Plaintiff's interrogatory No. 2 specifically stated:

> 2. **Explain in detail why Mr. Youssef was not assigned to the International Terrorism Operations Section. In answering this question, please explain why Mr. Youssef was assigned to a position in the Communications Analysis Section rather then [sic] the International Terrorism Operations Section, in accordance with the April 30, 2002 memorandum** entitled "Request for Directed Placement Supervisory Special Agent Bassem Youssef From the Counterintelligence Division to the Counterterrorism Division" (DOJ 003960). In answering this question, please set forth any performance issues which were relied upon by the decision makers in reaching this decision.

In addition, Interrogatory No. 5 stated:

> 5. **Explain in detail why Mr. Youssef has not been placed (either in an acting, temporary or permanent position) in the FBI Counterterrorism Division's . . . [ITOS] I or II Sections.** In answering this question, please set forth any performance issues which were relied upon by the decision makers in reaching this decision.

Plaintiff's First Set of Interrogatories and Request for Production of Documents, p. 7-8 (Mar. 9, 2005) (emphasis added) (Exh. 6 to Plaintiff's Motion for Enlargement of Number of Depositions and Memorandum of Law in Support Thereof, (May 10, 2005) [Docket No. 41]). These questions could not ask more clearly for information relevant to Plaintiff's ITOS placement according to the April 30, 2002.

---

Q Do you know ?[sic] did anyone ever discuss with you the reasons why Mr. Youssef was not placed into ITOS?
A You're telling me he was not placed in ITOS. I did not know he wasn't placed in ITOS, no.

Deposition of Director Mueller, Ex. 7, Tr. 70, ln 22; Tr. 71, ln 1-3.

Defendants' answer to these interrogatory questioned failed to articulate a legitimate non-discriminatory reason as to why Mr. Youssef was not transferred into ITOS.  FBI Response to Interrogatory Questions 2 and 5, Exh. 6 to Plaintiff's Motion to Enlarge Number of Depositions (May 10, 2005) [Docket No. 41].  Given the significance of that factual assertion (i.e. the fact that the FBI could not meet its burden of production under controlling case law), Mr. Youssef made every effort during the discovery phase of the proceeding to permit the FBI to amend or clarify its response.

First, Mr. Youssef attempted to depose additional witnesses about the ITOS decision. The Magistrate Judge partially granted this request, and permitted Mr. Youssef to take the deposition of Mr. Thomas Kinnally.  In granting leave for the Kinnally deposition, the Court noted that the FBI *admitted* that "Kinnally's explanation is the only one known to defendants for why plaintiff was transferred to [the Document Exploitation Unit] rather than ITOS." Memorandum Opinion, p. 5 (June 7, 2005) [Docket No. 53].

Mr. Kinnally was deposed and he testified, under oath, that he never saw the ITOS transfer memo and had no knowledge about that decision.  Plaintiff's Motion for Partial Summary Judgment, Ex. 29 [Docket No. 82].

Mr. Youssef also requested that the Magistrate Judge order the FBI to more completely answer Interrogatory Nos. 2 and 5.  Nearly one year ago, the Magistrate Judge denied this request, noting that the Defendant produced Mr. Kinnally for deposition and had answered the interrogatory requests with "as much information as was available to [the FBI] regarding the assignment."  Memorandum Opinion dated July 22, 2005, p. 19 [Docket No. 69].

The ITOS transfer decision was litigated *ad nauseam* during the pre-Summary Judgment proceedings.  The FBI was provided ample opportunity to fully and completely explain why Mr.

Youssef was not transferred into ITOS.  The FBI was also informed, at both the administrative and court-proceeding levels, that Mr. Youssef understood that the ITOS transfer decision was a major part of his case, and thus, the explanation for this decision provided by the FBI would be highly material to his claim.

Long after discovery closed in this matter, *after* the FBI had two opportunities to clarify its interrogatory responses and *after* Mr. Youssef relied upon, at considerable expense, the detailed discovery record created in this matter to seek partial summary judgment on one of the FBI's decisions not to properly utilize Mr. Youssef's background and experience, the FBI has sought to reopen discovery and amend its interrogatory responses (and provide new testimony from a witness) related to the ITOS transfer decision.

The law simply does not permit this type of discovery abuse.  Defendants' new response to Plaintiff's Interrogatory No. 2, along with all of the other testimonial materials which support that interrogatory response and summary judgment papers, must be stricken from the record.

B. **Defendants' Assertion that They Were Excused from Their Discovery Obligations because Mr. Youssef's "Employment History" was not "Relevant to the Discrimination and Retaliation Claims" is Completely without Merit**

Defendants have now fully conceded (as they must) that they did not fully respond to numerous discovery requests in which Mr. Youssef requested information on his background, expertise and performance.  Their justification for this discovery misconduct is as follows: "plaintiff's employment history is not relevant to the discrimination and retaliation claims articulated in the first amended complaint."  Def. Opp., p. 1.

As a matter of law, Mr. Youssef's counsel is not aware of any case ever decided in the history of employment discrimination law in which a "plaintiff's employment history" was not highly relevant.  Furthermore, Defendants do not even bother to attempt to distinguish between

their discovery obligations and a limited requirement only to produce what they feel is "relevant" information.  As the Magistrate Judge in this case has already held, discovery cannot be denied "because it relates to a claim or defense that is being challenged as insufficient." Memorandum and Order, pp. 7 and 19 (July 22, 2005) [Docket No. 69]. Instead, a party must produce information that is not only "relevant," but they must also produce information that could simply "lead to the discovery of admissible evidence."  *Id.*

First, the FBI knew at all times relevant to this case that the promotional records reviewed by the FBI in *all* promotion cases must include certain information stretching back to an agent's first day on the job – and can  include information going back years.  Take, for example, the SIOC position for which Mr. Youssef applied.  The standard Supervisory Vacancy Request form that all applicants *must* fill out includes a description of all "prior assignments," including "work specialty."   Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Ex. 99, p. 1.  It also includes a section in which agents set forth their "specialties and training."   This section has no date limitation, and a review of the documents produced under seal demonstrates that most applicants will include information from their earliest days within the FBI.  The second page of the application contains space for discretionary descriptions of work experience.[3]

For example, an applicant for the very SIOC position for which Mr. Youssef had applied extensively discussed matters related to his entire career with the FBI (1995-2001), and then provided information related to "pre-FBI experience" going back to 1983.  Plaintiff's Opposition

---

[3] A review of the documents produced under seal demonstrates that most agents describe expertise and experiences going back years and years.  For example, in Mr. Youssef's application for SIOC, he explicitly referenced his first job assignment as a "special agent in St Louis and Los Angeles" in which he "worked several high profiles Terrorism investigations." He also referenced cases and awards obtained/worked on in 1981, 1992, 1993, 1994, and 1996-2000. *Id.*, p. 2.

to Defendants' Motion for Summary Judgment, Ex. 95, p. 1 (under seal).  In fact, as the FBI pointed out in its summary judgment filings, the FBI career board actually rated this candidate higher than Mr. Youssef based in large part on his "extensive, prior law enforcement" record (i.e. his non-FBI work history from 1983-1995).  Defendants' Motion for Summary Judgment, Ex. 16, p. 4 (filed under seal).

It is simply not credible for the FBI to argue that pre-9/11 experience is not relevant, when the FBI itself made the information highly relevant in its own career boards.

Even if the FBI did not routinely rely upon older employment achievements in rating officials for promotion, the FBI knew that Mr. Youssef had made his background and expertise the centerpiece of *all* of his claims.  In other words, all of Mr. Youssef's claims were predicated on the fact that since 1988 he had obtained unique and significant expertise in Middle Eastern counterterrorism.  At every step in this proceeding – from his first contacts with the FBI EEO through his summary judgment filings, Mr. Youssef has relied upon his background and experience at the foundation of all his employment claims.   For example, the FBI EEO file produced by the Bureau in its initial disclosures was filled with documents relating to Plaintiff's employment history dating back to 1988.

In addition, Defendants produced Career Board tapes in discovery that demonstrate that Defendants' internal promotional body believed an employee's performance history to be relevant in determining whether that employee should be promoted. Members of the Career Board reviewed each candidate's background and experience in the FBI, and weighed the candidate's expertise and experience. In the words of the FBI managers who successfully presented the GS-15 agents to the Board for approval, the following characteristics made the applicant the number one candidate for selection:   "A broad base of experience;"

"Counterterrorism experience as an agent;" "Good IT [international terrorism] experience;" "Extensive international investigative experience;" "Extensive IT [international terrorism] experience."

Plaintiff Bassem Youssef's Opposition to Defendants' Motion for Summary Judgment, p. 8 (May 15, 2006) (citing authorities) [Docket No. 100].

The Deputy Director of the FBI (the FBI's number two official who regularly participated in the Career Board deliberations) added: "You need somebody who has been there, who has done that, you need somebody who's, you know, gone overseas and handled bombing matters and liaison." *Id.* at p. 13, lines 29-36.

Mr. Youssef also clearly alerted the defendants to the fact that his work experience would be material to any claim or defense in the case.  In his Amended Complaint, Mr. Youssef made extensive references to his background and experience as a basis for his claims:  *See,* First Amended Complaint ¶¶ 19-36, 49, 54.   Plaintiff also extensively deposed witnesses about Plaintiff's performance history, once again alerting Defendants to the fact that Plaintiff's performance history was central to Plaintiff's case. *See* Plaintiff's Motion for Partial Summary Judgment, Exh. 10, Depo. Louis J. Freeh; Exh. 12, Depo. Edward J. Curran; Exh. 20, Depo. Robert Thompson; Exh. 48, Depo. Dale Watson.

Finally, in response to the FBI's interrogatory question concerning Mr. Youssef's basis for believing that the FBI improperly blocked his work on operational counterterrorism assignments, Mr. Youssef provided an eight page interrogatory response setting forth in detail his experience in counterterrorism matters with the FBI since 1988. Plaintiff's Partial Motion for Summary Judgment, Exh. 11 [Docket No. 82].

The FBI's conduct in conducting Mr. Youssef's deposition demonstrates the false nature

of the FBI's position on this matter.   The FBI *extensively* questioned Mr. Youssef about his background and work history – from 1988 forward, during the deposition.[4]

There were numerous discovery requests seeking background information. For example, in Mr. Youssef's first discovery request he sought all performance documentation related to himself, including such documents related to his "awards," "accomplishments," "qualifications," his "complete personnel files," all documentation concerning any "performance problems" or "allegations of misconduct," all documents related to any "promotion, reassignment, demotion and/or transfer," all documents related to his post 9/11 job assignments, all of his performance reviews, his certifications, his work in Saudi Arabia, hid DCI award and his transfer from CI to CT.  Ex. 4, Plaintiff Youssef's Request for Production of Documents (June 23, 2004),  Document Request Nos. 1, 2, 3, 7, 11, 16, 38 and 40.

Therefore, Defendants should have known that Plaintiff would find his performance history to be relevant to his claims. Defendants wrongly assert that Plaintiff's employment history is only relevant to his claim that his placement in ITOS was rescinded in retaliation. The ITOS rescission argument is merely a subset of Plaintiff's larger claim of retaliation – that he was consistently denied promotions, transfers, and assignments that he deserved

What is even more troubling about the documents the FBI is attempting to place on-the-record in this case is the selected nature of the materials.  On their face these documents are incomplete and clearly do not constitute all of the materials related to Mr. Youssef.  Instead of making a proper production of all of the new materials, Defendants have simply rifled through

---

[4]  *See* Ex. 8  (Youssef deposition), Tr. 10-14 (performance reviews, certificates, letters of recommendation); Tr. 41 – 53 (positions within FBI, Plaintiff's employment history: positions and promotions, duties, positions applied for); Tr. 58 – 59 (asking about employment history and positions applied for); Tr. 70–86, 97 – 107, 118-120, 124-127 (assignments throughout career, including St. Louis and Los Angeles).

decades of files concerning Plaintiff's employment history and produced only those documents that they think are favorable to their case, a violation of Fed. R. Civ. P. 26(b). *See Varga*, 242 F.3d at 697.

Defendants have failed to adequately explain how they could have thought that an employee's performance and employment history could be irrelevant to a claim that he was denied a promotion or assignment that he deserved. Performance history is simply always relevant in cases under Title VII.

**II.    DEFENDANTS FAILED TO ADDRESS THEIR VIOLATION OF FED. R. CIV. P. 16(B), WHICH REQUIRED OBTAINING LEAVE OF JUDGE PRIOR TO FILING DOCUMENTS IN CONTRAVENTION OF THE SCHEDULING ORDER; THEREFORE, THEIR CROSS-MOTION FOR SUMMARY JUDGMENT MUST BE STRICKEN FROM THE RECORD**

Defendants have failed to excuse their violations of this Court's scheduling orders establishing deadlines for filing dispositive motions.  Defendants have given no adequate explanation in their Opposition to Plaintiff's Motion to Strike Pursuant to Rules 16 and 37 for why they failed initially to state good cause to file their cross-motion, nor for why they failed to seek leave to modify the briefing schedule prior to filing their cross motion for summary judgment three months after the deadline. Rule 16(b) states that "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." Defendants did not file a motion for leave, as required by Rule 16(b), nor have they sought relief under Rule 16 to modify the briefing schedule to permit a second summary judgment motion. Defendants' second summary judgment motion filed on June 14, 2006, should be stricken from the record on that ground alone.

Defendants claim to have good cause because they believe that Plaintiff's allegations related to the failure to implement the ITOS placement constitute a new, independent retaliation

claim. However, as outlined above, Defendants' argument has no merit. Plaintiff clearly put the FBI on notice that (1) all three counts in the amended complaint contained retaliation components, regardless of the title for which Mr. Youssef gave those counts; (2) that the ITOS transfer decision was a major part of his case. In this regard, as explained above [in section I(A)], despite the fact that the FBI did not ask Mr. Youssef an interrogatory question related to his retaliation claims, Mr. Youssef clearly identified ITOS as a basis for his complaint in his responses to three other interrogatory questions.

Moreover, Defendants' late-filed motion is clearly an attempt to escape the deficiencies set forth in their March 13, 2006 motion for summary judgment.

On May 15, 2006, Mr. Youssef filed his Opposition to Defendants' Motion for Summary Judgment. In that opposition, Mr. Youssef set forth an entire argument concerning a major deficiency in the defendants' motion. This deficiency was identified in Part III of the opposition, entitled: "**Summary Judgment Should be Denied Because the Heart of This Case – That the Failure of the FBI to Properly Assign Mr. Youssef Work in Operational Counterterrorism After 9/11 Constitutes Adverse Action – Was not Addressed in the FBI's Motion for Summary Judgment.**"

From the commencement of Mr. Youssef's initial filing with the FBI EEO office in February 2002, throughout the entire EEO and pre-summary judgment phases of this case, Mr. Youssef has consistently and repeatedly asserted that his post-9/11 assignments constituted discrimination and (after June 2002) retaliation.[5]

---

[5] This case is similar to one of an internationally respected oncologist being forced to work in a hospital as a support-staff nurse. The pay grades and benefits are secondary to the quality of work assignments. It was the discrimination in the assignments that caused Mr. Youssef to engage in protected Title VII activities. In his own words: "Following the terrorist attacks of September 11, 2001, the priorities of the U.S. government were realigned to make

The FBI cannot untimely file a motion for summary judgment on matters directly related to the core of Mr. Youssef's discrimination/retaliation complaints – especially after Mr. Youssef raised in his opposition to defendants' initial motion for summary judgment that said motion failed to address core issues related to Mr. Youssef case.

## III. DEFENDANTS VIOLATED FED. R. CIV. P. 37(C) BY FAILING TO DISCLOSE EVIDENCE THAT THEY HAD A DUTY TO DISCLOSE UNDER FED. R. CIV. P. 26(A) AND (E).

Pursuant to Fed. R. Civ. P. 37(c)(1), "a party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."

Defendants had a duty pursuant to Rule 26(a)(1), (3) and (e) to provide to Plaintiff, in a timely manner, all of the previously undisclosed evidence that Defendants submitted as exhibits with their Cross Motion for Summary Judgment. See Defendant's Cross Motion for Summary Judgment on Plaintiff's New Retaliation Claim (June 14, 2006).[6] Defendants have put forth no valid arguments demonstrating a "substantial justification" for their untimely disclosure. Neither have Defendants demonstrated that this failure was "harmless." Therefore, "the sanction of exclusion is '*automatic and mandatory*.'" *Foster v. United States*, 130 F.Supp.2d 68, 70 n.1 (D.D.C. 2001) (emphasis added) (quoting *NutraSweet Co. v. XL Engineering Co.*, 227 F.3d 776,

---

Counterterrorism the most important task of the FBI.  Given my Arabic language skills, understanding of Middle Eastern culture, and extensive experience and expertise in the Counterterrorism field, it would have been reasonable to expect that I would play a role in the Bureau's post 9/11 Counterterrorism efforts.  . . . . Despite my four years as the Legal Attaché, responsible for seven countries of the Persian Gulf region, an additional four years as the coordinator of the Bureau's Islamic Group investigation during the first World Trade Center bombing, my fluency in the Arabic language and experience in [withheld by FBI as classified] terrorism, I have been excluded from my primary field of expertise . . . . ."  Plaintiff's Motion for Partial Summary Judgment, Ex. 42, p. 8 (EEO complaint dated July 5, 2002).

[6] See Pl. Mtn. to Strike at 9-10 for full description of this evidence.

785-86 (7th Cir. 2000)).  *See also David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995).

### A. Defendants Cannot Withhold Evidence Solely for the Purpose of Impeachment

Defendants assert that they "may present undislosed [sic] evidence and witnesses for rebuttal or impeachment purposes." Def. Opp. Strike at 10-11. Defendants state that "[a]ll of the documents produced as exhibits in response to plaintiff's statement of facts were produced solely to refute plaintiff's factual allegations. *See* Second Declaration of Christine Gallenstein and attached exhibits (Exhibit 2 to Defs.' SJ Opp. Memo)." *Id.* at 4. Defendants do not explain why only "most of the declarations (9 of 15) were submitted as evidence under Rule 56 to dispute plaintiff's statements of fact," and do not attempt to excuse their production of entirely new evidence. *Id.*

A party is not excused from producing documents in discovery on the basis that the documents may be used as part of a rebuttal case. *Varga v. Rockwell Int'l Corp.*, 242 F.3d 693, 697 (6th Cir. 2001), *cert. denied* 534 U.S. 821 (2001). All documents that are covered under a discovery request must be produced – regardless of how (if at all) the producing party intends to use the document.  *Id.*  Failing to produce documents which are otherwise covered under a document request is not excusable under any set of circumstances.

Defendants have failed to excuse their failure to comply fully with discovery requests or provide an explanation as to why they did not.  *See Id.* ("the recipient of a properly propounded document request must produce all responsive, non-privileged documents without regard to the recipient's view of how that information might be used at trial. A party may not, under any circumstances, hold back materials responsive to a proper discovery request because it prefers to use the evidence as surprise impeachment evidence at trial"); *see also* 8 Charles A. Wright,

Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2015, Supp. at 49 (2d ed. 1997 & Supp. 2005) (explaining that "[t]he fact that the party responding to discovery intends to use the material only for impeachment does not take it out of the realm of discoverable material if it is otherwise relevant"). In other words, the recipient of a properly propounded discovery request must produce all responsive, non-privileged evidence. *See Id.*

Plaintiff's initial complaint alleged that Defendant failed to properly utilize Plaintiff's skills after the 9/11 attacks. *See* Complaint, ¶ 13 (July 18, 2003) [Docket No. 1]. In his retaliation complaint and throughout the course of discovery, Plaintiff made it abundantly clear that, in light of his assertions about his skills, employee performance issues would play a substantive role in the retaliation claim.[7] Plaintiff made numerous attempts to obtain records related to FBI work performance.  Now, long after the close of discovery, Defendants incorrectly maintain that they are entitled to introduce evidence calculated to rebut Plaintiff's retaliation claim.

Because Plaintiff's ITOS placement argument is not a new claim, and because Defendants knew that performance history was central to Plaintiff's all of Mr. Youssef discrimination claims – both  retaliation and national origin -- Defendants cannot excuse their failure to disclose this evidence during discovery under the shield of the impeachment rule. On the contrary, Defendants' have now admitted that they purposefully withheld discoverable evidence by failing to conduct a full and complete search of information requested in discovery by Mr. Youssef – information which was always highly relevant to this case.

In addition, Defendants' assertion that they are providing this newly submitted evidence solely to rebut Plaintiff's summary judgment motion is disingenuous, as Defendants have submitted a cross-motion for summary judgment.

---

[7] In addition, the EEO investigation made it quite clear that SSA Youssef's performance history was relevant to his retaliation claim.

**B. Under Fed. R. Civ. P. 26(a) and (e), Defendants Had a Duty to Disclose, During Discovery, *All* of the Previously Undisclosed Evidence that They Included in Their Cross Motion for Summary Judgment and Opposition to the Plaintiff's Claim for Partial Summary Judgment.**

Defendants' failure to place Plaintiff in ITOS in accordance with the April 30, 2002 memo was the subject of extensive pre-Summary Judgment motion discovery.  As set forth above, the FBI had the both the duty and the opportunity to fully produce its complete explanation as to why the ITOS directed placement was not implemented.  Defendants had a duty to disclose *all* of their evidence during discovery. *See* Fed. R. Civ. P. 26(a)(1). This Rule states in relevant part:

> "except in categories of proceedings specified in Rule 26(a)(1)(E), or to the extent otherwise stipulated or directed by order, a party *must*, without awaiting a discovery request, provide to other parties:
>
> (A)    the name and, if known, the address and telephone number *of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses*…;
>
> (B)    a copy of, or a description by category and location of, *all documents*, data compilations, and tangible things that are in the possession, custody, or control of the party and *that the disclosing party may use to support its claims or defenses*…;"

As discussed above, all of the previously undisclosed evidence was clearly responsive to and required by the mandatory disclosure and Plaintiff's discovery requests.  The factual issues were all well within the scope of Mr. Youssef's case – especially in light of his interrogatory responses and the findings of the Magistrate Judge regarding the ITOS discovery issues.  As such, Defendants knew or should have known that some or all of these materials were "evidence that [they] may present at trial" to defend against Plaintiff's claims. Defendants cannot now excuse their violation of discovery rules by claiming that they had not intended to defend their case with this information, as Plaintiff's claim was clear and Plaintiff has no obligation to feed Defendants

a workable defense. *See* Def. Opp. Strike at 3. Thus, Defendants had an unmistakable duty to provide these materials to Plaintiff before the end of discovery.

Likewise, Defendants' cannot be allowed to add new witnesses at this point in time. Defendants filed an initial witness list in 2004 and filed an amended list on April 5, 2005. *See* Defendants' Supplement to Rule 26(a)(1) Disclosures and Disclosure of Expert Testimony under Rule 26(a)(1).  Defendants could have, and should  have, added the new witnesses to their list at that time.   For instance, Defendants have submitted statements from Doran and Ward. The potential information Doran had was well-known to Defendants, but Defendants declined to list Doran as a witness both in their initial witness disclosures in April 2004, and in their supplemental witness disclosures on April 5, 2005. Plaintiff's decision not to depose Doran was based solely on the fact that Defendants had not listed her as a witness; Plaintiff chose not to use one of his twenty depositions on someone Defendants were not intending to call as a witness.

Defendants' excuse their addition of Ward's deposition by explaining that he took Pikus' position as Section Chief, who Plaintiff deposed. However, the fact that Ward took Pikus' position is immaterial, as Pikus was not on Defendants' witness list either. In addition, at the time Pikus was deposed, Pikus no longer held the position of Section Chief. However, Pikus' testimony was very favorable to Mr. Youssef, and apparently the FBI decided, late in the game, to try to swap a witness that was not even named on their own witness list.

Finally, even if Defendants did not understand that they had a duty to disclose all evidence relating to their failure to assign Plaintiff to ITOS when they made their initial Rule 26(a)(1) disclosures, or in their initial responses to Plaintiff's discovery requests, Defendants still had a duty to amend all of these disclosures in a timely fashion.  Rule 26(e) provides that if original disclosures are "in some material respect incomplete or incorrect," parties have "*a duty*

*to supplement or correct the disclosure or response to include information thereafter acquired*."

*See also Coles v. Perry*, 217 F.R.D. 1, 5 (D.D.C. 2003) (emphasis added).  Defendants had a

duty to supplement their responses in a timely fashion. Defendants deliberately passed up an

opportunity to comply with their discovery duties in response to Plaintiff's motion to compel and

motion for enlargement of depositions. Defendants cannot now seek to introduce on their own

behalf some of the very evidence that they refused to disclose to Plaintiff during discovery, and

in response to Plaintiff's discovery requests. It is simply too late for Defendants to re-open

discovery and supplement their prior deficient discovery responses. Plaintiff relied on

Defendants' incomplete disclosures when moving for summary judgment. As a result, the Court

must strike all of Defendants' newly submitted evidence from the record, as well as every

document that relies on it for material support.

### C. Defendants had no "substantial justification" for failing to provide the plaintiff with the previously undisclosed evidence before the close of discovery, nor have they shown that this failure was "harmless."

Substantial justification is defined as "justification to a degree that could satisfy a

reasonable person that parties could differ as to whether the party was required to comply with

the disclosure request.  The test of substantial justification is satisfied if there exists a genuine

dispute concerning compliance." *Tolerico v. Home Depot*, 205 F.R.D. 169, 175 (M.D. Pa. 2002);

*see also Peterson v. Hantman*, 227 F.R.D. 13, 16 (D.D.C. 2005).  Failure to comply with a duty

to disclose is considered harmful if a reasonable attorney would have conducted additional

discovery or attempted to counter the evidence produced in violation of Rule 26.  *See Coles*, 217

F.R.D. at 6.  In other words, Defendants must show that they reasonably believed that they were

not required to disclose the contested evidence during discovery, or that this failure did not

prejudice the plaintiff.  The arguments put forth by Defendants in their opposition to the

plaintiff's motion to strike fail to demonstrate any such reasonable belief or harmless effect.

Defendants make no arguments that their failure to provide the plaintiff with the previously undisclosed evidence was harmless, stating only that, while this evidence "was available during discovery" it was "not pursued by plaintiff" who did not "ask the right questions or seek to compel the production of documents" and thus "any prejudice plaintiff has suffered results from his own tactical decisions rather than from defendants' actions." *See* Def. Opp. at 1-2. As already explained, Plaintiff "asked the right questions" and yet Defendants withheld the information from Plaintiff.

Defendants' disclosure of this new evidence begs the question as to what other evidence they have failed to disclose. Any reasonable attorney, having discovered that Defendants had withheld the highly relevant evidence at issue would immediately make further inquiries and seek further court orders to acquire this additional information. Plaintiff has invested many hundreds of hours and incurred substantial expense in the preparation of his case during the months of litigation since the close of discovery, all of which was based on Defendants' incomplete and admittedly deficient disclosures. To allow Defendants to introduce this unjustifiably withheld and highly relevant evidence at this stage of the litigation would be grossly unfair, it could necessite the reopening of costly and time consuming discovery and it could result in Plaintiff opposing Defendants' summary judgment motions on the grounds of FRCP 56(f).

For this reason and those set forth in his motion to strike, the plaintiff was greatly prejudiced by Defendants' actions and the Court must strike all of the previously undisclosed

evidence from the record.  *See* Pl. Mtn. to Strike at 9-10, 15-16.[8]

### D. **The Appropriate Remedy for Defendants' Discovery Failures is Exclusion**

Defendants' discovery violations are as egregious as other cases in which previously undisclosed evidence was precluded, despite Defendants' assertions to the contrary.  *See* Def. Opp. Strike at 17, n.4.  Defendants further argue that "the preclusion of testimony is a severe sanction, especially where the Court has not set a trial date and where there is no evidence of bad faith or egregious behavior to warrant such a severe sanction." *See Robinson v. District of Columbia*, 1998 WL 429837 (D.D.C. 1998); Def. Opp. Strike at 17, n.4.  Whether or not a trial date has been set is irrelevant in light of the substantial evidence of bad faith.  The Court in *Robinson* did not preclude the late-filed testimony because it was filed only three weeks late. See *Id.* at 9, 13.  Prior to the close of discovery, there was no evidence of bad faith, and the plaintiff was not prejudiced by the late filing.  Defendants also cite *David v. Caterpillar, Inc.,* 324 F.3d 851 (7th Cir. 2003), for support.  In *Caterpillar*, the court allowed Plaintiff to submit testimony late in the discovery process when the plaintiff had notified the defendant that the witness might testify, and Defendant had failed to interview or take any other measures for over a year to discover the nature of his testimony. *Id.* at 857.

In the current case, Defendants are introducing new evidence, which Plaintiff had specifically and repeatedly requested, eight months after the close of discovery. Defendants have

---

[8] In addition, Rule 56(c) and Local Rule 56.1, cited by Defendants, do not allow the introduction of new evidence not provided to Plaintiff during discovery. These Rules merely allow Defendants to contest Plaintiff's motion for partial summary judgment by setting forth a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." Despite Plaintiff's numerous requests, which made it clear that Plaintiff's performance history was a central part of his case, Defendants failed to submit vital evidence to Plaintiff during discovery. Defendants incorrectly use Rules 56(c) and Local Rule 56.1 in their Opposition to Plaintiff's Motion to Strike.

done this in order to undermine the plaintiff's motion for partial summary judgment based on Defendants' previous incomplete disclosures.  As such, Defendants' violations are much more egregious than the ones in *Robinson* or *Caterpillar* and just as egregious as the discovery violations that merited mandatory exclusion preclusion described in *Foster*, 30 F. Supp. 2d at 70 n.1, *Nguyen*, 162 F.R.D. at 680, and *Grajales-Romero v. American Airlines*, 194 F.3d 288, 297 (1st Cir. 1999).

As described above, Defendants' discovery violations were neither substantially justified nor harmless and so must be excluded.  The nature of these violations is on par with other cases in which previously undisclosed evidence was excluded and as such Defendants have no basis on which to argue that their own previously undisclosed evidence should be permitted.  The Court must strike all of the previously undisclosed evidence from the record, as well as every document that relies on it for material support, including but not limited to the defendants' entire cross motion for summary judgment and opposition to the plaintiff's motion for partial summary judgment.

## CONCLUSION

For the above stated reasons, Plaintiff's Motion to Strike should be granted.

Respectfully submitted,

/s/Stephen M. Kohn
Stephen M. Kohn, # 411513

/s/David K. Colapinto
David K. Colapinto, # 416390
KOHN, KOHN & COLAPINTO, LLP.
3233 P Street, N.W.
Washington, D.C. 20007-2756
(202) 342-6980
(202) 342-6984 (fax)
July 19, 2006                                    Attorneys for Plaintiff