# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BASSEM YOUSSEF, | |
| Plaintiff, | |
| v. | Civil Action No. 03-1551 (CKK) |
| FEDERAL BUREAU OF INVESTIGATION, *et al.* | |
| Defendants. | |

## MEMORANDUM OPINION
(March 30, 2008)

Plaintiff Bassem Youssef ("Youssef") brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, against the Federal Bureau of Investigation, the United States Department of Justice, the United States Attorney General in his official capacity, and the Director of the Federal Bureau of Investigation in his official capacity (individually and collectively "the FBI"). Youssef is an Egyptian-born American citizen who has been employed by the FBI since 1988. He claims that the FBI discriminated against him following the September 11, 2001 terrorist attacks by excluding him from positions associated with counterterrorism and by retaliating against him after he filed an Equal Employment Opportunity ("EEO") complaint. Currently pending before the Court are Defendant's [85] Motion for Summary Judgment, Plaintiff's [82] Motion for Partial Summary Judgment, Defendant's [109] Second Motion for Summary Judgment, and Plaintiff's [114] Motion to Strike Defendant's Second Motion for Summary Judgment and related exhibits. Although Youssef is clearly disappointed that the FBI has not used his Arabic-speaking abilities and background differently

in his assignments following the September 11, 2001 terrorist attacks, the Court finds that

Youssef has failed to demonstrate that a genuine issue of material fact exists concerning his

claims of discrimination.  The Court finds that Youssef has, however, demonstrated the existence

of genuine issues of material fact as to whether the FBI retaliated against him in response to his

statutorily-protected activities.  Accordingly, after a searching review of the Parties' submissions,

including the voluminous exhibits attached thereto, applicable case law and statutory authority,

the Court shall grant in part and deny in part Defendant's [85] Motion for Summary Judgment,

deny Plaintiff's [82] Motion for Partial Summary Judgment, grant Defendant's [109] Second

Motion for Summary Judgment, and deny Plaintiff's [114] Motion to Strike, for the reasons that

follow.

## I.  BACKGROUND

Because this case has a complex factual and procedural background, the Court divides

this section into five parts: Part A describes Youssef's FBI employment background from 1988

to 2001; Part B describes Youssef's FBI employment after the September 11, 2001 terrorist

attacks (hereinafter "9/11 attacks") through July 18, 2003, the date the Complaint was filed in the

present action; Part C describes the two acts of alleged discrimination at issue; Part D describes

the two acts of alleged retaliation at issue; and Part E describes the procedural posture of this

case, including an explanation as to why the FBI took the somewhat unusual step of filing a

Second Motion for Summary Judgment.

A.      *Youssef's Employment Background, 1988-2001*

Youssef began working as a GS-10 level Special Agent for the FBI in 1988.[1]  Defs.' Stmt.

¶ 2.  Following new agent training, the FBI assigned Youssef to its St. Louis office, although he

also traveled to other locations (including Pakistan) on short-term assignments.  Pl.'s Stmt. ¶¶ 7-

11.  Youssef contends that he participated in terrorism investigations, including advising and

assisting with counterterrorism cases, searches, seizures, arrests, and "extract[ing] confessions"

during this period.  Pl.'s Stmt. ¶¶ 5, 7-12.  The FBI maintains that Youssef's counterterrorism

assistance was limited to that of a "translator."  Defs.' Resp. Stmt. ¶ 6-12.  The Parties do not

dispute that Youssef received various assignments utilizing his Arabic speaking capabilities

during this period.[2]  *See, e.g.*, Pl.'s Stmt. ¶ 17; Defs.' Resp. Stmt. ¶ 17.

---

[1] As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil Rule 56.1 when resolving motions for summary judgment.  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 56.1 before applying it to the case).  Although discretionary in the text of the Local Civil Rule 56.1, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.  The Court issued an Order on June 22, 2004, explaining that the parties were expected to comply fully with Local Civil Rule 56.1, and stating that the Court would "assume facts identified by the moving party in its statement of material facts [were] admitted" unless controverted by the non-moving party.  *See* [13] Order at 4-5 (June 22, 2004).  Thus, in most instances the Court shall cite only to Plaintiffs' Statement of Material Facts ("Pls.' Stmt.") or Defendant's Statement of Material Facts ("Defs.' Stmt.") unless a statement is contradicted by the opposing party.  Where a party objects to relevant aspects of an opposing party's proffered material fact, the Court shall cite to Plaintiff's Response to Defs.' Stmt. ("Pl.'s Resp. Stmt.") or Defendant's Response to Pl.'s Stmt. ("Defs.' Resp. Stmt."), as necessary.  The Court shall also cite directly to evidence in the record, where appropriate, to provide additional information not covered in either of the parties' Statements.

[2] For reasons explained in greater detail below, the Parties' recurring dispute concerning how to properly characterize Youssef's employment background and responsibilities do not raise genuine issues of material fact precluding entry of summary judgment on Youssef's discrimination claims.  *See* Section III.A.3 & n. 27, *infra*.

The FBI transferred Youssef from its St. Louis office to Los Angeles in 1992 to "fill the need for an Arabic speaking agent."  Pl.'s Stmt. ¶ 21.  Youssef was assigned to the International Terrorism Squad, part of the Los Angeles Task Force on Terrorism.  *Id.* ¶ 24.  In that capacity, Youssef coordinated one or more FBI "Islamic Group cases," which were part of a counterterrorism program that investigated certain crimes and collected criminal intelligence.  *Id.* ¶ 25; Defs.' Resp. Stmt. ¶ 25.  Youssef was also a case agent on one or more counterterrorism investigations.[3]  Pl.'s Stmt. ¶ 26.  In October 1994, the Polygraph Unit at FBIHQ selected Youssef to become a Bureau-certified Polygraph examiner.  *Id.* ¶ 36-37.  Youssef believes that he is the FBI's first and only polygraph examiner trained to conduct exams and debriefings in Arabic at a native fluency level, *id.* ¶ 38, although the FBI explains that Youssef's examinations have involved mostly job applicants, and only one examination occurred in the context of a criminal investigation.  Defs.' Resp. Stmt. ¶ 38.  Youssef also operated with a false name and credentials while assigned to the Los Angeles office, which Mr. Edward Curran, Youssef's supervisor, felt was necessary based on "the type of work [Youssef] was doing."  Pl.'s Stmt. ¶¶ 39, 41.  Mr. Curran also testified that Youssef was an important part of the Los Angeles counterterrorism program.  *Id.* ¶¶ 43-45.

Youssef asserts that, during this period, he undertook activities such as taking custody of, and debriefing, an FBI fugitive, *id.* ¶ 48, providing input on Foreign Intelligence Surveillance Act ("FISA") applications and analytical materials, serving on a temporary assignment in Egypt, and managing a bombing investigation.  *Id.* ¶¶ 62-69.  The FBI acknowledges some of this activity,

---

[3] Youssef also claims that he was selected to lead a covert team of FBI agents to conduct a counterintelligence operation in a Middle Eastern country, but failed to provide specific details of the same.  Pl.'s Stmt. ¶ 33; Defs.' Resp. Stmt. ¶ 33.

such as his participation in the submission of FISA applications, Defs.' Resp. Stmt. ¶ 62, and traveling on an assignment to Egypt, *id.* ¶ 64, but denies that Youssef played a role beyond that of a translator, *id.* ¶ 48, or that he led any investigations, *id.* ¶¶ 66, 69. Nevertheless, Youssef received high praise from his supervisor during this period, and he received an award from the Director of Central Intelligence for the quality of his work. Pl.'s Stmt. ¶ 50, 57; Defs.' Resp. Stmt. ¶ 50.

In 1996, Youssef applied for and was promoted to the position of Legal Attache ("Legat") in Riyadh, Saudi Arabia.[4] Pl.'s Stmt. ¶ 71. Youssef's fluency in Arabic and interpersonal skills appear to have played a significant role in his selection as Legat based on comments considered by the Career Board. *Id.* ¶¶ 73-76. When Youssef arrived in Riyadh to begin his work as Legat, relations between the FBI and the Mabahith (the FBI's counterpart in Saudi Arabia) were strained. *Id.* ¶ 84. Youssef helped to improve relations between the two organizations. *Id.* ¶ 88; Pl.'s Mot. for Summ. J., Ex. 10, Tr. 57:19-22 (Deposition of CIA Director Louis Freeh) ("I think [Youssef] was the essential player. I think his – his very good work there, the high regard that the Saudis had for him advanced that."). According to the FBI Inspection Division Report, Youssef established and maintained effective liaison with law enforcement entities for the purpose of supporting its investigative missions. Pl.'s Stmt. ¶ 90. When Youssef received a copy of his performance evaluation on May 3, 2000, his first and second line supervisors assessed his performance as "exceptional." *Id.* ¶ 94. Among other words of praise, Ambassador Wyche Fowler remarked that Youssef was "just the right man" for the Legat position. *Id.* ¶ 95.

---

[4] A Legat is the FBI's liaison with a foreign country's FBI counterpart and a contact for United States Agencies overseas. *See* Pl.'s Stmt. ¶¶ 81, 82; Defs.' Mot. for Summ. J. at 5.

There is no question that Youssef achieved various successes in his capacity as the Riyadh Legat.  For example, Youssef and the Legat staff established working relationships with representatives from thirty-two different law enforcement entities and American Embassies throughout the Gulf Region.  *Id.* ¶ 100.  The Director of Liaison for the Mabahith visited the United States Embassy for the first time on Youssef's invitation.  *Id.* ¶¶ 101, 104.  The FBI agrees that Youssef's "efforts helped the FBI accomplish its mission in Saudi Arabia."  Defs.' Resp. Stmt. ¶ 112.  Nevertheless, the Parties continue to disagree as to the extent to which Youssef's activities during this period can be said to relate to counterterrorism experience as opposed to experiences associated with performing as a translator.  *Compare* Pl.'s Stmt. ¶ 119 ("At the time of [the 9/11 attacks] and thereafter, Mr. Youssef possessed far superior skills and knowledge in dealing with Middle Eastern Counterterrorism than any other FBI Agent") *with* Defs.' Resp. Stmt. ¶ 119 ([Youssef's] counterterrorism experience is very limited, and mostly involves performing as a translator").  The FBI also points out that a subsequent inspection of the Legat office found certain organizational and administrative deficiencies at the Legat office that were partially attributable to Youssef.  *See* Defs.' Mot. for Summ. J. at 9 & Ex. 30 at 18-24 (Riyadh Legat Inspection Report).

In July 2000, Youssef left his position as Legat in Saudi Arabia and returned to the United States to work as the Chief of the Executive Secretariat Office ("ESO") at the National Counterintelligence Center ("NACIC") of the Central Intelligence Agency ("CIA").[5]  Pl.'s Stmt. ¶¶ 128-29; Defs.' Stmt. ¶ 13.  Although the FBI formally reassigned Youssef from the Legat

---

[5] The NACIC was an organization formed by a Presidential Decision Directive that coordinated the counterintelligence activities of the United States Government.  Pl.'s Stmt. ¶ 132.

Office to the Counterintelligence Division of the FBI ("CID"), the NACIC position was a detail to another agency, and consequently, Youssef was not stationed at the FBI's Headquarters ("FBIHQ").  Defs.' Stmt. ¶ 14.  Youssef's responsibilities in his NACIC position included coordinating liaison activities with representatives from various agencies in the United States Government associated with counterintelligence issues, and acting as the Executive Secretary for a number of multi-agency groups that developed policy and other initiatives in support of the counterintelligence community at large.  Pl.'s Stmt. ¶ 138.  Robert Thompson, Youssef's supervisor during this period, considered Youssef's performance in this role "excellent."  *Id.* ¶ 141.

Youssef's detail to the NACIC was expected to last two years, but in February 2001, the President issued a Presidential Decision Directive that dismantled the NACIC and created a new organization in its place called the National Counterintelligence Executive ("NCIX").  Defs.' Stmt. ¶ 15.  Youssef's position was abolished during this reorganization.  Pl.'s Stmt. ¶ 144; Defs.' Stmt. ¶ 17.  Employees (including Youssef) whose details to the NACIC had not yet expired were assigned to other positions within the organization.  Defs.' Stmt. ¶ 16.  Youssef was reassigned to a position in the NCIX where he was responsible for assessing damage to the nation's counterintelligence interests as a result of the disclosure of national security information.[6]  *Id.* ¶ 18.  Youssef was permitted to remain in this position until his term expired or until he found a new position in the FBI.  *Id.*

After Youssef received his reassignment within the NCIX, he applied for two Unit Chief

_____

[6] Youssef objects to this fact proffered by the FBI because it relies on the statement of an affiant who Youssef was unable to depose.  Nevertheless, Youssef does not deny that he was reassigned to this position.  *See* Pl.'s Resp. Stmt. at 26.

positions at FBIHQ.  Defs.' Stmt. ¶ 19.  Youssef applied for, but did not receive, the position of

Chief of the Undercover Safeguards Unit, Operational Support Section, Criminal Division.[7]  *Id.*

Youssef also applied for Unit Chief of the Strategic Information and Operations Center

("SIOC"), Intelligence Operations Support Center, Investigative Services Division.  *Id.* ¶ 20.  The

FBI did not select Youssef for this position either, and as described in greater detail below,

Youssef argues that the FBI's denial of his application for the SIOC position was discriminatory.

  B.  *Youssef's Employment, Post- 9/11 Attacks*

  Youssef was employed at the NCIX (with his application for the SIOC position pending)

when the 9/11 attacks occurred.  The attacks galvanized the FBI to divert a significant number of

resources and personnel to counterterrorism.  Pl.'s Stmt. ¶ 147.  Youssef believes that the FBI

should have immediately moved him into a critical role related to the 9/11 attacks, including one

that would allow him to use his Arabic-speaking skills.  Pl.'s Stmt. ¶¶ 146, 148.  In seeking out

such a position for himself, Youssef called or left messages for several FBI managers to offer

assistance following the attacks.  *See* Defs.' Mot. for Summ. J., Ex. 8, Tr. 121:17 - 124:19

(Deposition of Bassem Youssef).  It is undisputed that Youssef did not apply for any of the

available positions at FBIHQ that were posted in its computer database.  *Id.*, Tr. 244:4 - 245:22.

  Youssef believes that one reason he had difficulty obtaining his desired placement is that

there were derogatory rumors circulating about Youssef within the FBI at this time.  Pl.'s Stmt.

¶¶ 157, 161.  The rumors were that Youssef was a Muslim who wore traditional Arabic head-

gear while assigned in Saudi Arabia, and that he had refused to participate in an investigation

---

  [7] The FBI's denial of Youssef's application for this position is not at issue in the present
action.

based on his ethnic background.  *Id.* ¶¶ 155, 157, 160.  In fact, Youssef is a Coptic Christian, not

a Muslim, and the stories concerning the head-gear and investigation were apparently associated

with a different FBI agent with a similar-sounding name.  *Id.* ¶¶ 156, 161, 162.  The FBI disputes

Youssef's description of these rumors based on a lack of evidence adduced by Youssef that the

rumors ever existed, and also based on the testimony of various FBI officials who deny ever

having heard any rumors or gossip concerning Youssef.  Defs.' Resp. ¶¶ 155, 161.  Youssef

alleges these rumors existed based on the statements of two FBI agents.  *See* Pl.'s Opp'n to

Defs.' Mot. for Summ. J., Ex. 84 ¶21 (Affidavit of Paul Vick) (explaining that he heard a rumor

from Jim Olsen, a former FBI employee); *id.*, Ex. 22 at 5 (EEO Investigation) (EEO investigator

explaining that William Chornyak said he heard a rumor from a third-party).  Notwithstanding

the fact that the latter statement is clearly hearsay, the former does not support the idea that such

rumors, if they existed, were known to those who Youssef believes discriminated or retaliated

against him.  Moreover, Youssef fails to connect these rumors to any adverse employment action,

and fails to present evidence showing that they could, standing alone, constitute an adverse

action.  *See* Section III.A (page 46), III.E, (pages 68-69), *infra*.

    In early 2002, Youssef spoke to William Chornyak, Deputy Assistant Director in the

Counterintelligence Division ("CID") at FBIHQ, concerning placement opportunities.  Pl.'s Stmt.

¶¶ 153, 154.  He explained to Mr. Chornyak that he wanted to terminate his detail at NCIX and

return to FBIHQ.  *See* Pl.'s Mot. for Partial Summ. J., Ex. 22, Tr. 22:13-15 (Deposition of

William Chornyak).  Mr. Chornyak, in turn, sought the assistance of his supervisor, Ellen

Knowlton.  *Id.*, Ex. 18, Tr. 33:3-7 (Deposition of Ellen Knowlton) ("[Mr. Chornyak] explained to

me that [Youssef] was looking to come back to headquarters, and [Mr. Chornyak] spoke very

highly of him and was inquiring as to whether we had any openings that he might be interested

in"). In February 2002, Mr. Chornyak and Ms. Knowlton informed Youssef that he would be

transferred into the CID's Budget Unit. Pl.'s Stmt. ¶ 164. Ms. Knowlton testified in her

deposition that the budget position "was open, and based on my confidence in Mr. Chornyak . . .

I thought that based on [Youssef's] experiences at NCIX with policy and writing, that . . . he

might be a good fit for a key position in our division, the budget officer."[8] Pl.'s Mot. for Partial

Summ. J., Ex. 18 Tr. 33:10-15 (Deposition of Ellen Knowlton). The work Youssef would have

performed in the Budget Unit would have been below his GS-15 level.[9] Pl.'s Stmt. ¶ 166.

Youssef, a GS-15 level agent at this time, would also have been supervised by a non-agent in the

Budget Unit position, which is rare in the FBI. *Id.* ¶¶ 167-68. Youssef sought to "block" this

transfer by speaking with Timothy Caruso, Assistant Director in the Counterterrorism Division

("CTD"), and by initiating a proceeding under Title VII of the Civil Rights Act of 1964. *Id.* ¶¶

170-71. On March 14, 2002, Youssef contacted the FBI's EEO office and formally alleged that

the FBI was discriminating against him based on his Middle Eastern National Origin. *Id.* ¶ 171.

Youssef complained about his transfer to the CID's Budget Unit, and indicated that he wanted a

placement "commensurate with his grade and experience." *Id.* ¶¶ 172-73.

Mr. Caruso met with Youssef and informed him that he would not be assigned to the

Budget Unit, and would instead be temporarily assigned to a new program within CTD involving

---

[8] Ms. Knowlton had previously held the same Budget officer position. *See* Pl.'s Mot. for Partial Summ. J., Ex. 18, Tr. 33:19-22 (Deposition of Ellen Knowlton).

[9] Although the FBI disputes this fact, it does so only on the basis that the position "would have provided plaintiff with important skills and, in the long run, could have enhanced his career prospects." Defs.' Resp. Stmt. ¶ 166.

document exploitation ("DocEx") beginning in March 2002.[10]  Pl.'s Stmt. ¶ 175; Defs. Mot. for

Summ. J., Ex. 8, Tr. 224-26 (Deposition of Bassem Youssef).  Youssef was not satisfied with the

work he was asked to perform at DocEx.  According to Youssef, he was responsible for

"cataloging [documents], i.e. as [in] putting an identifying number or serial number on a

document before storing the document as original evidence."[11]  Pl.'s Stmt. ¶ 184.  The FBI

disputes that Youssef performed this type of "clerical function," and instead characterizes his

work as "triage" of documents (apparently a reference to the capturing and disseminating of

information in documents, *see* Defs.' Mot. for Summ. J. at 12).  Defs.' Stmt. ¶ 184.  Mr. Kinnally

testified that Youssef did an excellent job in this position.  Pl.'s Stmt. ¶ 185.

On June 28, 2002, Youssef met with United States Congressman, Frank R. Wolf, to

discuss his employment situation at the FBI and seek the Congressman's advice.  *Id.* ¶ 195-96,

199.  Congressman Wolf arranged a meeting with Youssef and the FBI Director, Robert Mueller.

---

[10] Thomas G. Kinnally testified that in December 2001 or early January 2002, the FBI recognized a need to develop a program to exploit information contained in documents seized in Afghanistan.  *See* Defs.' Mot. for Summ. J., Ex. 32, Tr. 10:22 - 11:20 (Deposition of Thomas Kinnally).  The FBI developed a system to "triage" such documents in the DocEx program.  *Id.*; *see also id.*, Ex. 8, Tr. 263:13-21 (Deposition of Bassem Youssef) (describing DocEx as a "mission where they go and collect documents from Afghanistan in the caves, basically, not knowing what their intelligence value is . . . And we bring that stuff back to the U.S. on C-131s and military planes.  And so they built this – not built; they established this DocEx thing, document exploitation, looking at documents, seeing if this is worthwhile or not.").  Because DocEx was a new program, it lacked an established place within the FBI's organizational "structure."  DocEx was eventually moved into the FBI's Communications Analysis Section which is part of the FBI's CTD.  Pl.'s Stmt. ¶ 182.  In June 2002, Youssef was informed that he was officially transferred into the CTD.  *Id.* ¶ 186.

[11] Youssef's statement in this regard is undermined by his deposition testimony, wherein he stated that he was reviewing documents to indicate whether they had "worthwhile" information and drafting notes of the same.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 56, Tr. 268:10-11 (Deposition of Bassem Youssef).

At this meeting, Youssef explained to Director Mueller that he was uniquely qualified to help

with the FBI's counterterrorism efforts since the 9/11 attacks, but that senior management was

discriminating against him based on his national origin and, consequently, he was not placed in a

position he deemed "most in line with his background and skills." *Id.* ¶¶ 201-04.  Director

Mueller indicated that he would look into the matter. *Id.* ¶ 206.

On July 10, 2002, Youssef filed a formal EEO complaint. *Id.* ¶ 208.  The Complaint

alleged the following:

> Following the terrorist attacks of September 11, 2001, the priorities of the U.S.
> government were realigned to make Counterterrorism the most important task of
> the FBI.  Given my Arabic language skills, understanding of Middle Eastern
> culture, and extensive experience and expertise in the Counterterrorism field, it
> would have been reasonable to expect that I would play a role in the Bureau's post
> 9/11 Counterterrorism efforts.  However, despite the importance of effective
> Counterterrorism and protecting America's Homeland Security, I have not been
> allowed to work in Counterterrorism in any capacity since 9/11.

Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 34 at 5 (EEO Complaint).  Youssef submitted a

supplemental complaint on October 13, 2002, alleging that the FBI had retaliated against him by

providing him with conflicting information concerning whether he was assigned to CTD or CID.

Pl.'s Stmt. ¶ 212.  The EEO indicated that it would investigate Youssef's alleged exclusion from

counterterrorism work and the confusion surrounding whether he was assigned to the CTD or

CID.  *Id.* ¶¶ 215-16 (citing EEO Letter dated January 9, 2003).

In August 2002, Youssef applied for and received a permanent position as Unit Chief of

DocEx.  Defs.' Stmt. ¶ 33.  Youssef was employed in that position on July 18, 2003, when he

filed this present action.  The FBI subsequently transferred Youssef to a new position as Unit

Chief of the Communications Analysis Unit ("CAU") in November 2004.[12]

C.      *Alleged Discriminatory Acts*

Youssef's First Amended Complaint[13] and the Parties' Summary Judgment briefing address two claims of alleged discrimination.

1.      Non-Selection for SIOC Position

In August 2001, Youssef applied for the position of Unit Chief of SIOC in the Investigative Services Division of the FBI.  Defs.' Stmt. ¶ 20.  The SIOC "serves as the focal point for information flowing into FBIHQ and . . . accommodates special event monitoring as well as crisis action teams activated in response to specific situations."  Defs.' Mot. for Summ. J., Ex. 14 at 1 (Vacancy Announcement).  The SIOC is responsible for, among other things, monitoring global events, "identifying and reacting to those of strategic importance to the FBI, and providing first responder assistance to FBIHQ, field offices, and Legats . . . ."  *Id.*  The SIOC also "represents FBIHQ and the Director" during non-business hours.  *Id.*  The Unit Chief of the SIOC is responsible for administering and managing a staff of forty-four persons, including ten special agents and thirty-four professional support employees.  *Id.*

The Vacancy Announcement for the SIOC Unit Chief position stated that there were preferred, but not mandatory, qualifications that would be taken into consideration by the

---

[12] Youssef does not argue that his transfer to the CAU was discriminatory or retaliatory. *See* Pl.'s Resp. Stmt. ¶ 41 ("Youssef's lateral transfer was not [an] adverse action and resulted in an increase of Mr. Youssef's [Unit Chief] responsibilities.")

[13] Youssef's operative Complaint in this case is his First Amended Complaint along with Count V of his Second Amended Complaint, which was added with leave of the Court on May 26, 2005.  For ease of reference, the Court shall continue to refer to Youssef's operative complaint as his "First Amended Complaint."

reviewing Career Board.  Defs.' Stmt. ¶ 21.  These preferred qualifications included "in-depth

management experience in a broad range of FBI operational & investigative matters to include

counter terrorism, crisis management experience, strong organizational & administrative skills,

strong liaison and interpersonal skills, strong communication skills, familiarity with

communication and computer information systems and the ability to assimilate and apply new

technologies."  *Id.*

Youssef was one of six employees who applied for the SIOC position, although one

person withdrew from consideration.  Defs.' Stmt. ¶ 22.  The Career Board consisted of Steven

McGraw, Cassandra Chandler, Virginia Bollinger, Patrick Patterson (the presenter), and Randy

Sayles (the minority non-voting member).  *Id.* ¶ 23.  After deliberating, the Career Board ranked

the top three candidates; Youssef was not ranked in the top three.  *See* Defs.' Mot. for Summ. J.,

Ex. 16 at 2 (Career Board Memorandum).  The top-ranked candidate[14] was offered, and

apparently accepted, the SIOC position.[15]  Defs.' Reply at 22 n.20.  Youssef claims that the

Career Board's failure to select him as the top-ranked candidate was discriminatory, and the

Career Board's explanation for its decision was pretextual.  *See* Pl.'s Opp'n to Defs.' Mot. for

Summ. J. at 27-32.

## 2.    Selection for SES Position

At FBIHQ, the senior executive management hierarchy extends down from the Director

of the FBI to a Deputy Director, four Executive Assistant Directors, Assistant Directors, Deputy

---

[14] Pursuant to the Court's Privacy Act Protective Order entered October 4, 2004, the Court shall not refer to these candidates by name.

[15] Youssef does not contend that the top-ranked candidate refused the SIOC position offer.

Assistant Directors, and Section Chiefs.  *See* Defs.' Mot. for Summ. J., Ex. 1 ¶ 3 (Declaration of

Michael B. Ward).  All of these personnel, except for the Director, hold Senior Executive Service

("SES") positions.  *Id.*  The entry level SES positions are generally Section Chiefs at FBIHQ.

Defs.' Stmt. ¶ 1.  All entry level SES vacancies are advertised Bureau-wide, *see* Defs.' Mot. for

Summ. J., Ex. 1.c (Manual of Administrative Operations and Procedures ["MAOP"] 3-11.1),

although Youssef argues that "many SES positions are created and applicants for the position[s]

are often 'pre-selected' prior to any advertisement of the position[s]," Pl.'s Resp. Stmt. ¶ 1.  To

apply for entry-level SES positions, candidates must submit a two-page resume for consideration

by the SES Board, Defs.' Stmt. ¶¶ 1-2, although Youssef argues that Career Board members

often rely on "personal knowledge" so that the two-page resumes do not "stand alone."  Pl.'s

Resp. Stmt. ¶¶ 1-2.

Youssef did not apply for an SES position.  Defs.' Stmt. ¶¶ 33, 36.  Youssef argues that

he demonstrated his desire to be promoted into an SES position by enrolling in the inspection

certification process, *see* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 33, a process that is required

for advancement into the SES, *id.*, Ex.63, Tr. 93:9 - 94:1 (Deposition of Robert S. Mueller).

According to Youssef, the FBI's failure to promote him to an SES position was discriminatory.

*See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 33-38.

D.    *Alleged Retaliatory Acts*

Youssef and Congressman Wolf met with FBI Director Mueller on June 28, 2002, Pl.'s

Stmt. ¶ 201, and Youssef filed an EEO complaint on July 10, 2002, Pl.'s Stmt. ¶ 208.  Youssef

also filed his Complaint in the present action on July 18, 2003.  Youssef claims that the FBI

retaliated against him for undertaking these and other statutorily-protected activities.  The two

retaliatory acts identified by Youssef in his Complaint and Partial Motion for Summary

Judgment include (1) his supervisor's denial of his requests for leave to attend the inspection

necessary to become "inspection certified" and (2) the FBI's rescission of an April 30, 2002

memorandum transferring Youssef into the International Terrorism Operations Section ("ITOS")

Unit.

1.     <u>Inspection Certification</u>

FBI senior special agents with at least a GS-14 level may participate in inspections of FBI

offices to monitor their compliance with the Bureau's policies, procedures, and administrative

requirements.  Pl.'s Resp. Stmt. ¶ 9.  Agents must complete six inspections in order to become

"inspection certified."  *Id.*  Inspections are viewed as training tools for agents and are not

required as part of an agent's job, *see* Defs.' Mot. for Summ. J., Ex. 23, Tr. 146:13-17

(Deposition of John Lewis) (describing the inspection process as "one of the best learning tools

out there for us agents"), although inspection certification is required to become eligible for SES-

level positions.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 63, Tr. 93:9 - 94:1 (Deposition

of Robert Mueller); *id.*, Ex. 84 ¶ 9 (Affidavit of Paul W. Vick).  Youssef completed his fifth

inspection in November 2004, but had not completed his sixth and final inspection as of May 26,

2005, the date on which Youssef added a retaliation claim to his First Amended Complaint based

on the FBI's denial of his requests for leave to complete his sixth inspection.  According to

Youssef, the FBI has "systemically denied [him] permission to conduct his last inspection."  Pl.'s

Opp'n to Defs.' Mot. for Summ. J. at 35.

In May 2004, John Lewis ("Lewis") became the Deputy Assistant Director in CTD

responsible for overseeing the Communications Exploitation Section.  Defs.' Stmt. ¶ 37.  Laurie

16

Bennet ("Bennet") was appointed as the Section Chief in August 2004.[16] *Id.* After assuming his

new position, Lewis learned that staffing levels throughout the CTD were low and the division,

including DocEx, was in poor shape. Defs.' Stmt. ¶ 38. Although Youssef argues that any

performance problems in DocEx were unrelated to himself, he does not deny that DocEx suffered

from various problems. *See* Pl.'s Resp. Stmt. ¶ 38 (arguing that information related to DocEx

should be struck because the FBI refused to produce certain discovery related to DocEx, but not

arguing that DocEx had no performance issues). Lewis testified that DocEx suffered from poor

communication among its employees and a deterioration of its evidence room:

> [The DocEx problems were] the interaction between [Youssef] and his
> subordinates, that was very poor, of those that I talked to. It was just not a good
> environment for the people that were there. I was somewhat surprised in taking
> [sic] the unit at the amount of material that was backlogged and when I arrived,
> there was no plan that I could find from the person in charge of the unit, Mr.
> Youssef, on how that was going to be addressed . . . The most alarming thing that
> I indicated before was the shape of the evidence room. That was [Youssef's]
> responsibility as a GS-15 . . . It was poor functioning and the FBI agents were
> supposed to be tuned into that. They get training on that from Day One.

Defs.' Mot. for Summ. J., Ex. 23, Tr. 175:10 - 176:7 (Deposition of John Lewis) (hereinafter

"Lewis Depo. Tr.").

Lewis further testified that he and Bennet decided that, because the issues associated with

DocEx began prior to receiving their new positions in CTD, they would not treat the DocEx

deficiencies as a reflection of Youssef's performance; instead, they decided to laterally transfer

Youssef to the position of Unit Chief of the Communications Analysis Unit ("CAU") in

November 2004. *Id.*, Tr. 177:1 - 178:22; Defs.' Mot. for Summ. J., Ex. 24, Tr. 161:12-20

---

[16] Both Lewis and Bennet testified that Youssef told them about his EEO complaint early
in their respective tenures. *Id.* ¶¶ 38, 40.

(Deposition of Laurie Bennet) (hereinafter "Bennet Depo. Tr.").  Lewis and Bennet viewed this

transfer as an opportunity for Youssef to get a fresh start in a new position.[17]  *Id.*  Almost

immediately after Youssef's transfer to the CAU, Lewis also allowed Youssef to leave for an

inspection of the Cincinnati field office.  Defs.' Stmt. ¶ 43.  Following that inspection, Youssef

had completed five of the six inspections he needed to become "inspection certified."  *Id.*

After returning from the Cincinnati field office inspection, Youssef was out of the office

approximately two-thirds of the time from November 2004 until January 2005, largely in

connection with his EEO-related activities.[18]  *Id.* ¶ 46.  In January 2005, the Inspections Division

asked Youssef to participate in an inspection of the Los Angeles field office.  *Id.* ¶ 44.  Bennett

initially approved Youssef's request for three weeks leave to attend this inspection.  *Id.*  Bennett

subsequently learned that Youssef had also requested leave during one of the weeks leading up to

the inspection for family reasons.  *Id.*; Pl.'s Resp. Stmt. ¶ 44 (objecting to this fact only on

grounds of materiality).  After speaking with Bennet and learning of Youssef's request for

approximately four weeks of leave, Lewis reversed Bennet's approval and denied Youssef's

request to participate in the Los Angeles office inspection.  Defs.' Stmt. ¶ 46; Pl.'s Resp. Stmt. ¶

40.  According to Lewis' testimony:

> The thing that struck me as odd when [Youssef] told me about this [Los Angeles
> inspection request] at lunch was you were just there.  Excuse me.  You were just
> out on an inspection.  You have a brand new unit, very important . . . He and I
> both know that he has a learning curve to get down which is fairly complex . . .
> now he's signing up for a three week inspection, mind you, without discussing

[17] Youssef believes this transfer increased his job responsibilities and he does not view it as an act of discrimination or retaliation.  Pl.'s Resp. Stmt. ¶ 41.

[18] Youssef does not dispute that he was out of the office two-thirds of the time during this period.  *See* Pl.'s Resp. Stmt. ¶ 44.

this with his immediate supervisors, the assistant section chief and section chief.

Lewis Depo. Tr. 146-47.

Not quite one month later, Youssef asked for permission for leave to attend an inspection of the FBI's Washington D.C. office.  Bennett Depo. Tr. 79:3-12.  Lewis again denied Youssef's request to participate, sending an email to both Youssef and Bennett explaining his reasoning:

> Laurie/Bassem: both of you will recall following our conversations that the reason for withdrawing from the LA Inspection had to do with the amount of time [Youssef] has/has not spent in the [Unit Chief] chair.  As stated earlier, our first priority is to CTD, to ensure a smooth transition from the old [Unit Chief] to the new [Youssef], and to ensure CAU is receiving consistent and appropriate leadership, oversight, and direction.  For that reason I asked that [Youssef] be moved off the LA inspection and we'll find another assignment some where [sic] down the line.  In regards to the most recent [inspection request], I do not believe those who made this assignment are aware of the above concerns or for that matter prior conversations I may have had with the Inspection Division . . . [Youssef] can stand down on the [inspection request] in favor of a future Inspection assignment as we have previously discussed.

Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 115 (Lewis Email dated Feb. 16, 2005).[19]

According to Youssef, Lewis denied his requests for leave to participate in these inspections in retaliation for Youssef's having filed a complaint and having spent time out of the office attending EEO-related activities, not because he was needed in the CAU.  Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 37-39.

2.    ITOS Transfer Rescission

On April 30, 2002, the CID requested the directed placement of Youssef to ITOS.[20]  Pl.'s

---

[19] This email reflects Lewis' contemporaneous explanation for denying Youssef's requests for leave to participate in inspections.  Lewis subsequently expanded on these reasons during a deposition taken in connection with this case, which the Court addresses in section III.C, *infra* (pages 57-60).

[20] Youssef was assigned to DocEx beginning March 2002.

Stmt. ¶ 187.  According to the request, based on "Youssef's knowledge relative to overseas operations (previous assignment to a legal attache) coupled with his arabic speaking ability, it's recommended that approval be granted for the directed placement of SSA Youssef from the [CID] to [ITOS] effective immediately."  Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 81 (Directed Placement Memorandum dated April 30, 2002) (hereinafter, the "ITOS transfer memorandum").  This directed placement was approved and signed by FBI Director Mueller, Dale Watson, James Caruso, Pasquale D'Amuro, David Szady, and Margaret Buckely.  *Id.*  It is undisputed that the transfer of Youssef into ITOS was never implemented.  Pl.'s Stmt. ¶ 230.

The circumstances arising after Youssef filed his complaint in this action are particularly relevant to the disposition of Youssef's retaliation claim based on the ITOS transfer memorandum.  Youssef claims that he did not see the ITOS transfer memorandum prior to filing his complaint in the present case.  Pl.'s Stmt. 191.  On April 28, 2004, the FBI provided a copy of the ITOS transfer memorandum to Youssef with its Initial Disclosures.  *See* Defs.'Opp'n to Pl.'s [41] Mot. to Enlarge the Number of Depositions at 3; Pl.'s [52] Reply at 2.  Youssef sought, and the Court granted, leave to file a First Amended Complaint on October 25, 2004, which did *not* include a claim based on the ITOS transfer memorandum.  *See* [20] First Am. Compl.  Prior to seeking leave to file another amended complaint on March 8, 2005, Youssef deposed three signatories on the ITOS transfer memorandum, including Dale Watson (December 8, 2004), Pasquale D'Amuro (November 30, 2004), and David Szady (February 3, 2005).  *See* Defs.' Opp'n to Pl.'s [41] Mot. at 4.  Of those individuals, Youssef only questioned Mr. Szady about the ITOS transfer memorandum.  *See* Pl.'s [41] Mot., Ex. 5 (Deposition of David Szady).  On April 26, 2005, Youssef also deposed FBI Director Mueller and asked him about the ITOS transfer

memorandum, which Director Mueller could not recall.  *See* Pl.'s [121] Reply, Ex. 7, Tr. 70:21 -

71:3 (Deposition of Robert S. Mueller) ("Q: did anyone ever discuss with you the reasons why

Mr. Youssef was not placed into ITOS?  A: You're telling me he was not placed in ITOS.  I did

not know he wasn't placed in ITOS, no").

     Discovery in this action was set to close on May 18, 2005, after having been extended

twice.  Nevertheless, Youssef filed a [41] Motion to Enlarge the Number of Depositions on May

10, 2005, and a [42] Motion to Compel Production of Documents and Verified Answers to

Interrogatories on May 18, 2005.  The first motion explained that Youssef wanted to take

additional depositions concerning the ITOS transfer memorandum, which Youssef stated was

"[c]entral to [his] claim . . . that the FBI failed to assign him to 'operational' counterterrorism

work after the 9/11 attacks."  Pl.'s [41] Mot. at 3.  Youssef's second Motion clarified that he

sought information concerning the ITOS transfer memorandum because it was "relevant to his

claims that the FBI excluded him from assignments within his area of expertise and/or failed to

promote him on the basis of his national origin."  Pl.'s [42] Mot. at 36.  On June 7, 2005,

Magistrate Judge Alan Kay granted in part and denied in part Youssef's request for additional

depositions, allowing Youssef to depose an individual who was not a signatory on the ITOS

transfer memorandum, but denying Youssef's request to depose additional signatories on the

memorandum because that discovery was deemed cumulative and Youssef had "possession of

the FBI memorandum for more than a year and had ample opportunity to explore the reasons for

his transfer with other deponents." [53] Mem. Op. at 5 (June 7, 2005).  Magistrate Judge Kay's

memorandum opinion characterized the discovery concerning the ITOS transfer memorandum as

related to Youssef's claim that "the FBI did not assign [Youssef] to [ITOS] because of his

Middle Eastern descent." *Id.* at 1-2.

Youssef moved for leave to file a Second Amended Complaint on March 8, 2005 to add disparate impact discrimination claims as to all "non-white FBI employees" and an additional retaliation claim. *See* Pl.'s [22] Second Mot. to Amend at 1-9. Magistrate Judge Kay denied Youssef's requests to add the disparate impact discrimination claims because Youssef failed to exhaust his administrative remedies for such claims, Youssef lacked standing to assert them, and the claims were prejudicial to the FBI because Youssef asserted them for the first time at the very end of discovery and more than six months after Youssef had indicated that all amendments to his complaint would have already been proposed. *See* [47] Mem. Op. at 4-15 (May 26, 2005). Nevertheless, Magistrate Judge Kay *did* allow Youssef to add an additional retaliation claim (included as Count V of the Second Amended Complaint) which alleged that the FBI retaliated against Youssef by denying his requests to perform his sixth and final inspection needed to become inspection certified. *Id.* at 15. This Court denied Youssef's Motion for Reconsideration of Magistrate Judge Kay's decision on July 22, 2005. *See* [67] Order at 1 (July 22, 2005). Youssef did not request leave to add a retaliation claim based on the ITOS transfer memorandum in March 2005, nor did Youssef ask for leave to amend his First Amended Complaint to add such a claim any time thereafter.

On March 13, 2006, Youssef moved for Partial Summary Judgment claiming that the FBI rescinded the ITOS transfer in retaliation for his EEO-related activities. *See* Pl.'s Mot. for Partial Summ. J. at 15-37. The FBI argues that it never had notice of this claim as it was not included in Youssef's First Amended Complaint and was never previously discussed by Youssef as anything other than evidence related to Youssef's claims of discrimination. *See* Defs.' [109] Cross-

Motion for Summ. J. at 1 n.1.   In any event, the FBI argues that the ITOS transfer memorandum

was simply intended to transfer Youssef from the "CID to CTD due to his then-current

assignment to [DocEx], a program that did not formally exist within the FBI's structure and

which primarily served the ITOS."   *Id.* at 1-2.

      E.     *Procedural Background*

      Youssef commenced this action on July 18, 2003 and filed a First Amended Complaint

on October 25, 2004.   As noted above, Youssef added an additional retaliation claim with the

Court's permission on May 26, 2005.   *See* [47] Mem. Op. at 15 (May 26, 2005).   The Parties

filed Cross-Motions on March 13, 2006.   Youssef's [82] Cross-Motion for Partial Summary

Judgment raised a retaliation claim based on the FBI's decision to allegedly rescind Youssef's

transfer to the ITOS unit.   The FBI's [85] Cross-Motion for Summary Judgment concerned four

claims – two claims of discrimination based on Youssef's non-selection to the SIOC unit and his

non-promotion to an SES position, one retaliation claim based on Youssef's allegation that the

FBI prevented him from becoming inspection certified, and one claim based on the First

Amendment and Lloyd-Lafollette Act that was included in Youssef's original complaint but that

the Parties agree has subsequently become moot.[21]   Youssef filed an Opposition to the FBI's

Motion for Summary Judgment on May 16, 2006.

      On June 14, 2006, the FBI filed its Opposition to Plaintiff's Motion for Partial Summary

Judgment, consolidated with a second [109] Cross-Motion for Summary Judgment (hereinafter

"Defs.' Second Motion for Summary Judgment").   The FBI explained that Youssef had not

---

     [21] Consistent with the Parties' agreement that this claim has become moot, *see* Pl.'s
Opp'n to Defs.' Mot. for Summ .J. at 44 ("Youssef's First Amendment and Lloyd-Lafollette
issues are moot"), the Court shall dismiss it from this action without further analysis.

pleaded a retaliation claim based on rescission of the ITOS transfer memorandum in his First

Amended Complaint, and accordingly, the FBI had not addressed that claim in its first Motion

for Summary Judgment.[22]  *See* Second Mot. for Summ. J. at 1 n.1.  The FBI also filed three

Notices with the Court shortly after submitting its Second Motion for Summary Judgment:  a

[111] Notice explaining that certain previously-filed exhibits had not been scanned properly, a

[112] Notice that the FBI was re-filing its response to Plaintiff's Statement of Facts to comply

with the protective order entered by the Court, and a [113] Notice that the FBI was filing

additional exhibits (some of which were not produced in discovery) in support of its Second

Motion for Summary Judgment.

On June 22, 2006, Youssef filed a [114] Motion to Strike the FBI's Second Motion for

Summary Judgment and the FBI's Notices on the grounds that the FBI's Second Motion for

Summary Judgment was improper and untimely, and that at least one of the Notices contained

documents that had not previously been produced to Youssef during discovery.  *See* Pl.'s Mot. to

Strike at 1.  The FBI opposed the Motion to Strike arguing that it did not previously have notice

of Youssef's ITOS transfer claim, and that the new exhibits attached to its [113] Notice were

introduced in response to Youssef's new claim.  *See* Defs.' Opp'n to Pl.'s Mot. to Strike at 1-2.

Youssef filed a Reply on July 19, 2006.

## II.  LEGAL STANDARD

---

[22] While the FBI's should have sought leave of this Court to either supplement its original
Motion for Summary Judgment or to file a Second Motion for Summary Judgment, the FBI had
good cause for its filing.  Had the FBI merely responded to Youssef's Motion for Partial
Summary Judgment and explained that the claim was not properly pled, a potential denial of
Youssef's Motion would have left the claim in the case and would not have resulted in its
dismissal.

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party, in response to the motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the

adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary

judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must

do more than simply "show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the

movant bears the initial responsibility of identifying those portions of the record that demonstrate

the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come

forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing

Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in

discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial."  *Morgan v.*

*Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd*, 328 F.3d 647

(D.C. Cir. 2003); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special

caution "does not eliminate the use of summary judgment in discrimination cases") (citing

cases).  "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral

procedural tool which promotes the speedy and inexpensive resolution of every case."  *Marshall*,

276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews

the defendant's motion for summary judgment under a "heightened standard" that reflects

"special caution."  *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal

quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

Nonetheless, while this special standard is more exacting, it is not inherently preclusive.

Although more circumspect, the Court shall grant a motion for summary judgment where the

nonmoving party has failed to submit evidence that creates a genuine factual dispute and the

moving party is entitled to a judgment as a matter of law.

## III.  DISCUSSION

*A.      Non-Selection for SIOC Position*

Youssef's First Amended Complaint, although not drafted *pro se*, is not a model of artful

pleading.  Although he claims to have been subject to discrimination based on the FBI's failure

to place him in a position commensurate with his background and abilities after the 9/11 attacks,

his First Amended Complaint references only the FBI's failure to promote him into the SES, a

position for which he admittedly did not apply.  The one position at issue to which Youssef *did*

apply, the Unit Chief of the SIOC, is inexplicably not referenced in his First Amended

Complaint.  Youssef's arguments on Summary Judgment only underscore his pleading failures

by lacking any citation to his First Amended Complaint.  Nevertheless, Youssef's EEO

Complaint provided the FBI with notice of this claim, *see* Defs.' Mot. for Summ. J., Ex. 13 at 4

(EEO Complaint) (discussing Youssef's application for the SIOC position), and the FBI included

the claim in its Motion for Summary Judgment.  Accordingly, the Court shall proceed to address

the merits of Youssef's discrimination claim based on his non-selection for the SIOC position.[23]

---

[23] The Court reminds Youssef's counsel that claims must be supported by a properly pled
Complaint.  Failure to adhere to this basic rule leads to confusion surrounding a party's claims,
prevents a narrowing of the issues, and often results in a loss of judicial economies.  Failure to
adhere to this rule may also result in dismissal of claims that are not found in a plaintiff's
complaint, particularly where a defendant has not received any notice of such claims.  *See Sharp
v. Rosa Mexicano*, 496 F. Supp. 2d 93, 97 n. 3 (D.D.C. 2007).  This scenario applies to Youssef's
ITOS transfer claim, discussed by the Court in Section III.D, *infra*.  While the Court would
ordinarily require Youssef to amend his First Amended Complaint to add a claim for his non-
selection for the SIOC position, the Court's dismissal of this claim on summary judgment
obviates the need for such an amendment.

Pursuant to Title VII, all personnel actions affecting employees of the federal government "shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  To prove a violation of Title VII, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted).  Furthermore, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006).  Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).  It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Youssef has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If he succeeds, the burden shifts to the FBI to articulate some legitimate, non-discriminatory reason for why Youssef was not promoted to the SIOC position, and to produce credible evidence supporting its claim.  *Id.*  The FBI's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*,

28

450 U.S. at 254; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he

determination that a defendant has met its burden of production (and has thus rebutted any legal

presumption of intentional discrimination) can involve no credibility assessment."). As such,

"the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties,

[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan*

*Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881 (2003); *see also*

*Burdine*, 450 U.S. at 253.

    If the FBI is successful, then "the *McDonnell Douglas* framework – with its presumptions

and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation

marks omitted). At that point, Youssef has the burden of persuasion to show that the FBI's

proffered reasons were not the true reasons for its employment decision. *Burdine*, 450 U.S. at

256. Pretext may be established "directly by persuading the court that a discriminatory reason

more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence." *Id.* at 256; *see also Reeves*, 530 U.S. at 143. "Proof that

the defendant's explanation is unworthy of credence is simply one form of circumstantial

evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*,

530 U.S. at 147 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517) ("[P]roving the employer's

reason false becomes part of (and often considerably assists) the greater enterprise of proving that

the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156

F.3d 1284, 1290 (D.C. Cir. 1998) ("[A] plaintiff's discrediting of an employer's stated reason for

its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143 (quoting *Burdine*, 450 U.S. at 255 n.10). The Court of Appeals for the District of Columbia Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289. However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997). "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-finder] could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

1.    Youssef's *Prima Facie* Case

At the outset, the Court notes that Defendant has already articulated a legitimate non-

discriminatory reason for the denial of Youssef's application for the SIOC position in the form of

the December 4, 2001 Intelligence Branch Career Board (the "Career Board") Memorandum

explaining its selection decision.  *See* Defs.' Mot. for Summ. J., Ex. 16 (Career Board Memo).

As the D.C. Circuit recently reiterated in *Czekalski v. Peters*, "once a defendant has proffered

such a nondiscriminatory explanation, it has 'done everything that would be required of [it] if the

plaintiff had properly made out a *prima facie* case.'" 475 F.3d 360, 364 (2007) (quoting *U.S.*

*Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).  Thus, whether Plaintiff

actually made out a prima facie case "'is no longer relevant,' and the only question is 'whether

the defendant intentionally discriminated against the plaintiff.'" *Id.*  Nevertheless, the Court

evaluates Plaintiff's *prima facie* case because, as noted above, it "'is part of the evidence [the

Court] must consider in addressing the question' of whether [Plaintiff] has created a genuine

issue of [] discrimination." *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)).

Youssef argues that the Career Board's failure to select him as Unit Chief of SIOC

constituted discrimination on the basis of his national origin.  *See* Pl.'s Opp'n to Defs.' Mot. for

Summ. J. at 26-32.  Youssef may establish a *prima facie* case by showing that: (1) he is a

member of a protected class; (2) he applied for and was qualified for an available position; (3)

despite his qualifications, he was rejected; and (4) either someone filled the position or it

remained vacant and the employer continued to seek applicants.  *Holcomb v. Powell*, 433 F.3d

889, 895 (D.C. Cir. 2006) (citing *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).  The

D.C. Circuit has also articulated the *prima facie* requirements in a way that, although not

designed to supplant the *McDonnell Douglas* paradigmatic elements of a *prima facie* case, is

"designed to accommodate the wide variety of employment discrimination claims that extend

31

beyond the typical 'failure-to-hire' situations of the sort confronted in *McDonnell Douglas*."

*Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004).   Under this alternative

formulation, a plaintiff may establish a *prima facie* case by showing that (1) he is a member of a

protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action

gives rise to an inference of discrimination.   *See Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir.

2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

In the present action, the FBI focuses on the language reflected in *Stella* and argues that

Youssef has failed to make a *prima facie* showing because the FBI's failure to select him for the

SIOC position did not constitute an adverse employment action.   *See* Defs.' Mot. for Summ. J. at

16.   Specifically, the FBI argues that "[t]he decision not to select plaintiff for the SIOC position

is not actionable because, if selected, the position would have involved a purely lateral transfer

from one GS-15 SSA position to another."   *Id.* at 18.   While it may be true that, in some

instances, a lateral transfer may not constitute an adverse employment action, *see Alexander v.*

*Tomlinson*, 507 F. Supp. 2d 2, 14 (D.D.C. 2007) (finding no adverse employment action where

defendant failed to approve plaintiff's reassignment to perform the same job at a different

geographic location), the Court finds that Youssef has adduced sufficient evidence to show that

his selection for the SIOC position would have resulted in "materially [changed] job-related

consequences" such that his non-selection may be considered an adverse employment action.[24]

*Id.*

In *Brown v. Brody*, the D.C. Circuit announced a "rule" that a lateral transfer or denial

---

[24] The Court notes that Youssef describes his application for the SIOC position as a "promotion" whereas the FBI describes it as a "transfer."   *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 29 n.12.   This semantic difference does not affect the Court's analysis.

thereof may constitute an actionable injury when accompanied by some "materially adverse consequences affecting the terms, conditions, or privileges of [the plaintiff's] employment or [the plaintiff's] future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." 199 F.3d 446, 457 (1999). Whether a particular reassignment of duties constitutes an adverse action "is generally a jury question," *Czekalski*, 475 F.3d at 365 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2417 (2006)), but "[m]ere idiosyncracies of personal preference are not sufficient to state an injury," *Brown*, 199 F.3d at 457. Withdrawal of an employee's supervisory duties or significant changes to an employee's responsibilities may constitute an adverse employment action, even when there is no change in the employee's salary, grade level, or benefits. *Id.*

In the present case, Youssef applied for the SIOC position while he was on a temporary detail at the NCIX and supervising just one employee. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 27. In contrast, the Unit Chief of the SIOC position required supervision of forty-four persons, including ten Senior Special Agents, and thirty-four support personnel. *See* Defs.' Mot. for Summ. J., Ex. 14 at 1 (Vacancy Announcement). This difference in supervisory authority is sufficient, by itself, to establish a *prima facie* showing of an adverse employment action. *See Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) ("[f]ailing to select an employee for a position with substantially greater supervisory authority is an adverse employment action"). In addition, the SIOC position would have moved Youssef from a temporary detail outside of the FBI where he operated with narrow responsibilities (i.e., assessing damage to the nation's counterintelligence interests as a result of national security information disclosures), *see* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 28, to a permanent position within the FBI where he would

have operated with a broad range of responsibilities.  *See* Defs.' Mot. for Summ. J., Ex. 14 at 1

(Vacancy Announcement) (stating that the SIOC is responsible for, among other things,

monitoring global events, "identifying and reacting to those of strategic importance to the FBI,

and providing first responder assistance to FBIHQ, field offices, and Legats . . . [and]

represent[ing] the FBIHQ and the Director during non-business hours").  The broadening of his

responsibilities and repositioning in the FBI from outside the agency could have materially

advantaged Youssef and/or materially enhanced his opportunities for advancement within the

FBI.  *See Czekalski*, 475 F.3d at 364 (holding that reassignment with "significantly different

responsibilities" may constitute an adverse employment action) (quoting *Forkkio v. Powell*, 306

F.3d 1127, 1131 (D.C. Cir. 2002)).  *See also Clipper v. Billington*, 414 F. Supp. 2d 16, 22-23

(D.D.C. 2006) (finding that plaintiff met her *prima facie* burden by showing that she was

transferred to a new position with undefined duties with a reduced potential for career

advancement, even though the plaintiff received two wage increases after the transfer).

For these reasons, the Court finds that Youssef has set forth sufficient facts establishing

that his non-selection to the SIOC constituted an adverse action for purposes of his *prima facie*

case.  The FBI does not contest that Youssef has otherwise established a *prima facie* case of

discrimination with respect to his non-selection for the SIOC position by demonstrating that: (1)

he is Egyptian-born; (2) he applied for an SIOC position; (3) he was not selected; and (4) a

different agent was selected to fill the position.

## 2.     The FBI's Proffered Legitimate, Non-Discriminatory Reasons

The burden now shifts to the FBI to produce evidence that Youssef was not selected for

one or more legitimate, nondiscriminatory reasons.  *Reeves*, 530 U.S. at 142.  As noted above,

the FBI has met this burden in the form of a contemporaneous Career Board Memo describing

why Youssef was not selected for the position.  *See* Defs.' Mot. for Summ. J., Ex. 16 (Career

Board Memo).

In September 2001, the Career Board met to discuss the qualifications for each of the five

candidates under consideration for the SIOC position.  *Id.* at 1.  The preferred qualifications, all

of equal weight, where identified as: (1) in depth management experience in a broad range of FBI

operational and investigative matters to include Counterterrorism; (2) Crisis management

experience; (3) Strong organizational and administrative skills; (4) Strong liaison and

interpersonal skills; (5) Strong communications skills; and (6) Familiarity with communication

and computer information systems and the ability to assimilate and apply new technologies.  *Id.*

at 2.  After deliberations concerning the candidates and the criteria, the Board ranked the top

three candidates for the position.  *Id.*  The Board did not find that Youssef's application

warranted a ranking in the top three positions.  *Id.* at 5-6.  The top-ranked candidate was offered

the position.  Defs.' Reply at 22 n.20.

The top-ranked candidate was a GS-15 who had been assigned to the Inspection Division

at FBIHQ.  *Id.* at 3.  He had 19 years of investigative experience in the FBI "in a wide range of

operational and investigative programs as well as managing complex administrative matters as

part of his inspection duties."  *Id.*  He was also inspection certified.  *Id.*  Prior to his assignment

in the inspection division, he was a field supervisor who "managed complex Group I and II

UCOs, including Title III interceptions, which resulted in significant statistical accomplishments

on a number of major cases."  *Id.*  Moreover, "[b]ased on his [application] and the

recommendations of his division head, [he] was rated by the Intelligence Branch's Career Board

35

as outstanding with regard to his experience in FBI investigative and operations experience." *Id.*
Nevertheless, he had not worked in counterterrorism matters, so the Career Board considered his
experience in that area as "none." *Id.* His crisis management experience was considered "good"
based on his participation in several command post exercises. *Id.* His organizational and
administrative skills were considered "outstanding." *Id.* His liaison skills were considered
"extensive" and his familiarity with communication and computer information systems, and his
ability to assimilate and apply new technologies, were considered "extensive." *Id.*

The Board found that Youssef's application was not as competitive as the top-ranked
candidates' applications. *Id.* at 6. The Board identified his management experience based on his
work as a Legat from 1997 to 2000. *Id.* at 5. His FBI operational and investigative experiences
were considered "good" as a result of his work on several terrorism investigations and his
assignment as a Legat in Riyadh. *Id.* The Career Board found, however, that unlike the ranked
candidates, Youssef provided limited information in his application concerning his crisis
management skills, "which are an essential element for the management of SIOC." *Id.* The
Board found that his organizational, administrative, and liaison skills, and his familiarity with
communication and computer information systems were considered "extensive." *Id.* However,
the Board also found that Youssef's application failed to address his ability to assimilate and
apply new technologies, which limited his rating in that category. The Board also found that his
application, unlike the ranked candidates, did not identify "whether he was the case agent
managing and directing any of the cases he cited; nor did he identify management of matters in a
variety of investigative programs." *Id.* Finally, the Board found that although Youssef "has
extensive experience in the counterterrorism program, his background is limited to that program

36

. . . [and] the top three ranked candidates . . . had broader investigative experiences in other programs." *Id.*

As set forth above, the Board's memorandum reflects the FBI's proffered legitimate, non-discriminatory reasons for selecting a candidate other than Youssef for the SIOC position.

### 3.    Evidence of Pretext or Discrimination *Vel Non*

Given the FBI's legitimate, non-discriminatory reasons justifying Youssef's non-selection, Youssef must now seize the "opportunity to discredit the employer's explanation," *Aka*, 156 F.3d at 1288, by demonstrating that the proffered reasons are mere pretext for discrimination, *see Paquin*, 119 F.3d at 26-27. Additionally, "one way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false." *Czekalski*, 475 F.3d at 366 (internal citations omitted). The Court therefore turns to considering the "ultimate question of discrimination *vel non*." *Reeves*, 530 U.S. at 142-43. As always, Youssef retains the "ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. At this point,

> a court reviewing summary judgment looks to whether a reasonable [fact-finder] could infer intentional discrimination or retaliation from all the evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).

*Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted).

Youssef responds to the FBI's proffered legitimate, non-discriminatory reasons for his

non-selection with a litany of arguments, unsupported by specific citations to the record or to

case law, essentially objecting to all of the Career Board's findings.[25]  *See* Pl.'s Opp'n to Defs.'

Mot. for Summ. J. at 30-32.  Having examined the Parties' arguments, including Plaintiff's

voluminous Statement of Material Facts and Response to the FBI's Statement of Material Facts,

in addition to the record, the Court finds that Youssef has not adduced evidence showing that the

FBI's proffered justification for his non-selection was false or pretextual.

Youssef initially challenges the FBI's qualifications-based explanation for his non-

selection by arguing that Board misstated or overstated the qualifications of the respective

candidates.  *Id.* at 31-32.  Youssef further argues that if the Board had fairly and properly

understood the Parties' qualifications, it would have found that he was the "superior" candidate.

*Id.* at 32.  Although the D.C. Circuit has stated that a court must not "serve as a 'super-personnel

department that reexamines an entity's business decision[s],'" *Holcomb*, 433 F.3d at 897

(quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999)), a factfinder may infer

discrimination if the evidence shows a reasonable employer would have found the plaintiff

"significantly" better qualified for the job but nevertheless failed to offer the job to the plaintiff.

---

[25] Youssef appears to be relying on an omnibus citation to his Statement of Material Facts and his Response to the FBI's Statement of Material Facts to present his arguments in opposition to the FBI's Motion for Summary Judgment.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 30. That is exceedingly improper.  In addition to the obvious point that these Statements should include facts and not arguments, Youssef's Statement of Facts contains 581 paragraphs of material, and his Opposition includes 115 exhibits.  Counsel is reminded that the burden to identify the factual materials associated with Youssef's legal arguments should fall on Youssef's counsel, not the Court.  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (recognizing that the burden of parsing the record should fall on the litigants, and the "district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis . . .") (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)).

*Aka*, 156 F.3d at 1295.   In order to justify an inference of discrimination, the plaintiff must

demonstrate a "qualifications gap . . . great enough to be inherently indicative of discrimination."

*Holcomb*, 433 F.3d at 897.   *See also Stewart*, 352 F.3d at 429-30) (examining record for

evidence of a "stark superiority of credentials" and concluding that "fine distinctions" were

insufficient to raise a jury question).

Youssef's Response to the FBI's Statement of Material Facts lists areas, largely without

support, where Youssef believes the Board made incorrect conclusions concerning the top-ranked

candidate's qualifications.   For example, Youssef argues that the top-ranked candidate's

experiences were predominately drug-related and not based in counterterrorism, an area in which

the SIOC is involved.   Pl.'s Resp. Stmt. ¶ 25.   The candidate's application failed to identify the

cases he actually supervised or justify his contributions to the same.   *Id.*   He argues that the

candidate lacked counterintelligence and counterterrorism experience, and that his experiences at

a "command post" "could simply be sitting in a room . . . ."[26]   *Id.*   According to Youssef,

"[v]irtually every FBI agent, including a novice agent, can assert the same statement."   *Id.*

Similarly, Youssef argues that the candidate did not sufficiently explain his technological

---

[26] Youssef also argues, on this point, that Career Board Member Chandler gave the top-ranked candidate a grade of "limited" in the area of counterterrorism, and Board Presenter Patterson rated him "good," when he should have been rated lower based on his inexperience in that area.   Although Youssef argues that the fact that these members gave these rankings "speaks for itself," that is hardly the case.   Youssef has not established that these ratings were material to the Board's final ranking decisions, which occurred after deliberation, not simply after the candidates' scoring sheets were completed.   *See Holcomb*, 433 F.3d at 901 (explaining that a few trivial or remote inconsistencies will not permit a jury to infer discriminatory intent).   Moreover, the question to be asked is not whether a Board Member gave a "correct" score from Youssef's subjective perspective, but rather whether the Board as a whole could have reasonably reached its ultimate decisions based on "honestly believ[ing] in the reasons it offer[ed]."   *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

abilities and his application "merely references a number of common FBI computer programs on which most agents working drug investigations are very familiar." *Id.* According to Youssef, "[s]ome of the programs referenced are actually inferior programs, which agents who actually understand advanced computer technologies would find laughable." *Id.* Youssef also claims that the candidate's liaison skills are limited to local law enforcement and, therefore, does not justify the "outstanding" grade given by the Board. *Id.*

Several of these arguments highlight the fact that the top-ranked candidate had limited experience in counterterrorism and counterintelligence, and by comparison, that Youssef was a better candidate because he had extensive experience in those areas. That conclusion is unjustified. The Vacancy Announcement for the SIOC position specified that the preferred candidate would possess "in-depth management experience in a broad range of FBI operational & investigative matters to include counter terrorism." *See* Defs.' Mot. for Summ. J., Ex. 14 at 1 (Vacancy Announcement). The Career Board echoed this sentiment when it found that the top-ranked candidate had "19 years investigative experience in the FBI in a wide range of operational and investigative programs." *See* Defs.' Mot. for Summ. J., Ex. 16 at 3 (Career Board Memorandum). In contrast, the Board found that Youssef's concentrated background in counterterrorism actually worked against him because he lacked a similar range of experiences.[27] *Id.* at 6 ("although SSA Youssef has extensive experience in the counterterrorism program, his background is limited to that program"). Based on the selection criteria, the Board was entitled to value the top-ranked candidate's broad base of experience to a greater extent than what it

---

[27] Because the Career Board fully credited Youssef's claims of counterterrorism experience, the dispute between the Parties concerning Youssef's background experiences, as reflected in the Court's recitation of background facts, is not a genuine issue of material fact.

perceived as Youssef's more narrowly-focused background.  *See Young*, 457 F. Supp. 2d at 21

("it is within the defendant's prerogative to place greater value on some legitimate qualifications

than others"); *Carter*, 387 F.3d at 881-82 (finding that a jury could not reasonably conclude that

the plaintiff was significantly better qualified where two qualified candidates have different

relative strengths);  *Stewart*, 352 F.3d at 430 (holding that courts "must defer to the employer's

decision as to which qualities required by the job . . . it weighs more heavily. . . .").

The Board's decision to place greater emphasis on a broad base of experience rather than

a focus in counterterrorism is bolstered by the deposition testimony of FBI Director Robert

Mueller, who explained that experiences in one area of the FBI may build skills that can be used

in other areas of the FBI:

> Q: Can someone be an effective leader without extensive subject matter
> [experience] in the area for which they will become a leader?
>
> A: Yes
>
> * * *
>
> A: You often have persons moving between subject matter.  They become a unit
> chief in white collar crime; they do a fantastic job.  I've had occasions where as a
> U.S. Attorney I've taken somebody that's been a drug prosecutor, I put him in
> charge of SEC prosecutions.  They've done a fantastic job.

Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex.63, Tr. 57:8 - 59:6 (Deposition of Robert Mueller).

Youssef also faults the Board's analysis of the top-ranked candidate's qualifications

because he believes that the candidate's application did not provide sufficient details justifying

his qualifications.  That argument is decidedly unpersuasive, as the Career Board found that

Youssef's application was the one that lacked the necessary information – not the top-ranked

candidate's.  *See* Defs.' Mot. for Summ. J., Ex. 16 at 5-6 (Career Board Memorandum).  For

example, the Career Board found that Youssef failed to identify his crisis management skills,

"[u]nlike the other candidates," even though that was an essential element for the management of

the SIOC.  *Id.* at 5.  The Board found that Youssef's application did not address his ability to

assimilate and apply new technologies.  *Id.*  The Board also found that Youssef failed to identify

whether he was the case agent managing and directing any of the cases he cited in his application

and failed to "identify management of matters in a variety of investigative programs."  *Id.* at 6.

Although Youssef faults the Board for not reading this information into his application, and for

valuing the experiences that the top-ranked candidate included in his application, the Board was

entitled to rely on the information supplied by the candidates in their applications.  *Fischbach*, 86

F.3d at 1183 (finding that an employer is entitled to make a particular decision where it "honestly

believes in the reasons it offer[ed])."[28]

Youssef next argues that the Board's findings concerning his own qualifications were

inaccurate.  Pl.'s Resp. Stmt. ¶ 28.  For example, Youssef claims that his application described a

wide variety of investigative experiences, including his polygraph specialty and his Legat

background that Youssef believes "should [] have [made the Board] aware that [he] . . . had

supervisory responsibility of *all* U.S. case leads that pertained to the region within his

jurisdiction."  *Id.*  (emphasis in original).  Youssef argues that the FBI demonstrated "bias"

because it attempted to downplay the importance of counterterrorism experience, and that his

ratings were too low in areas like "operational and investigative experience" and "organizational

---

[28] Youssef undertakes a similar analysis, with similarly unpersuasive objections, with
respect to the second- and third-ranked candidates.  Because the top-ranked candidate was
offered and apparently accepted the position, however, the relative qualifications of the lower-
ranked candidates are immaterial.

skills." *Id.* Youssef claims that his application actually demonstrated that he has "keen abilities in crisis situations," and that he has extensive knowledge in the area of technology. *Id.*

These arguments are unpersuasive because the Board identified Youssef's background experiences and weighed them accordingly. Although Youssef may believe the Board should have been more impressed with his credentials, the Board was entitled to form its own opinions concerning the relative value of his experiences. *See Fischbach*, 86 F.3d at 1183 ("[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible, he must show that the explanation given is a phony reason") (quoting *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994). Youssef's subjective opinion concerning his credentials does not weigh heavily in this calculus. *See Young*, 457 F. Supp. 2d at 19 ("it is clear that plaintiff's argument that, in her opinion, her qualifications were 'well ahead' of [the employee selected for the job] does not establish pretext"); *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) ("[P]laintiff's perception of himself, and of his work performance, is not relevant. It is the perception of the decisionmaker which is relevant.") (internal citation and quotation marks omitted), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002). In this regard, the Board identified that Youssef had extensive operational and investigatory experiences, and that he was a Legat. *See* Defs.' Mot. for Summ. J., Ex. 16 at 5 (Career Board Memorandum). The Board found that he had extensive experiences with technology. *Id.* Nevertheless, the Board also found that Youssef lacked the broad-based experiences of the top-ranked candidate, in part because Youssef's background was so concentrated in counterterrorism, and because he failed to provide sufficient details concerning several other areas of his background. *Id.* at 5-6. While Youssef may want to elaborate on his experiences in this

proceeding, the Court is neither required nor permitted to reevaluate his credentials with this additional information.  *See Fischbach*, 86 F.3d at 1183 (a court must "beware of using 20/20 hindsight [and] must respect the employer's unfettered discretion to choose among qualified candidates").

Youssef's next argument is that the Board Members were biased because two of the career board members personally knew two of the candidates and made comments reflecting their personal knowledge of the candidates during the Board meeting.  *See* Pl.'s Resp. Stmt. ¶ 24. According to Youssef, it was impermissible for any member to "interject[] their personal preferences."  *Id.* ¶ 24 (citing MAOP Selection Process subpart (d)) (attached to Defs.' Mot. for Summ. J. as Ex. 1c) (hereinafter the "MAOP Selection Procedure").  Youssef's argument ignores the language of the MAOP Selection Procedure as well as applicable D.C. Circuit case law.

Pursuant to the MAOP Selection Procedure, Career Boards "may obtain information from interviews of the candidates, the candidate's [application], division head comments, and current rating officials . . ."  *Id.*  Contrary to Youssef's argument, the provision does not prevent a board member from relying upon his or her own personal observations of the candidates.  Instead, the provision states that "[i]f any comments of rating officials other than [application] verifications are obtained and considered by the local career board, then similar comments from the rating officials of all candidates must be sought."  *Id.*  That a member of the Board expressed his or her personal knowledge of a candidate does not violate the letter or the spirit of this provision. Moreover, the D.C. Circuit has expressly held that decision makers may bring to bear their own personal observations of candidates in making selection decisions.  *See Aka*, 156 F.3d at 1298 ("employers may of course take subjective considerations into account in their employment

44

decisions" and "[r]eliance on disputed subjective assessments will not create a jury issue in every

employment discrimination case.  For example, if this reliance is modest, and the employer has

other, well-founded reasons for the employment decision, summary judgment for the defendant

may be appropriate"); *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 151 (D.D.C. 1998) ("An employer

is entitled to rely on his own perception of an employee's work performance.").  Youssef's

arguments fail to demonstrate that the Board Members' subjective views overrode the objective

explanation contained in the Career Board's memorandum, especially when the unsworn

transcript of the Board Meeting submitted by Youssef suggests that the personal observations

expressed by the Board Members had a *de minimus* effect on the Board's final rankings.  *See*

Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 86 (Career Board Transcript).

     Youssef also argues that the Board was wrong not to include him as a top-ranked

candidate "because the minority representative on the Board gave Mr. Youssef the highest

numerical ranking," and the Career Board presenter initially ranked Youssef as the third-best

candidate.  Pl.'s Resp. Stmt. ¶ 28.  This argument is unpersuasive because the minority

representative on the Board is a non-voting member who acts only in an advisory capacity.  *See*

Defs.' Mot. for Summ. J., Ex. 1c (MAOP 3-11.3(1)).  That the Board Presenter initially ranked

Youssef as the third-best candidate for the position does not establish that the Board

discriminated against him on the basis of his national origin, as the Board's final rankings were

based on the members' deliberations, not on one member's scores.  The D.C. Circuit has held

that courts should refrain from assessing "the significance of small differences" when examining

an employer's reasons concerning employee qualifications.  *Stewart*, 352 F.3d at 430.  Moreover,

because the top-ranked candidate was offered the position, *see* Defs.' Reply at 22 n. 20,

Youssef's argument that he was the third-ranked candidate on one member's scoring sheet is simply immaterial.[29]

Having considered the arguments raised by Youssef, the Court also considers "any further evidence of discrimination that may be available to the plaintiff[,] such as independent evidence of discriminatory statements or attitudes on the part of the employer[]." *Carter*, 387 F.3d at 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted).  According to Youssef, there were derogatory rumors circulating through the FBI that he was a Muslim who wore traditional Arabic head-gear while assigned in Saudi Arabia, and had refused to participate in an investigation based on his ethnic background.  Pl.'s Stmt. ¶¶ 155, 157, 160.  However, Youssef does not allege that these rumors were heard by any of the members of the Career Board, nor that the rumors played any role in the Board's deliberations.  *See* Opp'n to Defs.' Mot. for Summ. J. at 30-32.  The Board's Memorandum also expressly indicated that it did not consider the candidates' national origins, *see* Defs.' Mot. for Summ. J., Ex. 16 at 1 (Career Board Memorandum) ("No discussions were held concerning the protected characteristics of age, color,

_____

[29] Youssef also alleges, without citation or further explanation, that the FBI's staff responsible for reviewing the Career Board documentation determined that Youssef should have been ranked within the top three candidates.  Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 30-31. This argument appears to be a reference to the Executive Development and Selection Program ("EDSP") Section's review of the Career Board's memorandum.  *See* Defs.' Stmt. ¶ 29.  The EDSP staff reviewed the initial draft Career Board memorandum and found that it failed to state sufficient reasons explaining why Youssef was not a ranked candidate.  *See* Defs.' Mot. for Summ. J., Ex.19, Tr. 33-35 (Deposition of Regina Stephens); Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 100 at 3-4 (Sworn Statement of Regina Stephens).  The EDSP staff asked the Board to explicate its rationale, resulting in the final Career Board memorandum discussed herein.  *Id.*  Although Ms. Stevens, who works with the EDSP, indicated that she believed Youssef should have been a ranked candidate based on her review of the Board's initial draft memorandum, she also believed that he lacked the crisis management skills that the other ranked candidates possessed.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 100 at 4.

religion, handicap, national origin, race, or gender"), and the unsworn meeting transcript submitted by Youssef as an exhibit appears to confirm the same.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 86 (Career Board Transcript).

In sum, Youssef would have this Court conclude that his non-selection was discriminatory based on his *prima facie* case, without a proffer of additional evidence supporting an inference that the FBI's reasons for his non-selection were false or pretextual.  As a result, and based on the totality of the admissible evidence before the Court, a jury could not reasonably conclude that Youssef's non-selection constituted impermissible discrimination.  Accordingly, the Court shall grant the FBI's Motion for Summary Judgment on this claim.

> B.      *Non-Promotion to SES Position*

Youssef claims that the FBI discriminated against him by failing to promote him to an SES position.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 32-41.  As stated above, one of the threshold requirements for a *prima facie* case of discrimination based on non-promotion is that the plaintiff actually applied for the position that the employer denied him.  *See Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003).  It is undisputed that Youssef failed to apply for an SES position.  Defs.' Stmt. ¶ 33; Pl.'s Resp. Stmt. ¶ 33.

Youssef argues that his failure to apply for an SES position should be excused because his application would have been futile.  Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 33-34.  The Supreme Court has held that a plaintiff's application may be deemed "futile" where (1) the employer's policy of "gross and pervasive" discrimination communicated to a protected class the futility of applying and (2) the employee would have applied for the job had it not been for those practices.  *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365-67 (1977).  This

doctrine is based on a theory that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Id.* at 365.  Because this doctrine's intended use is reserved for only "the most invidious effects of employment discrimination," *id.* at 367, a plaintiff's ability to prove futility is a difficult burden.  *Id.* at 367-68.  Certain factors undermine claims of futility, such as a lack of knowledge of the discriminatory policy, prior applications for jobs, and public posting of positions.  *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710-712 & n.12 (2d. Cir. 1998).

The Court previously rejected a claim of futility raised by Youssef when he asked for leave to file a Second Amended Complaint.  In his Motion for Leave to File, Youssef sought to add certain disparate impact claims concerning the FBI's SES positions.  *See* Pl.'s Mot. for Leave to File at 3-7.  The FBI opposed the addition of these claims because, *inter alia*, Youssef never applied for an SES position.  *See* Defs.' Opp'n to Pl.'s Mot. for Leave at 6.  Youssef argued that his application for an SES position would have been futile because a number of high level officers within the FBI's CTD provided testimony suggesting that many of the positions were filled without soliciting applications.  *See* Pl.'s [37] Reply at 10.  Magistrate Judge Alan Kay, to whom Youssef's Motion had been referred, rejected Youssef's futility argument.  Magistrate Judge Kay found that Youssef "acknowledges he first learned of the FBI's alleged discriminatory policies during the deposition of Mr. Pikus on February 2, 2005; thus, by his own admission, he could not have been aware of such policies when he initiated his administrative EEO process in March 2002."  [47] Mem. Op. at 10 (May 26, 2005).  Magistrate Judge Kay found that this lack of knowledge directly undercut Youssef's claim that he did not apply for an SES position

48

because he knew it would have been futile.  *Id.*  This Court upheld that decision on Youssef's

Motion for Reconsideration.  *See* [67] Order at 1 (July 22, 2005).

Youssef now raises two new futility arguments in his Opposition to the FBI's Motion for

Summary Judgment, both equally unpersuasive.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at

33-35, 39-41.  The first argument is based on the following syllogism:  Inspection certification is

a required qualification for an employee applying for an SES position; the FBI retaliated against

Youssef by not allowing him to become inspection certified; therefore, by denying Youssef the

opportunity to become inspection certified, the FBI rendered futile any application submitted by

Youssef for an SES position.  *Id.* at 33-34.  Youssef's argument is inconsistent with the futility

doctrine's purpose, which is to excuse an employee from applying for a position when an

employer has implemented a "consistently enforced discriminatory policy."  *Int'l Brotherhood of*

*Teamsters*, 431 U.S. at 365-66; *Lathram*, 336 F.3d at 1089.  The policy allowing employees to

become inspection certified applies *uniformly* to all FBI Special Agents.  *See* Pl.'s Resp. Stmt. ¶

9 (identifying the uniform criteria applicable to any agent seeking to become inspection

certified).  Youssef has not claimed otherwise in his First Amended Complaint, but such an

argument is nevertheless illogical based on the timeline of Youssef's claim.  Between 2000 and

2004, the FBI permitted Youssef to complete five inspections.  *See* Pl.'s Opp'n to Defs.' Mot. for

Summ. J. at 34.  Youssef filed his EEO action in March 2002.  Youssef could not have known

that the FBI would prevent him from becoming inspection certified in 2004, and therefore, a

potential argument that he did not apply for an SES position because of an FBI policy preventing

his inspection certification lacks support.[30]

Youssef's second new futility argument is based on transcripts of career board meetings where various career boards deliberated the selection of SES applicants. According to Youssef, these transcripts show that career board managers "drafted" candidates for SES positions. Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 40. The career boards also selected candidates who were employed in an "acting" capacity, which were not available for competition or posting to other employees. *Id.* Youssef argues that this information creates "strong factual support for [his] contention that he should have been 'drafted' into the SES and/or placed in an acting SES position." *Id.* at 41.

It is true that a plaintiff's failure to apply for a position may be excused if the employer filled the position without soliciting applications. *See Carroll v. England*, 321 F. Supp. 2d 58, 68 (D.D.C. 2004). The present case, however, does not fit this paradigm. First, the Court has already found that, by his own admission, Youssef was unaware of any alleged discriminatory promotion policies until the February 2005 deposition of John Pikus, several years after his failure to apply for the SES positions for which he now claims he should have been considered. *See* [47] Mem. Op. at 10 (May 26, 2005). A lack of knowledge concerning these policies undermines his argument that he knew at the time it was futile to apply for an SES position. Additionally, even if Youssef were aware of the FBI's alleged policies at the time, the record

---

[30] Nor did Youssef exhaust his administrative remedies as to a futility claim based on the FBI's alleged decision to prevent Youssef from becoming inspection certified. *See* Defs.' Mot. for Summ. J., Ex. 13 (EEO Complaint). The Court notes that the D.C. Circuit recently explained that two circuits have considered and reached different conclusions with respect to whether a claim arising after the filing of a formal administrative complaint must be raised administratively before being brought before a district court, but it declined to adopt either of the two positions on the facts of the case before it. *See Weber v. Battista*, 494 F.3d 179, 183-84 (D.C. Cir. 2007).

evidence undermines his argument.  The FBI points out (and Youssef does not refute) that between 1999 through June 2005, twenty-four entry-level SES position were filled in CTD, and all but three of the individuals were promoted to an SES position after submitting applications for the positions, and only three were employed in "acting" capacities.  Defs.' Mot. for Summ. J. at 23; Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 40.  The FBI also maintains a policy requiring advertisement of SES positions bureau-wide.  *See* Defs.' Mot. for Summ. J., Ex. 1.c (MAOP 3-11.1).  The futility defense is "unavailable if an employer openly advertised job vacancies to all employees."  *Carroll*, 321 F. Supp. 2d at 68.  *See also Brown*, 163 F.3d at 710-12.

Because Youssef cannot establish a *prima facie* case by showing that either (1) he applied for, and was denied, an SES position or (2) his application for an SES position is excused based on the doctrine of futility, the Court shall grant the FBI's Motion for Summary Judgment on this claim.

### C.  Denial of Requests for Leave to Complete Final Inspection

"Like claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme."  *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).  Under the *McDonnell Douglas* paradigm, Youssef has the initial burden of proving by a preponderance of the evidence a *prima facie* case of retaliation.  *McDonnell Douglas*, 411 U.S. at 802.  If Youssef succeeds in establishing a prima facie case, the burden shifts to the FBI to articulate some legitimate, non-retaliatory reason for its actions, and to produce credible evidence supporting its claim.  *Id.*  If the FBI is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] [retaliation] *vel non*."  *Reeves v. Sanderson*

51

*Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks

omitted).  At that point, Youssef has the burden of persuasion to show that the FBI's proffered

reasons were not the true reasons for its employment decisions.  *Burdine*, 450 U.S. at 256.

### 1.    Youssef's Prima Facie Case

As Youssef proffers no direct evidence[31] that the FBI retaliated against him for filing an

EEO complaint, the *McDonnell Douglas* framework applies.  Youssef may establish a *prima*

*facie* case of retaliation by showing that (1) he engaged in statutorily protected activity; (2) the

FBI took an adverse personnel action against him; and (3) a causal connection exists between the

two.  *Carney*, 151 F.3d at 1095 (citing *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)).

Youssef's burden in this regard is not particularly onerous; he "merely needs to establish facts

adequate to permit an inference of retaliatory motive."  *Forman*, 271 F.3d at 299.

"An activity is 'protected' for the purposes of a retaliation claim 'if it involves opposing

alleged discriminatory treatment by the employer or participating in legal efforts against the

alleged treatment.'"  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C.

---

[31]   Youssef's Opposition initially argues that the record contains direct evidence of
retaliation.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 35-36 (arguing, without citation to
any portion of the record, that "[i]nferences and circumstantial evidence aside, Mr. Lewis has
admitted, in sworn testimony, that his reason for denying Mr. Youssef the opportunity to
complete his inspections is motivated by direct animus related to Mr. Youssef's participation in
EEO proceedings").  A review of Lewis' deposition testimony reveals that Lewis did not testify
that he denied Youssef's requests to complete his inspections based on direct animus related to
Youssef's EEO-related activities, but rather denied requests for leave to complete inspections
based on the amount of time Youssef had spent out of the office after becoming Unit Chief of the
CAU (which included absences pursuant to EEO-related activities).  *See* Lewis Depo. Tr. 79:1 -
80:9.  Although Youssef may draw an inference of retaliation based on this testimony and the
circumstances surrounding the denial of his requests, the Court fails to see how this testimony
may be characterized as direct evidence of retaliatory intent.  *Cf. Forman v. Small*, 271 F.3d 285,
299 (D.C. Cir. 2001) (finding direct evidence where supervisor stated that he did not forward
plaintiff's complaint because plaintiff had filed an EEO charge).

2006) (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212-13 (D.D.C.

2006)).  Youssef establishes the first prong of his *prima facie* case by showing that he engaged in

statutorily-protected activities, such as filing an EEO complaint, meeting with Director Mueller

and Congressman Wolf to oppose perceived discrimination, and initiating a lawsuit.  *See* 42

U.S.C. § 2000e-3(a) (prohibiting discrimination against an employee because he "opposed any

practice made an unlawful employment practice by this title or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

this title"); *Welzel v. Bernstein,* 436 F. Supp. 2d 110, 118 (D.D.C. 2006), *appeal dismissed*, 2007

U.S. App. LEXIS 12377 (D.C. Cir. May 25, 2007).  An action is "adverse" if the employer's

actions are likely to have "'dissuaded a reasonable worker from making or supporting a charge of

discrimination.'" *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2415

(2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. 2006)).  Youssef also meets the

second prong of his *prima facie* case by showing that he suffered an adverse action based on the

FBI's denials of his requests for leave to complete his final inspection necessary to become

inspection certified.[32]  *See Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (explaining that

---

[32] A point of clarification concerning Youssef's inspection requests is necessary.  Youssef
argues in his Opposition that the FBI retaliated against him because his supervisor, Lewis,
prevented him from completing his sixth and final inspection necessary to become inspection
certified.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 34-35.  Youssef's Statement of Material
Facts, however, also identifies previous denials of his inspection requests by a former supervisor,
Mr. Michael Fedarcyk, occurring in November 2002, July 2003, and November 2003.  Pl.'s
Resp. Stmt. ¶ 34.  The FBI addressed these denials in its Motion for Summary Judgment, *see*
Defs.' Mot. for Summ. J. at 26 (arguing that Youssef failed to establish a *prima facie* case or put
forth evidence of pretext as to the denials of these requests), but Youssef failed to respond with
any contrary arguments in his Opposition to the FBI's Motion for Summary Judgment.
Accordingly, any claims Youssef may have intended concerning Mr. Fedarcyk's denials of his
requests may be treated as conceded.  *See Speaks v. D.C.*, Civ. A. No. 03-1963, 2006 U.S. Dist.
LEXIS 16776 at *12 n.1 (D.D.C. Apr. 6, 2006) ("Defendant's summary judgment motion seized

denial of a promotion, or the opportunity to compete for a promotion, may constitute a materially

adverse action); *Moncrief v. Daro*, 2005 U.S. Dist. LEXIS 9244 * 32 (D.D.C. Apr. 28, 2005)

(limiting advancement opportunities may constitute an adverse action).  The FBI does not argue

that Youssef has failed to establish the first two elements of his *prima facie* case.

As for the third element of Youssef's *prima facie* case, the FBI argues that Youssef has

not shown the requisite link between his statutorily-protected activities and the alleged adverse

action taken by the FBI.  Defs.' Mot. for Summ. J. at 28.  Youssef may establish this link by

"showing that the employer had knowledge of the employee's protected activity, and that the

adverse personnel action took place shortly after that activity,"  *Mitchell v. Baldrige*, 759 F.2d

80, 86 (D.C. Cir. 1985), or by establishing other facts "adequate to permit an inference of

retaliatory motive," *Forman*, 271 F.3d at 299.

According to Youssef, Lewis' deposition testimony in this case suffices to provide the

requisite causal link to establish a *prima facie* case because it shows Lewis had knowledge of

Youssef's EEO-related activities and considered those activities when he denied Youssef's

requests for leave to participate in inspections, *see* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 36.

Lewis testified as follows:

> Q: While [Youssef is] taking leave for the EEO process, in your mind, would that
> impact your willingness to allow him out of the office on other matters not
> directly related to his job?

---

upon these deficiencies in the record, yet Plaintiffs' opposition papers are silent on the issue,
which arguably provides an independent basis for treating Defendant's argument as conceded.").
Even if they were not deemed conceded, it is clear as a matter of law that Youssef's one
paragraph description of the requests does not set forth sufficient evidence to establish, for each
request Mr. Fedarcyk denied, a *prima facie* case of retaliation, nor *evidence* of pretext beyond
Youssef's self-serving conclusory statement that the reason provided by Mr. Fedarcyk for one of
the denials was "pretexual."  *See* Pl.'s Resp. Stmt. ¶ 34.

A: Yes.

Q: Why?

A: Because it all adds up the time away from the office.

Q: Would that include the inspections he's asked for?

A: Yes, most definitely . . . Now I know this process is going to end at some point and then this won't be part of his time and attendance equation any more.  There will be greater flexibility and seeing him go to inspections or training or whatever else, you know, he might want to go because this thing is done.  But to do the normal sorts of things that take him away from his job, on top of this unusual thing that has cropped up, is a couple extra straws on that camel's back.  So there's got to be some reasonableness and consideration plugged into that process, in my view."

Lewis Depo. Tr. 79:1 - 80:9.

The FBI argues that, despite the above testimony, Youssef has failed to establish a causal link between the filing of his EEO complaint and Lewis' decision to deny Youssef's requests to participate in inspections because (1) Lewis learned of Youssef's EEO complaint in May 2004, (2) Lewis *approved* Youssef's request to participate in an inspection in November 2004, and (3) Lewis' denial of Youssef's inspection requests occurred in January and February 2005.  *See* Defs.' Mot. for Summ. J. at 28.  Based on this timeline, the FBI argues that there can be no causal connection between Youssef's complaint and the denial of his requests to participate in inspections.  *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that "very close" temporal proximity may prove causation for purposes of establishing a *prima facie* case).

The FBI's argument is unpersuasive because Youssef engaged in statutorily-protected activities beyond filing a complaint, such as meeting with Director Mueller, leaving work for

depositions, and taking the depositions of other FBI employees.  *See Lemmons*, 431 F. Supp. 2d
at 91 ("An activity is 'protected' for purposes of a retaliation claim 'if it involves opposing
alleged discriminatory treatment by the employer or participating in legal efforts against the
alleged treatment.'") (quoting *Coleman*, 422 F. Supp. 2d at 212).  Lewis' testimony above
expressly refers to the "EEO process," not just the filing of Youssef's complaint.  Because
Youssef has set forth numerous instances of protected conduct and Lewis' knowledge of the
same, Lewis' testimony is sufficient to establish the requisite causal link.  *See Harding v. Gray*,
9 F.3d 150, 152 (D.C. Cir. 1993) (holding that a plaintiff's burden of establishing a *prima facie*
case is "not onerous").

        Accordingly, the Court finds that Youssef has adduced sufficient evidence of the requisite
link between Lewis' knowledge of Youssef's EEO-related activities and the denial of his
inspection requests to perform his final inspection.

##                    2.        The FBI's Proffered Legitimate, Non-Retaliatory Reasons

        The burden now shifts to the FBI to produce evidence that Lewis denied Youssef's
requests for one or more legitimate, non-retaliatory reasons.  *Reeves*, 530 U.S. at 142; *Than v.
Radio Free Asia*, 496 F. Supp. 2d 38, 48 (D.D.C. 2007).  The FBI relies on substantial evidence
in the record to argue that Lewis denied Youssef's requests for leave to perform inspections
based on Youssef's prolonged absences from work, notwithstanding the reasons for those
absences.  *See* Defs.' Reply at 22-25.  This evidence includes Lewis' contemporaneous email
explanation to Youssef and Youssef's supervisor Laurie Bennet:

        Laurie/Bassem: both of you will recall following our conversations that the reason
        for withdrawing from the LA Inspection had to do with the amount of time
        [Youssef] has/has not spent in the [Unit Chief] chair.  As stated earlier, our first

> priority is to CTD, to ensure a smooth transition from the old [Unit Chief] to the
> new [Youssef], and to ensure CAU is receiving consistent and appropriate
> leadership, oversight, and direction.  For that reason I asked that [Youssef] be
> moved off the LA inspection and we'll find another assignment some where [sic]
> down the line.  In regards to the most recent [inspection request], I do not believe
> those who made this assignment are aware of the above concerns or for that
> matter prior conversations I may have had with the Inspection Division . . .
> [Youssef] can stand down on the [inspection request] in favor of a future
> Inspection assignment as we have previously discussed.

Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 115 (Lewis Email dated Feb. 16, 2005).

    The FBI also identifies evidence in the record suggesting that Youssef had been absent

from work about two-thirds of the time during the first four months that he was assigned to a new

Unit Chief position in the CAU.  *See* Lewis Depo Tr. 65:9-13 (testifying that Youssef was absent

about two-thirds of the time between early November 2004 through February 2005).  The FBI

further identifies evidence suggesting that Lewis was concerned about Youssef's ability to

perform his job responsibilities if he continued to be absent from the CAU:

> The thing that struck me as odd when [Youssef] told me about this [Los Angeles
> inspection request] at lunch was you were just there.  Excuse me.  You were just
> out on an inspection.  You have a brand new unit, very important . . . He and I
> both know that he has a learning curve to get down which is fairly complex . . .
> now he's signing up for a three week inspection, mind you, without discussing
> this with his immediate supervisors, the assistant section chief and section chief.
>
> * * *
>
> I'm not sure he has the level of understanding that I would like him to have as to
> how important the business is going on in that unit.  If he did, if he had the same
> understanding that I do, if he felt the same sense of urgency, I don't believe he
> would have been absent for about two thirds of the time for most of the time he
> has been in the unit . . .

Lewis Depo. Tr. 146:18 - 147:15; 69:18 - 70:2.

    Based on this evidence, the Court finds that the FBI has proffered legitimate, non-

retaliatory reasons for denying Youssef's requests for leave to perform inspections in January and February 2005 in the form of Youssef's significant absence during the first four months of his new position.

3.     Evidence of Pretext or Retaliation, *Vel Non*

Given the FBI's legitimate, non-retaliatory reasons justifying the denial of Youssef's requests for leave to perform inspections in January and February 2005, Youssef must now seize the "opportunity to discredit the employer's explanation," *Aka*, 156 F.3d at 1288, by demonstrating that the proffered reasons are mere pretext, *see Paquin*, 119 F.3d at 26-27. According to Youssef, Lewis' deposition testimony supports his argument that Lewis denied his requests for leave to perform inspections out of retaliation for his statutorily-protected activities. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 39.  For example, Youssef alludes to portions of Lewis' deposition testimony indicating that Lewis did not believe his EEO-related activities were appropriate:

> A: . . . the security of this country is far more important than what [Youssef] is doing in this office.
>
> Q: And does that mean . . . the attorney's office here?
>
> A: Yes.
>
> * * *
>
> Q: . . . are you aware that . . . [Youssef] has been away a lot, attending a lot of depositions?
>
> A: Right, and I have to strike a careful balance.  I don't want to give you the notion or [Youssef] that I'm completely insensitive to the process.  I'm not.  I understand this process.  I've been around it a lot and I understand that these things need to go forward.  There's a careful balance to be struck.  Having said that, there's no one here at the table that can convince me that this process or

58

anything else that any of us are party to is more important than protecting the
United States against the next 9/11 . . . If this were Home Depot or the Hallmark
Card Shop or Dunkin' Donuts, that would be okay.  But it ain't okay for the FBI.

Lewis Depo. Tr. 66:3 - 67:21.

Youssef also alludes to a portion of the Lewis deposition testimony that, according to

Youssef, suggests that Lewis would only allow Youssef to complete his final inspection after he

finished with his EEO-related activities:

Q: While [Youssef is] taking leave for the EEO process, in your mind, would that
impact your willingness to allow him out of the office on other matters not
directly related to his job?

A: Yes.

Q: Why?

A: Because it all adds up the time away from the office.

Q: Would that include the inspections he's asked for?

A: Yes, most definitely . . . Now I know this process is going to end at some point
and then this won't be part of his time and attendance equation any more.  There
will be greater flexibility and seeing him go to inspections or training or whatever
else, you know, he might want to go because this thing is done.  But to do the
normal sorts of things that take him away from his job, on top of this unusual
thing that has cropped up, is a couple extra straws on that camel's back.  So
there's got to be some reasonableness and consideration plugged into that process,
in my view.

Lewis Depo. Tr. 79:1 - 80:9.

Youssef also highlights the fact that Lewis learned of Youssef's meeting with Director

Mueller and Congressman Wolf in May 2004, and persisted in his belief that Youssef had acted

inappropriately:

A: . . . As I think about it here and now and as I have a couple of other times since
he told me, I can hardly fathom what would bring someone to cause a

[Congressman] to call the FBI Director and pull him away from his duties and to surprise him with some sort of, the best term I can use is, ambush and questions . . . I'm still amazed that he had the wherewithal, and maybe there's pieces of this I don't fully understand, so I don't know what happened exactly right but the Director was truly appalled, a surprise visit and hit with questions upon his arrival not knowing why he was walking into [] Congressman [Wolf's] office.  On a scale of one to 100, the judgment factor there would be way down into the negatives as far as I'm concerned.

* * *

Q: And you then testified that you still think, in other words, you still have a negative opinion about it today?

A: Holy mackerel.  I mean absolutely.  I couldn't imagine being more disloyal and discourteous putting the director of the FBI in that position.  It surprised me . . . I don't think anyone in the history of our organization has ever done that to the director . . .

* * *

A: It shows a tremendous disloyalty to the director.  It shows me that at least at that time he was far more interested in Bassem Youssef than he was serving this government or the FBI.  Those things concern me a great deal.

Pl.'s Mot. for Partial Summ. J., Ex. 40, Tr. 180:20 - 181:17; 131:13-18; 129:16-19 (Deposition

of John Lewis).  Youssef implies that Lewis' reaction to his requests for leave to perform his

final inspection may have been related to how Lewis perceived Youssef's treatment of the

Director.  Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 36.

Reviewing Lewis' deposition testimony as a whole, two different inferences are possible.

On the one hand, a jury could find that Lewis retaliated against Youssef by preventing him from

becoming inspection certified out of animus toward his statutorily-protected activities.  A jury

could further find that Lewis' testimony implies that Youssef would not be allowed to become

inspection certified until after he ended his EEO-related activities.  On the other hand, a jury

could find that Lewis denied Youssef's requests for leave to perform inspections because he was concerned about the functioning of the CAU after Youssef had been installed as its Unit Chief and then was absent two-thirds of the time for the first four months he was placed in that position.  A jury could also find that Lewis' denial of Youssef's requests was reasonable because the decision to grant or deny leave for training opportunities, including inspections, is discretionary, and based on a supervisor's belief that an employee can otherwise meet his job responsibilities.  The finder of fact, not the Court, must decide which of these inferences is more likely based on the evidence.  Accordingly, the Court shall deny the FBI's Motion for Summary Judgment on this claim.

###### D.        Rescission of ITOS Directed Placement

The FBI transferred Youssef into the International Terrorism Operations Section ("ITOS") unit pursuant to an FBI transfer memorandum dated April 30, 2002.[33]  That transfer was never implemented.  Youssef filed a Motion for Partial Summary Judgment arguing that the FBI's decision to "rescind the transfer" was retaliation for pursuing his statutorily-protected activities.  Pl.'s Mot. for Partial Summ. J. at 2.  In response, the FBI filed a Second Motion for Summary Judgment arguing, *inter alia*, that Youssef's First Amended Complaint did not assert a retaliation claim based on rescission of the April 30, 2002 memorandum, and that the claim should be dismissed because the FBI had no notice of it.[34]  *See* Defs.' Second Mot. for Summ. J. at 1 n.1, 13-16.  Based on a review of Youssef's First Amended Complaint, the Court is

---

[33] Youssef was assigned to the DocEx Unit beginning March 2002.

[34] Youssef filed a Motion to Strike the FBIs Second Motion for Summary Judgment, and the Parties completed their briefing of this "claim" in the context of Youssef's Motion to Strike.

compelled to deny Youssef's Motion for Partial Summary Judgment, and to grant the FBI's

Motion for Summary Judgment.

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to provide "a short and plain

statement of the claim showing that the pleader is entitled to relief."  This requirement is not

particularly onerous, and a plaintiff need only set forth sufficient facts to provide the defendant

with "fair notice" of the plaintiff's claim.  *See Arent v. Shalala*, 70 F.3d 610, 618 (D.C. Cir.

1995).  *See also Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) ("While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do") (internal citations omitted).

Youssef's First Amended Complaint contains three counts.  Count I is denominated

"National Origin Discrimination," and describes Youssef's lack of counterterrorism work since

the 9/11 attacks, his treatment in the DocEx Unit, and his non-promotion to SES.  Count II is

denominated "Reprisal," and focuses on rumors allegedly circulated about Youssef and

allegations related to his First Amendment Claims.  Count III is denominated

"Reprisal/Discrimination," and describes the FBI's denial of Youssef's inspection requests,

denial of certain travel opportunities, and exclusion from certain lists maintained by the FBI.

Nowhere in his First Amended Complaint does Youssef make even an oblique reference to the

ITOS transfer memorandum, a potential transfer into the ITOS unit, or the FBI's reversal of a

decision to transfer him into the ITOS unit.

Rather than explain where in his First Amended Complaint he included his ITOS transfer

claim, Youssef's argues that the ITOS transfer was generally part of overlapping discrimination and retaliation claims that were the subject of discovery.  *See* Pl.'s Reply at 2.  That argument is both non-responsive and unpersuasive.  Youssef cannot amend his complaint by merely taking discovery on a subject or by filing a Motion for Partial Summary Judgment; he must amend his complaint in accordance with Fed. R. Civ. P. 15(a).  *See Sharp v. Rosa Mexicano*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) (plaintiff may not, through summary judgment briefs, raise [] new claims . . . because plaintiff did not raise them in his complaint, and did not file an amended complaint" such claims may be dismissed); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 84 (D.D.C. 2007) (rejecting plaintiff's attempts to broaden its conspiracy claims in its opposition to defendant's motion for summary judgment because plaintiff failed to amend its complaint).  The Eleventh Circuit recently explained this principle:

> The Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a).  This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.  Indeed, the simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.  Efficiency and judicial economy require that the liberal pleading standards under [*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)] and Rule 8(a) are inapplicable after discovery has commenced.  At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).

*Gilmour v. Gates*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (internal citations and quotations omitted).  Even though Youssef was permitted to amend his First Amended Complaint to add an additional retaliation claim at the close of discovery, *see* [47] Mem. Op. at 15 (May 26, 2005), Youssef did not add a retaliation claim based on the ITOS transfer memorandum.[35]  Nor did

---

[35] The additional retaliation claim added by Youssef at the close of discovery concerned his allegations that the FBI prevented him from becoming inspection certified.  *See* [47] Mem.

Youssef request leave to amend his First Amended Complaint at any time thereafter to add such a claim.

Youssef now attempts to cobble together support for this claim from a variety of sources, including a reference to just a single paragraph in his 179-paragraph First Amended Complaint. Youssef identifies Paragraph 101–contained in the "Discrimination" section of his complaint–as describing the FBI's "decision [to] revers[e] Youssef's transfer to the counterterrorism division in July 2002." Pl.'s [121] Reply at 4.  Set forth in its entirety, the paragraph reads:

> However, on July 26, 2002, it was announced at a multi-agency meeting that another individual would be the new acting Unit Chief of the Document Exploitation Unit.  This announcement was both discriminatory and taken in reprisal for the EEO claim that plaintiff had recently filed.

First Am. Compl. ¶ 101.  As is clear from the language of this paragraph, Paragraph 101 actually describes an incident where Youssef's supervisor in the DocEx Unit announced that another individual, rather than Youssef, would become the acting Chief of that Unit.  The Paragraph bears no relationship to the ITOS transfer claim.  The paragraphs surrounding Paragraph 101 only underscore this point.  Paragraph 100 states, in its entirety, that "[i]n June 2002, Mr. Youssef was named Acting Unit Chief of the Document Exploitation Unit in the Counterterrorism section."  Paragraph 102 states, in its entirety, "Mr. Youssef was not even warned about the announcement prior to the meeting.  When the announcement was made at the meeting, Mr. Youssef was extremely embarrassed and humiliated."  It is impossible to read these Paragraphs as asserting a retaliation claim based on rescission of the ITOS transfer memorandum.  In short, Youssef's First Amended Complaint contains no facts underlying

---

Op. at 15 (May 26, 2005).

Youssef's claim concerning the FBI's rescission of his ITOS transfer.

Despite his failure to properly plead his ITOS transfer claim, Youssef argues that the FBI was, in any event, placed on notice of its existence because of an interrogatory propounded to the FBI and deposition questioning of FBI Director Mueller.  *See* Pl.'s [121] Reply at 6-9.  Not only does this argument fail to respond to the basic problem that this claim was not pled, it is also unpersuasive.  Youssef's complaint and various submissions contain allegations of many actions that Youssef concedes do not "rise to the level of actionable adverse action," but may be probative of motive or evidence of other elements.  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 27 n.11.  The ITOS transfer memorandum was viewed at all times as something that could be probative of discrimination.  For example, Youssef explained in his Motion to Compel filed May 18, 2005 (the day discovery was set to close after two prior extensions) that the ITOS memorandum was "relevant to his claims that the FBI excluded him from assignments within his area of expertise and/or failed to promote him *on the basis of his national origin*."  Pl.'s Mot. to Compel at 36 (emphasis added).  On June 7, 2005, Magistrate Judge Alan Kay granted in part and denied in part Youssef's request for additional depositions, wherein he also identified the ITOS transfer memorandum as concerning Youssef's claim that "the FBI did not assign [Youssef] to [ITOS] *because of his Middle Eastern descent*."  [54] Mem. Op. at 1-2 (June 7, 2005) (emphasis added).  That Youssef asked about the ITOS transfer memorandum would not have placed the FBI on notice that it was a distinct legal claim, especially considering that no supporting facts can be found in Youssef's First Amended Complaint. Youssef's argument that the FBI could have anticipated his retaliation claim even though the ITOS transfer memorandum had been discussed in this context of his discrimination claim ignores the legal reality that those

two claims are different.  *See Burlington N. & Santa Fe Railway Co. v. White*,  548 U.S. 53, 126

S. Ct. 2405, 2412 (2006) ("The [discrimination] provision seeks to prevent injury to individuals

based on who they are, i.e., their status.  The anti-retaliation provision seeks to prevent harm to

individuals based on what they do, i.e., their conduct.").  Moreover, unlike Youssef's claim based

on his non-selection for the SIOC position–which was included in Youssef's EEO Complaint,

thereby providing the FBI with notice of the claim–the ITOS transfer claim was not included in

Youssef's EEO complaint, so the FBI had no notice of it.[36]  At bottom, Youssef cannot now re-

write history to turn his discovery of the ITOS transfer memorandum into a claim that was not

pled in his First Amended Complaint.

Finally, the Court further notes that the D.C. Circuit recently reminded lower courts to

"read [the plaintiff's] complaint as he wrote it."  *Schuler v. PriceWaterhouseCoopers*, 2008 U.S.

App. LEXIS 3150 *14 (D.C. Cir. 2008).  In *Schuler*, the district court had construed the

plaintiff's ADEA claim (analyzed under the *McDonnell Douglas* tripartite inquiry) as alleging

two non-promotion claims.  The D.C. Circuit reversed, holding that the plaintiff's claim should

have been construed as a "pattern and practice" claim because it made "no reference to individual

nonpromotion decisions, but rather incorporate[d] the rest of the complaint [which described the

non-promotion decisions] by reference."  Based on this guidance, this Court shall construe

Youssef's complaint "as he wrote it," taking into account the factual allegations as he has

presented them.  In so doing, the Court reaches the inescapable conclusion that Youssef has

---

[36] Youssef claims he had no knowledge of the ITOS transfer until the FBI produced the ITOS transfer memorandum with its initial disclosures in this case.  *See* Pl.'s [52] Reply.

moved for summary judgment on a claim that he failed to plead in his complaint.[37]  Accordingly,

the Court shall deny Youssef's Motion for Partial Summary Judgment, grant the FBI's Second

Motion for Summary Judgment,[38] and deny Youssef's Motion to Strike.[39]

       E.     *Additional "Claims"*

One final issue remains.  In his Opposition to the FBI's Motion for Summary Judgment,

Youssef argues that there are five claims that the FBI failed to address in its Motion for Summary

Judgment that were included in Youssef's First Amended Complaint.  It is admittedly difficult to

evaluate which allegations Youssef considers to be legal "claims" because his First Amended

Complaint is not particularly clear in this regard.  Moreover, even Youssef acknowledges that

many allegations "may not rise to the level of actionable adverse action" although they may be

"evidence of impermissible motive."  *See* Pl.'s Opp'n to Defs. Mot. for Summ. J. at 27 n. 11.

Youssef identifies five areas where he believes that he has asserted a claim that the FBI has not

addressed in its Motion for Summary Judgment:  (1) Youssef was "blocked from obtaining

meaningful work in his area of expertise post-9/11"; (2) the FBI rescinded Youssef's transfer to

---

[37] The Court also notes that Youssef failed to exhaust his administrative remedies with respect to this claim, although it is an open question in this circuit as to whether a claim arising after the filing of a formal administrative complaint must be raised administratively before being brought before a district court.  *See Weber v. Battista*, 494 F.3d 179, 183-84 (D.C. Cir. 2007).

[38] Because Youssef failed to allege this claim in his First Amended Complaint, the Court notes that it "does not matter whether judgment is entered pursuant to either rule 56(c), Rule 12(b)(6), or 12(c)."  *See Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 107 n. 15 (D.D.C. 2004).

[39] Youssef alleges that certain of the documents introduced by the FBI to support its Second Motion for Summary Judgment were not produced in discovery but should have been.  It is unclear whether resolution of these Motions moot any issues associated with these exhibits.  If there are issues that have not been rendered moot, the Parties should confer to resolve them, and absent resolution, may seek the intervention of this Court.

the ITOS unit; (3) Youssef was assigned to DocEx which "deprived Youssef of the ability to

work within" his desired area of work; (4) FBI officials heard the "the utterly false statement that

the Office of Professional Responsibility had conducted an investigation" of Youssef; and (5)

Youssef "was to be transferred into the Budget Unit" (emphasis in original omitted).  Pl.'s Opp'n

to Defs.' Mot. for Summ. J. at 41-43.

      The Court agrees with the FBI that these are not legal "claims."  Addressing them in the

order presented above, the first claim does not allege an adverse employment action, it alleges

the status quo.  The FBI addressed Youssef's non-promotion to the SES and his non-selection to

the SIOC, and the Court ruled on them above.  *See* Sections III.A and B, *supra* (pages 26-50).  In

the absence of identifying other positions to which he applied, it is unclear how Youssef could

show that he is basing a claim on anything other than "[m]ere idiosyncracies of personal

preference [that] are not sufficient to state an injury."  *Brown*, 199 F.3d at 457.  The second claim

was not pleaded in Youssef's First Amended Complaint and cannot properly be viewed as a legal

claim.  *See* section III.D, *supra* (pages 60-66).  The third claim appears to be a repackaging of

Youssef's first claim that Youssef did not perform the work he desired.  The FBI addressed, and

the Court ruled on, the two positions to which Youssef believed himself entitled.  *See* Sections

III.A and B, *supra* (pages 26-50).  The fourth claim concerns alleged rumors circulated at the

FBI.  Youssef fails to connect these rumors to any adverse employment action, and fails to

present evidence showing that they could, standing alone, constitute an adverse action.  *See*

*Burlington N. & Santa Fe Railway Co.*, 126 S.ct at 2415 ("Title VII . . . does not set forth a

general civility code for the American workplace" and adverse employment actions do not

include "petty slights, minor annoyances, and simple lack of good manners") (citation and

internal quotation marks omitted).  In addition, one of the two statements on which Youssef

relies to show that the rumors existed is hearsay, *see* Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex.

22 at 5 (EEO Investigation) (EEO officer explaining that William Chornyak said he heard a

rumor from a third-party), and the other offers nothing to support the idea that such rumors, if

they existed, were known to those who Youssef believes discriminated or retaliated against him.

*See id.*, Ex. 84 ¶21 (Affidavit of Paul Vick) (explaining that he heard the rumors from Jim Olsen,

a former FBI agent).  The fifth claim concerns Youssef's transfer into the Budget Unit.  Because

it is undisputed that Youssef was never transferred into this unit, *see* Defs.' Mot. for Summ. J.,

Ex. 8, Tr. 224:12-22 (Deposition of Bassem Youssef), Youssef could not have suffered an

adverse employment action in this regard.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall grant in part and deny in part Defendant's

[85] Motion for Summary Judgment, deny Plaintiff's [82] Motion for Partial Summary

Judgment, grant Defendant's [109] Second Motion for Summary Judgment, and deny Plaintiff's

[114] Motion to Strike.  An appropriate Order accompanies this Memorandum Opinion.


Date:    March 30, 2008


        _/s/_____
        COLLEEN KOLLAR-KOTELLY
        United States District Judge