UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BASSEM YOUSSEF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:03CV01551 (CKK) |
| | ) | |
| ERIC HOLDER, JR., | ) | |
| ATTORNEY GENERAL, | ) | |
| U.S. DEPARTMENT OF JUSTICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MOTION FOR PROTECTIVE ORDER AND TO HOLD RULE 30(B)(6)
DEPOSITION IN ABEYANCE AND MEMORANDUM IN SUPPORT THEREOF**

**<u>Introduction</u>**

In its May 18, 2009 Order, the Court noted that "issues concerning liability and damages

may overlap." Order of May 18, 2009 (D.E. 156) at 2. Plaintiff has seized on this statement as

an invitation to reopen discovery on the promotion policies and practices of the Federal Bureau

of Investigation (FBI), issues related to liability without much, if any, impact on damages. On

May 19, 2009, plaintiff served the attached notice for a Rule 30(b)(6) deposition, scheduled for

May 27, 2009 (Exhibit 1), which makes no pretense to seeking discovery on damages, but instead

asks about categories of information that are central to plaintiff's liability claim. Moreover,

plaintiff already noticed and conducted a Rule 30(b)(6) deposition on the FBI's policies

regarding promotion to the Senior Executive Service (SES) at the outset of liability discovery in

this litigation (Exhibits 2 and 3) and has been provided, during the course of discovery, with

copies of the FBI's written policies on promotions and job requirements. *See infra.* In addition

to being irrelevant to damages and duplicative, the Rule 30(b)(6) notice is deficient because

several categories of information sought are so vague as to be effectively impossible to address.

For the reasons set forth herein, defendants move for a protective order barring plaintiff from

conducting a Rule 30(b)(6) deposition on the categories of information contained in the May 19,

2009 Notice.[1]  Defendants further move that the deposition, presently scheduled for May 27,

2009, be held in abeyance pending the Court's ruling on the motion for protective order.

**ARGUMENT**

**I.    THE COURT SHOULD ENTER A PROTECTIVE ORDER EXCUSING
       DEFENDANTS FROM THE OBLIGATION TO COMPLY WITH PLAINTIFF'S
       MAY 19, 2009 NOTICE OF DEPOSITION**

Federal courts have broad discretion to control the sequence and timing of discovery.  See

Herbert v. Lando, 441 U.S. 153, 177 (1979) ("[J]udges should not hesitate to exercise appropriate

control over the discovery process.").  Under Rule 26(c) of the Federal Rules of Civil Procedure,

courts have discretion to issue protective orders upon a showing of good cause.  Rule 26(c)

provides, in pertinent part, that:

> Upon motion by a party or by the person from whom discovery is sought, accompanied
> by a certification that the movant has in good faith conferred or attempted to confer with
> other affected parties in an effort to resolve the dispute without court action, and for good
> cause shown, the court in which the action is pending * * * may make any order which
> justice requires to protect a party or person from annoyance, embarrassment, oppression,
> or undue burden or expense, including . . . (1) that the disclosure or discovery not be had.

---

[1]  Defendants note that the Rule 30(b)(6) Notice was served one day after the Court's May
18, 2009 Order.  In that Order, the Court directed plaintiff to produce a supplemental expert
report setting forth the factual bases for the expert's opinion that plaintiff would have received an
SES promotion if he had been inspection certified; plaintiff was well qualified for an SES
position and should have been promoted; and plaintiff was more qualified than other individuals
who were, in fact, promoted to SES positions.  To the extent plaintiff seeks through the Rule
30(b)(6) deposition to obtain any or all of this information for the supplemental expert report,
such a tactic is inappropriate because the expert should already have in his possession the
information on which he relied to formulate his opinions.

Fed. R. Civ. P. 26(c).

   **A.    Categories 1, 2 and 4 of the Notice Are Exclusively Relevant to Liability
          Issues and Have Already Been the Subject of Rule 30(b)(6) Depositions**

These three categories are as follows:

   1.    The FBI's policies and practices for promotions.

   2.    The FBI's job requirements for promotions to ASAC and SES positions.

   4.    The work experience and qualifications of persons the defendants

         promoted between 2004 and 2007, including but not limited to Arthur M.

         Cummings II, Janice K. Fedarcyk . . . Michael Heimbach and John G.

         Kavanagh.

   Plaintiff's Notice offers no explanation as to how these overly broad categories relate to

damages or the extent to which these issues relating to liability may broach the subject of

damages.   Moreover, these broad and general categories of information already have been

subject to discovery in this case.  For example, in August 2004, plaintiff served a Rule 30(b)(6)

notice for an FBI representative to testify "with regard to all promotional activities concerning

counter-terrorism in which any employee for the FBI who had a rank of GS-15 or below was

promoted into the SES since 2001."  August 25, 2004 Pl.'s First Notice of Deposition (Exhibit

2).  The FBI designated and plaintiff examined John Pikus, who had served as the Section Chief

for the Executive Development and Selection Program.  Deposition of John Pikus (Pikus Depo)

at 8 (Exhibit 3).  Pikus' deposition testimony was not limited to SES promotion policies and

practices in the Counterterrorism Division, but addressed those policies and practices in general.

See, e.g., Pikus Depo at 23, 26-27, 45, 48-58.  In fact, Pikus' testimony concerning the selection

process for entry level SES positions was the basis for plaintiff's Motion to File Second

Amended Complaint in March 2005 (D.E. 22), which sought to add the claim that the FBI's

promotion policies for SES positions had a disparate impact on minorities.

Further, more than 750 pages comprising the written policies of the FBI regarding

promotion policies as well as job requirements for promotion to ASAC and SES position were

produced to plaintiff during discovery at bates nos. FBI-0001251-0001963 and FBIDD000325-

000359, FBIDD000387-000392, FBIDD000394-000405, and FBIDD000441-000444.  Moreover,

information about the individuals plaintiff lists in Category 3 was already produced during

discovery on liability.  Plaintiff already took the deposition of Arthur Cummings.  (Exhibit 4).

Defendants also produced Career Board records relating to all entry level SES selections in the

Counterterrorism Division for the period from 2001 through 2004.  Included among these records

were those relating to the entry level SES promotions of Arthur Cummings, Janice Fedarcyk, and

John Kavanaugh (bates nos. FBI0004544, FBI00010166, FBI0010377, FBI0009136).[2]  The

Career Board information provided a synopsis of each individual's qualifications as well as the

Career Board's rationale for recommending that person for an SES position.

Fed. R. Civil P. 30(a)(2)(A)(ii) requires that a party seek leave of court before it may

depose a "deponent who has already been deposed in the case."  This limitation has been

recognized where a party seeks to take two Rule 30(b)(6) depositions of a corporation or

government agency.  See Ameristar Jet Charter v. Signal Composites, Inc., 244 F.3d 189, 192-93

---

[2]  Because the discovery materials defendants reference herein total more than 750 pages, they are too voluminous to attach as exhibits hereto.  If the Court wishes to view any or all of this material, however, defendants can readily make it available either through the ECF filing system or on a CD.

(1st Cir. 2001).  Plaintiff has not sought such leave, nor should he be granted such leave in any event because the Court's order was not an invitation to reopen discovery.  Hence, the Court should grant defendants' motion for protective order and quash the deposition notice until plaintiff makes the required showing to obtain leave of the court for a second Rule 30(b)(6) deposition relating to the FBI's promotion policies for SES jobs.

**B.      Defendants Have Already Provided All the Information in Their Possession about Category 4**

In category 4, plaintiff seeks testimony from the FBI about "Bassem Youssef's work experience and qualifications."  Defendants have produced plaintiff's employment-related information during discovery.  Plaintiff has been provided with his Official Personnel Folder and has taken the deposition of more than 20 current and former officials of the FBI, from Director Mueller and former Director Freeh down the chain of command to several of his immediate or second level supervisors, including John Lewis and Laurie Bennett, those supervisors whose testimony is most directly relevant to the sole remaining retaliation claim at issue.  An organization need not produce a witness at a Rule 30(b)(6) deposition when it simply lacks any responsive information beyond what has already been produced.  See Dravo Corp. v. Liberty Mutual Ins. Co., 164 F.R.D. 70, 76 (D.Neb. 1995) (organization ordered to produce a more knowledgeable designee "if it is in a position to do so")

**C.      The Final Three Categories are Overbroad and Vague**

The final three categories are so overbroad, sweeping and vague as to make it impossible for defendants to identify a responsive witness. These three categories are:

        5.      The completeness of defendants' discovery responses.

6.     The current locations and addresses of persons with information within the scope described for the deposition.

7.     The existence, contents, locations, custody and authenticity of documents and other records within the scope described above for this deposition.

The deposition notice seeks information far beyond the remaining narrow issue of whether the denial of plaintiff's request to travel away from a new assignment for an extended period to conduct an inspection was due to retaliation or legitimate management concerns about plaintiff's time away from the office.  Given the scope of the issues presented in this case and the enormous amount of discovery already produced, defendants here are facing an impossible situation requiring them to identify an official who can testify to broad and vague categories of information.  See Tri-State Hosp. Supply Corp. v. United States, 226 F.R.D. 118, 125 (D.D.C. 2005).

## II.     THE RULE30(b)(6) DEPOSITION SHOULD BE HELD IN ABEYANCE PENDING THE COURT'S RULING ON THE MOTION FOR PROTECTIVE ORDER

Plaintiff's Notice was served on May 19, scheduling the deposition for May 27, 2009. Given the short period of time between the notice and the date on which defendants must produce a Rule 30(b)(6) witness, which includes a holiday weekend, defendants move the Court to hold the deposition in abeyance until an Order is issued with respect to the motion for protective order.

## CONCLUSION

Wherefore, for the foregoing reasons, defendants move for a protective order excusing

them from responding to plaintiff's May 19, 2009 Notice of Deposition and to hold the Rule

30(b)(6) motion in abeyance until the Court has ruled on the motion for protective order.

Dated: May 22, 2009                                    Respectfully submitted,

                                                       TONY WEST
                                                       Assistant Attorney General

                                                       JEFFREY A. TAYLOR
                                                       United States Attorney

                                                       STUART A. LICHT
                                                       Assistant Branch Director
                                                       Civil Division, Federal Program Branch

                                                       /s/   *Carlotta P. Wells*
                                                       DANIEL BENSING
                                                       CARLOTTA P. WELLS
                                                       U.S. Department of Justice
                                                       Civil Division, Federal Programs Branch
                                                       P.O. Box 883
                                                       Washington, D.C. 20044
                                                       (202) 305-0693 (telephone)

                                                       Counsel for Defendants

### Local Rule 7(m) Certification

On May 22, 2009, defendants' counsel, Carlotta Wells, left a message for Stephen Kohn,

having been advised that Richard Renner was absent from the office all day. While Ms. Wells

was on a series of calls relating to an emergency situation in another case, Richard Renner

returned her call and left a message suggesting that the parties confer on motions to compel on

Tuesday, May 26, 2009.  Ms. Wells was not able to return Mr. Renner's call until 4:30 p.m., at

which time she was advised by Erik Snyder of Kohn, Kohn & Coloapinto that both Mr. Renner

and Mr. Kohn had left the office for the long weekend.  At Ms. Wells' request, Mr. Snyder called

Mr. Renner.  Mr. Snyder then told Ms. Wells that Mr. Renner wished to defer a discussion of the

motion to compel until May 26 in order that the parties could, through discussion, narrow the

areas of contention.  Ms. Wells told Mr. Snyder that she agreed to this approach with respect to

the motion to compel, but wanted to confer with respect to the motion for protective order.

Again, after having made a call to Mr. Renner, Mr. Snyder stated that plaintiff opposes filing the

motion for protective order on Friday, May 22 because it is possible that the parties could agree

to narrow the scope of the Rule 30(b)(6) deposition through a discussion on May 26, 2009.  Ms.

Wells informed Mr. Snyder that she would file the motion today rather than wait until the day

before the scheduled deposition to file.

**DEFENDANTS' MOTION FOR PROTECTIVE ORDER
AND TO HOLD RULE 30(b)(6) DEPOSITION IN ABEYANCE**

**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
BASSEM YOUSSEF,                                            )
                                                          )
                              Plaintiff,                  )
                                                          )
v.                                                        )   Civil Action No.  1:03CV01551(CKK)
                                                          )
FEDERAL BUREAU OF INVESTIGATION,                          )
*et al.,*                                                 )
                                                          )
                              Defendants.                 )
_____)

**PLAINTIFF'S NOTICE OF DEPOSITION ON ORAL EXAMINATION**

Plaintiff gives notice pursuant to FRCP 30(b)(6) that he will take the deposition of the defendant

Federal Bureau of Investigation on May 27, 2009, at 10:00 am, at a place to be agreed upon by counsel

before May 25, 2009 (otherwise at 3238 P. St., NW, Washington, DC  20007).

The witness(es) will be questioned on:

1.      The Bureau's policies and practices for promotions;

2.      The Bureau's job requirements for promotions to ASAC and SES positions;

3.      Bassem Youssef's work experience and qualifications.

4.      The work experience and qualifications of persons the defendants promoted between

        2004 and 2007, including but not limited to Arthur M. Cummings II, Janice K. Fedarcyk

        (formerly known as Janice Novak), Michael J. Heimbach and John G. Kavanagh.

5.      The completeness of the defendants' discovery responses.

6.      The current locations and addresses of persons with information within the scope

        described above for this deposition.

7.      The existence, contents, locations, custody and authenticity of documents and other

        records within the scope described above for this deposition.

Respectfully submitted,


/s/ Richard R. Renner
Stephen M. Kohn
Richard R. Renner, Bar No. OH0021
KOHN, KOHN, COLAPINTO, LLP.
3233 P Street, N.W.
Washington, DC 20007
Phone: (202) 342-6980
Fax:    (202) 342-6984
sk@kkc.com, rr@kkc.com
Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Plaintiff's Notice of Deposition on Oral Examination was served by email on the following on this 19th day of May, 2009:

DANIEL BENSING,
daniel.bensing@usdoj.gov
CARLOTTA P. WELLS,
carlotta.wells@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044


By:      /s/ Richard R. Renner
         Richard R. Renner

**DEFENDANTS' MOTION FOR PROTECTIVE ORDER
AND TO HOLD RULE 30(b)(6) DEPOSITION IN ABEYANCE**

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BASSEM YOUSSEF, )
)
)
Plaintiff, )
)
v. ) C.A. No. 1:03CV01551 (D.D.C.)(CKK)
)
FEDERAL BUREAU OF INVESTIGATION, et al.,)
)
Defendants. )
)

## PLAINTIFF'S FIRST NOTICE OF DEPOSITIONS

Pursuant to Fed. R. Civ. P. Rules 26, 28, 30 and 34, Plaintiff, Bassem Youssef, hereby

notices the following persons for deposition. The depositions may be conducted by telephone

and may be videotaped. The location of each deposition shall 3238 P Street, N.W. Washington,

D.C. 20007. The times for the depositions shall be agreed upon by counsel for the parties.

The following persons are requested to appear for deposition:

1.    The individual named as Jane Doe on page 30, ¶ 30 of Bassem Youssef's June 9, 2003
EEO Statement;

2.    Officers, directors, or managing agents or a representative thereof designated by
Defendant FBI pursuant to Rule 30(b)(6) to testify on its behalf with regard to the
promotions (temporary or permanent) of Rudy Guerin and Kevin Favereau;

3.    Officers, directors, or managing agents or a representative thereof designated by
Defendant FBI pursuant to Rule 30(b)(6) to testify on its behalf with regard to all
promotional activities concerning counter-terrorism in which any employee for the FBI
who had a rank of GS-15 or below was promoted into the SES since 2001;

4.    Louis Freeh

5.    Thomas Pickard;

6.    Robert Mueller.

These depositions shall be conducted during the week of September 13, 2004. Due to the

potential difficulty in scheduling these matters, we request that the parties work together in

reaching specific dates and times for the depositions.

Respectfully submitted,

Stephen M. Kohn, DC Bar #411513
KOHN, KOHN & COLAPINTO, P.C.
3233 P Street, N.W.
Washington, DC 20007
(202) 342-6980

Dated: August 25, 2004                    Attorneys for the Plaintiff

- 2 -

**DEFENDANTS' MOTION FOR PROTECTIVE ORDER
AND TO HOLD RULE 30(b)(6) DEPOSITION IN ABEYANCE**

**EXHIBIT 3**

02/02/05: Youssef v FBI: Depo: John Pikus

PAGE 1 TO PAGE 129

Neal R. Gross & Co., Inc.

(202) 234-4433

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

Neal R. Gross Co., Inc.
1323 Rhode Island Ave. NW
Washington, DC    20002
Phone:    202-234-4433

## Page 1

(1)                UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
(2)
(3)
(4)   BASSEM YOUSSEF,
(5)        Plaintiff,
                                  Civil Action No.
                               1:03CV01551 (CKK)
(7)   FEDERAL BUREAU OF
      INVESTIGATION
(8)        et al.,
(9)        Defendants.
(10)
(11)
(12)                          February 2, 2005
(13)
      DEPOSITION OF:
(14)
                              JOHN PIKUS
(15)
      called for examination by counsel for the plaintiff,
(16)  pursuant to notice, at the law offices of Kohn, Kohn,
      & Colapinto, 1233 P Street, Northwest, Washington,
(17)  D.C., 20037, at 10:00 a.m., when were present on
      behalf of the respective parties:
(18)
(19)
(20)
(21)
(22)

## Page 2

(1)   APPEARANCES:
(2)
      On Behalf of the Plaintiff:
(3)
          STEPHEN M. KOHN, ESQ.
(4)       SARA MICHAELCHUCK, ESQ.
           DAN LAFRENZ, Intern
(5)   of:  Kohn, Kohn, & Colapinto, LLP
           3233 P Street, N.W.
(7)        Washington, D.C. 20007
           (202) 342-6980
(8)
(9)   On Behalf of the Defendants:
(10)      CARLOTTA P. WELLS, ESQ.
          Senior Counsel
(11)      Federal Programs Branch
          U.S. Department of Justice
(12)      Civil Division
          20 Massachusetts Avenue, N.W.
(13)      Room 7150
          Washington, D.C. 20530
(14)      (202) 514-4522
(15)      KATHLEEN ONEILL-TAYLOR, ESQ.
          Assistant General Counsel
(16)      Office of the General Counsel
          Federal Bureau of Investigation
(17)      935 Pennsylvania Avenue, N.W.
          Washington, D.C. 20535
(18)      (202) 324-4524
(19)  ALSO PRESENT:
(20)      BASSEM YOUSSEF
(21)
(22)

## Page 3

                           CONTENTS
(1)
(2)   WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
(3)   John Pikus      5       --      --        --
(4)                       EXHIBITS
(5)   EXHIBIT NO.   DOCUMENT                  MARKED
(6)   11      Johnson v. Gerson
              Settlement Agreement
(7)
(8)   12      Plaintiff's First Notice
              of Depositions
(9)
(10)  13      Sworn Statement
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

## Page 4

(1)  P R O C E E D I N G S
(2)   (10:49:49 a.m.)
(3)   MR. KOHN:  Maybe we could just
go around (4) and everybody introduce
themselves; should we do that? (5) I'll
start. Stephen Kohn, K-o-h-n, attorney
for the (6) Plaintiff, Bassem Youssef.
(7)   MR. YOUSSEF:  I'm Bassem
Youssef.
(8)   MS. MICHAELCHUCK:  Sara
Michaelchuck, no (9) "H," and that's
M-i-c-h-a-e-l-c-h-u-c-k, attorney.

(10)  MS. FAZLI:  Almara Fazli.
(11)  MR. LAFRENZ:  Dan Lafrenz,
L-a-f-r-e-n-z, (12) I'm an intern.
(13)  MS. O'NEILL-TAYLOR:  Kathleen
O'Neill- (14) Taylor, I'm with the FBI.
(15)  MS. WELLS:  Carlotta Wells, the
Department (16) of Justice,
representing the Defendant in the case.
(17)  MR. PIKUS:  John Pikus, P-i-k-u-s,
with (18) the FBI.
(19)  JOHN PIKUS (20) was called as a
witness and, after having been first (21)
duly sworn, was examined and testified
as follows:
(22)  DIRECT EXAMINATION

## Page 5

(1)  BY MR. KOHN:
(2)   Q  Mr. Pikus, could you please
state your (3) name and address for the
record.
(4)   A  John Pikus, P-i-k-u-s.  My
home address is (5) 2430 Harrison
Court.  I just moved there about a
half (6) a year ago.  H-a-r-r-i-s-o-n,
C-o-u-r-t.  Chesapeake (7) Beach,
Maryland 20732.
(8)   Q  And have you ever had your
deposition (9) taken before?
(10)  A  I've had depositions before,
yes.
(11)  Q  And do you know about how
many?
(12)  A  Just one.
(13)  Q  And what type of case was that?
(14)  A  I don't know, I forget.  It was
about (15) seven years ago, and it
was a person who was suing the (16)
Bureau for not getting a job, a
particular job, and I (17) was called in
as a witness who was in – a peer of
(18) that person, I wasn't part of a –
an object of that (19) lawsuit.
(20)  Q  And are you an attorney?
(21)  A  No, I'm not.
(22)  Q  And you're represented by
counsel for the

## Page 6

(1)  FBI today?
(2)   A  Yes.
(3)   Q  And, just generally, the rules of
(4) depositions are, there is no judge,
so if someone (5) raises an objection,
you can still answer the (6) question,
unless your counsel instructs you not
(7)   A  Yes.
(8)   Q  That happens sometimes and
causes a little (9) confusion.  Object?
Well, what do I do?
(10)  If you don't understand any of my
(11) questions, you're free to ask me to
rephrase, or just (12) tell me you don't
understand, that's fine.
(13)  If you need to speak with counsel,
you can (14) at any time, and you just
have to say, "I'd like to (15) speak with

counsel," or, "Go off the record." If you
(16) want to go off the record for a
personal reason at any (17) time, you
can just let us know, and we'll just go
off (18) the record.
(19)  A  Yes.
(20)  Q  It's not, like, as formal as a court,
(21) where you're just sitting there.
(22)  A  Right.

## Page 7

(1)  Q  And do you understand that
you're under an (2) obligation to tell the
complete truth?
(3)   A  Yes.
(4)   Q  Is there any reason why you
can't be fully (5) candid today?
(6)   A  No.
(7)   Q  Are you aware that this is a
proceeding (8) under the Title 7 of the
Civil Rights Act?
(9)   A  No.  No, I was not.
(10)  Q  Okay.  And it is.  And did anyone
make you (11) aware that – Are you
aware that testimony under (12) Title7 is
– your giving testimony is a fully (13)
protected activity, and there can be no
discrimination (14) or harassment
based upon that?
(15)  A  Now I do.
(16)  Q  Does the FBI, to the best of your
(17) knowledge, give any training in
terms of retaliation (18) for Title 7?  If I
say Title 7, do you understand what (19)
that word means?
(20)  A  Explain it.
(21)  Q  That is the Civil Rights Act of
1964 that (22) makes it illegal to
discriminate on the basis of race,

## Page 8

(1) sex or national origin, among other
things, religion.
(2)   A  Okay.
(3)   Q  Has the FBI given any training to
you (4) about your right to participate
and file charges or (5) complain or
testify in a Title 7 type proceeding?
(6)   A  Not that I remember.
(7)   Q  And what's your current position
with the (8) FBI?
(9)   A  I'm an Inspector in the
Inspection (10) Division.
(11)  Q  And how long have you been in
that (12) position?
(13)  A  Oh, a little more than a month
now.
(14)  Q  And what's your rank, in terms of
a GS or (15) SES?
(16)  A  It's an SES level, yes.
(17)  Q  And how long have you been an
SES?
(18)  A  Since March 3rd of last year.
(19)  Q  And before you were in the
Inspection (20) Division, where did you
work?
(21)  A  I was in the Executive
Development and (22) Selection

954s. A candidate would actually fill out the (21) 954s, that's his or her application.

(22) Q Okay. Yes.

Page 21

(1) A And, at that point, under the anchors, (2) under leadership, the chairman and the voting members (3) would go up and say, based on your – And they review (4) this. They review the 954s before they go into the (5) Local Career Board, and so the voting members would be (6) prepared to discuss what they believe to be – We (7) believe this to be exemplary, or we believe this to be (8) competent. We have exemplary, skilled, competent, or (9) needs improvement. So we end up having four (10) particular areas in which you can actually rate (11) somebody, and that's how it's done.

(12) Q Do you know if this type of binder (13) existed, say, back in 2000?

(14) A It did not.

(15) Q Do you know when it first came to be?

(16) A It came before my time. I'll give you a (17) rough guess on it, but the development of it was in (18) 2002 and 2003.

(19) Q And do you know why they decided to (20) develop it?

(21) A I don't know why particularly, but it was (22) tied into the Badge lawsuit of 1992 or '93.

Page 22

(1) Q Do you know if that was essentially (2) recommended as part of the on-going review of the (3) settlement of that lawsuit, do you know?

(4) A I do know that. I read an excerpt from (5) that where the Bureau in agreement with the Plaintiffs (6) was to develop a management aptitude test or a new (7) system, and/or a new system to select candidates in (8) the 14,15 area.

(9) Q Do you know if before '02, '03, if there (10) was another set of criteria people could use to try to (11) have some form of objectivity in defining these (12) anchors and criteria?

(13) A I don't know. My only experience with (14) that is putting up the jobs myself. Prior to the FD- (15) 954, there was something called the FD-638, which (16) identified – which was a one page document. Within (17) that four corners you had to articulate what were (18) your qualifications for that particular job, based on (19) what the JPA posting said. So they might have (20)

requested somebody, or preferred somebody with (21) organized crime experience and/or leadership in the (22) soft skills. There was always leadership in the soft

Page 23

(1) skills in there, but it was kind of a mix and match of (2) things. And so that's how we – Then we wrote down in (3) our 638s to those qualifications they were requesting.

(4) Q So this set of criteria that you're (5) testifying about, that does not exist in the SES (6) process?

(7) A No, the New SAMMSS does not exist – the (8) 954 does not exist.

(9) Q What about – Do you know, is there a book (10) of criteria, in other words is there a published, (11) objective criteria used for the promotional process (12) into the SES?

(13) A I don't know. I do know that in our MAOP, (14) basically, our manual of operations, there is a (15) section on SES. In there it talks about what the SES (16) Board should be made up of, in terms of voting (17) members. It also talks about that it's a recommending (18) board for the director's final selection on (19) promotions, and general statements like that.

(20) Q If you would be so kind, if we were going (21) to look at a system in which you would eliminate (22) subjectivity, biases, favoritism, okay? You're trying

Page 24

(1) to set up a promotional system that was as objective (2) as possible, can you compare what's in place to ensure (3) fairness and objectivity in the GS-14 and 15 selection (4) process, versus the SES. Going from a GS to an SES (5) selection process.

(6) My question, just to clarify, I'm not (7) saying that the absence means there is bias or is (8) favoritism, I'm just looking at purely objective, like (9) going for a driver's license, they check your eye (10) sight. That doesn't mean that the next day you're not (11) going to be blind or you're not going to miss a curb, (12) it just means that they want a level. They say, okay, (13) you have this and you have that, so they can look at (14) something that's more than just a gut feel or (15) something that's purely discretionary. Does that make (16) sense, that question?

(17) A Yes, but ask it again.

(18) Q Okay. I'm going to do it again. I'm (19) going to put SES on this side and the 14,15 on the (20) other side. What might exist procedurally with the (21) 14,15 to help ensure objectivity

and/or to eliminate (22) favoritism, and whether such a line exists on the SES

Page 25

(1) side.

(2) MS. WELLS: I'm going to object to the (3) form, but you can answer it, if you can.

(4) THE WITNESS: You're objecting to what?

(5) MS. WELLS: The form of the question. I (6) still think it's confusing.

(7) THE WITNESS: Let me answer it this way. (8) On the 14,15 side there is a verification process –

(9) BY MR. KOHN:

(10) Q Okay. Let's stop there. This is (11) verification process. Let's go through each one. (12) What is that verification process?

(13) A Well, in the 954, when you do your two (14) examples, there is a verifier line and the examples (15) that are given of your leadership, or whatever, you (16) have to, as a candidate, have to provide a (17) supervisor's name and phone number to allow the (18) advertising – actually, somebody designated within (19) that advertising agency, or the division, usually a (20) secretary or somebody designated to just make a phone (21) call to this person and sometimes read it over the (22) phone to that verifier, or fax it to the person and

Page 26

(1) say, "Is this something that this candidate did, (2) because they put you down as a verifier?" And it's (3) either yes, no or don't know. So that's something on (4) the 14,15 side, that's not on the SES side.

(5) Q Okay. What else is on the – a better way (6) to do it, maybe, if we can do it, is to go through (7) each of the procedural things in place, in terms of (8) safe guards, or procedures to ensure objectivity, (9) truthfulness, verification, et cetera, on the 14,15 (10) side, and just look it over and see if it exists on (11) the SES side.

(12) A Right.

(13) Q So we talked about that. What else exists (14) on the 14,15 side in the promotional process?

(15) A Again, just the actual KSAs themselves, (16) the knowledge, skills and abilities. They are (17) specific. The instructions are given as to what the (18) candidate should write to, a specific experience that (19) exhibits or denotes this particular skill. That's (20) something that, again, on the SES side, in the (21) advertisement it talks about the recommended skills of (22) safety

and leadership. Then it goes back to something

### Page 27

(1) like the old 638, in terms of you
have a two-page (2) resume,
basically, that you write to and say,
you (3) know, I have great leadership
skills.
(4)   Q So how is it different on the
KSA?
(5)   A Again, the specific – there is
(6) instructions on how to write the
KSAs.
(7)   Q On the 14,15 side?
(8)   A Right. There are no specific
(9) instructions, that I know of, on the
SES side.
(10) Q And the instructions on how to
write it on (11) the 14,15 side are based,
essentially, on an objective (12) criteria?
(13) A No, they are common sense
type of things. (14) It's more – I guess
I would say of the 14 and 15, (15)
every step of the way is spelled out.
It's to help (16) the candidate
understand what they need to do in
order (17) to be in the best position
to, you know, be the most (18)
competitive for that job. So in the
instructions to (19) the candidate it
says, fill out this 954, and this is (20)
how you do it. You should have a
specific example (21) verified to go to
that competency that you're writing
(22) to.  On the SES side, the
instructions are to fill out

### Page 28

(1) a two-page resume, addressing
these competencies that (2) were
noted in the –
(3)   Q Now what about the – You gave
earlier (4) testimony about differences
in how they create the (5) position
descriptions itself, but what about
coming up (6) with the specialized
qualifications?  Is there a (7) difference
in between – in how a specialized (8)
qualification is created or approved in
the 14,15 side (9) versus the SES side?
(10) A Well, again, like I mentioned
earlier, (11) there is – we do have on
the 14,15 side a list of (12) skills.
They run the gamut from technical
backgrounds (13) to – language is
actually a part of it. It's – say, (14) if
you wanted to use language, you
have to specify, (15) based on the
rules, why language is pre-eminent
over (16) skills, why it's needed in
that particular job. The (17) reason
being is that – Again, I'll use that as
an (18) example to make sure that
there's no bias towards (19)
somebody because either they have
the language or they (20) don't have
the language. The advertising

### Page 29

agency has (21) to explain why you
need the language for that (22)
particular position.

### Page 29

(1) An example would be Hong Kong,
legat Hong (2) Kong.  You might think
it's unimportant as to why (3)
Chinese is needed for Hong Kong,
but it's one of the (4) most proficient
English speaking areas in the world,
(5) so we would go to make sure that
OIO, or any (6) advertising division –
let's take this case, say, (7) legat, as
an example, in Hong Kong – why
Chinese is (8) important.  And they
may be able to specify why that (9) is.
If they can articulate that, and it
passed (10) muster, and our EDSP
does have a look at it and does (11)
make a decision on that, and they
say, listen, we want (12) it as part of
it, we would actually go to the
SAMMSS (13) Board and actually say,
is this part of a particular (14)
position requirement?  You don't
have that in SES.
(15) Q Now what about membership?
In other (16) words, who gets to make
the decisions, or participate (17) in the
promotional decisions?  Is there any –
Like, (18) are there any screening
mechanisms either on the 14,15 (19)
side or the SES side, like, to eliminate
someone's (20) friend, supervisor,
someone who may have a connection
(21) to them in some way, or may have a
bias?
(22) A At this point there isn't anyone
on either

### Page 30

(1) side.
(2)   Q Do you know if before someone
is selected (3) for a board, they have to
fill out some type of (4) questionnaire,
or swear under oath, or something, that
(5) they will be fair?
(6)   A No.
(7)   Q Does any member of any of
these (8) promotional boards have to
make an under oath (9) declaration at
any time to verify any of their (10)
opinions or recommendations?
(11) A By the time I left in December,
no.
(12) Q Are there any other procedures
that you (13) recall at this time that
would be in the 14,15 side (14) that are
not reflected in the SES side?
(15) A The one aspect, the one other
thing, was (16) the Division Head
Comments, which is an aspect for
(17) both the GS 14,15, as well as the
SES. The only thing (18) I would say
to that is there is instructions on the
(19) 14,15 side and policy and ———
guidance that – what the (20) division

head can actually write about.
(21) The New SAMMSS has a
prohibition against (22) writing
somewhere on the side, there, "He's
like a son

### Page 31

(1) to me," "Promote my friend," type
of thing.  The (2) Division Head has to
look at the performance of the – (3)
When I say Division Head, a SAC,
say, has somebody in (4) their
division who is a candidate for a
position back (5) at headquarters.
(6)   Based on what the candidate
has placed (7) down on their KSAs,
the Division Head looks at that, (8) as
well as the position in which this
person is (9) applying for, and just
writes "Recommend," or "Doesn't (10)
Recommend." Now, under each of
the competencies, they (11) can make
a comment, but they are pretty
restricted, (12) six lines, on each of
the competencies that are (13)
required for the position, to say,
number one – Well, (14) one of two
things:  Number one, that this
person, yes, (15) under leadership,
what this person wrote here, this (16)
person can most certainly do the job.
(17) That Division Head Comment on
the 14,15 side, is part of the
Local Career Board process to (19)
make sure that there's no bias by
Local Career Board (20) members
who sit there, who may in the past
know what (21) the Division Head
wants to be ranked.
(22) The process is on the local
board, they go

### Page 32

(1) through the ranking.  They look at
the 954s, they (2) debate, they rank
the people.  At the very end, they (3)
open up the Division Head
Comments for each of the (4)
candidates.  That is to make sure
there isn't – they (5) have not seen
the Division Head Comments until
after (6) they have ranked and done
their thing.
(7)   Now there are instructions in
place as to (8) when – there are
instances in which they may change
(9) their ranking, based on Division
Head Comments, but (10) they are
very restrictive.  There has to be
something (11) in there – And it's
never black and white, but we put
(12) some strong wording in there to
say the Division Head (13) has to say
something that – particularly, the
first (14) thing you look at is
"Recommend," or "Do not (15)
Recommend." (16) If it's a
"Recommend," and they look at (17)

## Page 45

(1) Q And why was there an interest in bringing (2) Rand in to do this?
(3) A In looking at the SES process, there was (4) nothing there that prohibited the Director from (5) placing somebody right out of the academy into a (6) position. Of course, the Director doesn't want to do (7) that, he wants to know who are the best candidates. (8) The SES Board is a recommending Board. They sit, they (9) look at a pin sheet that has where I've been or where (10) Bassem has been, they look at the two-page resume, and (11) they make a –
(12) MR. KOHN: One second.
(13) Can you go down and tell them to be quiet?
(14) I'm sorry.
(15) THE WITNESS: And they deliberate and say, (16) based on our knowledge of this person, based on the (17) resume, this was our recommending group of people to (18) the Director. It would seem obvious that you might (19) want a better criteria set up to allow the voting (20) members of this recommending Board to have a little (21) bit more at their disposal than just the two-page (22) resume and this pin sheet.

## Page 46

(1) BY MR. KOHN:
(2) Q And was that issue then raised? In other (3) words, who approved hiring the Rand Corporation?
(4) A DAD, Mark Bullock.
(5) Q Okay. Do you know if that was then (6) approved at a higher level? In other words, did he (7) have to go to the Director, or someone like that?
(8) A He was – No, at the level of Assistant (9) Director and EAD, like John Solomon, that's the level (10) at which these things can be done.
(11) Q And when did the Rand Corporation start (12) this review process?
(13) A They started it in the June time frame.
(14) Q And who is the point of contact there at (15) the Rand Corporation?
(16) A I don't remember the gentleman's name. (17) I've got cards, but –
(18) Q And they had done something similar for (19) the Air Force, is that right?
(20) A Yes.
(21) Q So they were used by the Air Force for (22) that process?

## Page 47

(1) A Right. And Dan McMullen took it over. I (2) was so starved for

## Page 48

agents and personnel in EDSP that (3) I gravely gave up one of my FSO in that section. Dan (4) created a special assistant to Mark Bullock, and one (5) of Dan's primary jobs, when he came on board, was to (6) take that.
(7) Q And before this decision was made to put (8) in the Rand Corporation to do this, do you know if any (9) other group or entity that had ever come in to do (10) something like this before, for the FBI and AS?
(11) A Not that I know of.
(12) Q Were there any specific complaints that (13) gave rise, like an incident happened, a story, (14) something occurred, not necessarily that it was good (15) or bad just, you know, to say, hey, maybe it's a good (16) idea to make this more objective?
(17) A No. When I got on board there was – it's (18) now tied into Rand as well. When I got on board there (19) was an initiative on-going to identify in a better way (20) the qualifications, or the skill level of the SESers (21) on board. So, when I got on board – Well, actually, (22) Steve Anthony was working with, when he was in the

## Page 48

(1) section, before he became the Unit Chief, was working (2) with our ITD, our IT people, in developing a data (3) base. Rand has picked that up as well, working with (4) ITD, to utilize their survey and utilize the data base (5) format. That was just a simple attempt to identify in (6) the SES ranks, what the skills are and what's the work (7) history, and any specifics that go beyond our BPMS, (8) our Bureau Personnel System that we had available to (9) us. That was in the process when I got on board in (10) March, so we just kind of adapted that. So I don't (11) know what was the origin of that, what talk went (12) around that, before – you know, to get that (13) initiative going, but that's the only thing that I (14) know.
(15) Q I'm looking now for checks and safeguards (16) within – that are procedural in nature and objective, (17) that are built into the SES promotional process to (18) prevent favoritism or discrimination?
(19) A I can only say the process is what it is. (20) You know, there is an advertisement, there is a review (21) of publications based on two-page resume in these SES (22) boards. It's a recommender. The Director makes the

## Page 49

(1) decision. I am not privy to discussions at that end (2) on the 7th floor as to what the decisions are, but in (3) the SES Board there is discussion on the candidates. (4) Ronnie Venture sits there from EEO, making sure that (5) they are – there was only one occasion when I (6) remember – I mean, she could have mentioned more, or (7) said more, where she spoke up, "No, no. You can't (8) talk that way." I think there was – an example was (9) that one of the voting members talked about the (10) person's eminent retirement, or something like that. (11) You know, you can't talk about that, because that goes (12) towards age, or something like that. That really is (13) the check on the Board. That's the only process that (14) I'm aware of, and that's how far I go in the process.
(15) Q The SES ranking system, is it similar to (16) the GS 14, 15, where they, like, rank three people?
(17) A Yes.
(18) Q And they give them a number and they also (19) kind of say – and then send those three off, or do (20) they send everybody off? Do you know how that goes?
(21) A The Presenter comes in. There's a (22) Presenter for the Division, for the Advertising

## Page 50

(1) Division. He or she comes in and presents, after (2) reviewing the backgrounds on the candidates ranks, and (3) says, I believe, based on the backgrounds and the job, (4) so-and-so is numbers one, two and three, for the (5) position.
(6) Questions are asked by the voting members, (7) and then the person is excused. Then there is (8) discussion within the SES Board as to – Based on the (9) person's ranking, a lot of times – Well, I say, a lot (10) of times, when you have something that is specific to, (11) say, the Laboratory Division, and you have the (12) Assistant Director of the Laboratory Division saying, (13) we need this type of person with this type of skills (14) and forensic sciences, the voting members do not have (15) that background. They will look at it and say, "Well, (16) he knows what he wants for that Division, and that is (17) articulated in laymen's terms as to why they need (18) and then this person is ranked as number one, number (19) two and number three, and then there are

discussions (20) along those lines. Then there is a vote, and the vote (21) is for rank one, two, three. If you rank – it's a (22) non-public vote. Everybody has a sheet, and they just

Page 51
(1) kind of slide it and then slide it over to me. If you (2) rank somebody number one, they get three points. If (3) you rank somebody number two, they get two points. (4) If you rank number three, you get one point.
(5)   At the end, when we tally from EDSP and (6) up, whoever has the most points, is number one. It (7) may not be what the presenter had presented, but it is (8) a private vote, in a way. It's not public so, after (9) discussion, that occurs. Then I send, or I did send, (10) when I was in EDSP, the EC that specified what the (11) Presenter had presented, what the Board has decided (12) upon, based on the vote, and then one final thing that (13) comes into play, and it's really the most active part (14) of the SES Board for me is, it's a lifetime check on (15) issues with the person, the candidates, and it's only (16) dealing with the rank candidates. It's EEO and EEO (17) issues, any OPR issues, any security issues, any DOJ, (18) OIG or OPR issues. I don't – To say who the (19) candidate is, I say, in today's proceedings, there (20) a candidate who had two EEOs and one OPR during their (21) career, and the EEOs are these: Does this preclude or (22) not preclude this candidate for further consideration

Page 52
(1) by the Director for selection?
(2)   The procedures are and the practice is (3) that your break them up by the issue, but the totality (4) is also there, except it tells what the – those two (5) issues don't on their own, but what is the OPR issue (6) that this person had. Some of them are, like, 10, 15, (7) 20 years ago, and the others are very fresh. Then the (8) Board says, when I ask them down the Board, does this (9) group of issues preclude this candidate?
(10) Q So that actually goes back to the same (11) Board that reviewed it initially?
(12) A Right. On the SES Board, in that session.
(13) Q Because the GS Board, doesn't that go to (14) the higher Board, they look at those issues?
(15) A No.
(16) Q The Career Board doesn't look at the OPR, (17) do they?  Isn't it the

SAMMSS Board?
(18) A The SES looks at all the issues and then (19) gives a recommendation.  Based on what they say, I (20) check it, you know, for this candidate it's determined (21) not to preclude this number one candidate, let's say. (22) I would do it in the EC and then send it on up as part of

Page 53
(1) communication up to the Director through the Deputy (2) Director.
(3)   On the SAMMSS Board there are issues that (4) require further – Because of Badge, it had been (5) determined that certain OPR issues appeared to be (6) discriminatory against certain protected classes, (7) African Americans.  So those issues, when they come (8) up, are automatically go up to the Director at his (9) discretion.  There isn't an agreement with Badge, it's (10) just that the Director had placed this extra level of (11) review to make sure that a Badge review is conducted (12) in the Director's office to make sure that everything (13) was done correctly.  On the SES side, the Director and (14) the Deputy Director have all of the issues placed, as (15) part of an attachment to the EC, going up to the (16) Deputy Director for their review.
(17) Q And so then there would be this EC?  So (18) every person promoted to the SES, there would be the (19) proceedings before their Board, and then there would (20) be an EC, and then that would go to the Director?
(21) A Correct.
(22) Q And then the Director would make the

Page 54
(1) decision?
(2)   A Correct.
(3)   Q Now who is the Presenter?  Who selects who (4) the Presenter is?
(5)   A For the SES Boards?
(6)   Q SES Boards.
(7)   A It's the Division Head.  But to say – The (8) Division Head is like EADs.  Generally, it's the (9) Assistant Director who may do it.
(10) Q So, like, for Counter Terrorism, when it (11) became a division, it would be the Assistant Director (12) for the Counter Terrorism Division?
(13) A Right.  Or EAD carries the ball.
(14) Q Okay.  So it could be either the EAD or (15) the AD?
(16) A Yes.
(17) Q And who are the members?  Who selects the (18) members for the Board on the SES?
(19) A The Deputy Director.  The

Deputy Director (20) is a chairman.  I'm just a worker bee.  The Deputy (21) Director is a chairman, who is also a voting member. (22) On the Board are the four EADs, one SAC from the

Page 55
(1) field, and one Assistant Director, rotated.  Both the (2) AD and the SAC are rotated every six months.
(3)   Q Okay.  So the Deputy Director chairs. (4) There are four AD's, one SAC, who is just randomly (5) selected or –
(6)   A There's a list and, you know –
(7)   Q And one AD?
(8)   A Yes.
(9)   Q And then the Presenter comes in and (10) presents?
(11) A Correct.
(12) Q Has there ever been a survey of, like, how (13) many times the Presenter wanted, that the person gets (14) the position?  Does anyone keep that type of (15) statistics?
(16) A No.
(17) Q Now have you ever heard – I know if (18) someone gets an acting position, or they are TDY'd to (19) a position, do you know what I'm talking about?
(20) A Yes.
(21) Q There's a position open and somebody (22) becomes acting, or given a position on a temporary

Page 56
(1) basis, do you know what – I'm just going to throw out (2) a hypothetical, on just how this plays out, to the (3) best of your knowledge.  Say there is a position and (4) someone becomes acting in that and they serve that for (5) 10 months and do a really good job, and the Presenter (6) comes in and says, well, he's been acting there for 10 (7) months, he knows it is a great job.  How does that fit (8) in to this promotional process?
(9)   A It does occur, I mean, in the sense that (10) if you have somebody in that acting position and they (11) put in for the job, there is talk regarding how they (12) performed in that job.  A lot of times the SES (13) succession planning in the Federal side is a little (14) bit different than on the private side.  The person (15) generally has to leave before the other person can (16) come in and occupy that SES slot.  So you don't (17) have a lot of turnover, you have some time gaps.  So (18) you do have people placed in acting positions (19) frequently, I would say, within the Bureau.  So on (20) many occasions they would put in for that job as well.

(21) So the discussions go, in terms of the SES Board, the (22) Presenter may – there's no prohibition against it, so

## Page 57
(1) the Presenter may say, these candidates are in for the (2) position. This candidate is acting in this capacity (3) right now, and I rate this candidate as whatever –
(4) Q As number one, because I've worked with (5) them; or, as number three, because I've worked with (6) them?
(7) A Well, I would say this, I have seen it (8) where you don't do a good job, and that happens.
(9) Q In other words, if someone would say – (10) again, a hypothetical. If someone held an acting (11) position for six months, the Presenter now, instead of (12) this person – Assume it's a Headquarters position, so (13) assume one applicant was in Denver and another (14) applicant was in Hong Kong, and a third applicant was (15) there acting, let's (16) say, with the Presenter. And the Presenter came – (17) Theoretically, that Presenter could say, essentially, (18) I rate this person who is acting as number three, (19) based on the fact he was acting in the position for (20) six months, and I think he's number three. (21) Conversely, He could say, I've worked with this person (22) for six months and I rate him number one.

## Page 58
(1) A Yes. Right.
(2) Q Based on the experience of interacting (3) with that person in their acting capacity.
(4) A They go over all three candidates' history (5) and there is Division Head Comments, but there is (6) nothing in the regulations that I can see where (7) personal interaction with somebody is prohibited, you (8) know, in terms of talking about it. That does occur.
(9) Q Were you – would you sit in the SES (10) Career Board meetings?
(11) A Yes. Do you mean the actual (12) deliberations, all the way through?
(13) Q Yes.
(14) Q Right. Because my job is to set them up, (15) get everybody up there and get the binders out and (16) record the results.
(17) Q Okay. So you would hear what people said (18) and what occurred at the actual meeting?
(19) A Correct.
(20) Q Okay. Now in terms of – I'm now

looking (21) at Counter Terrorism, you would have been doing that (22) for the time period that you served in that position?

## Page 59
(1) A Correct. My first Board was end of March. (2) The last Thursday of March.
(3) Q March of '04?
(4) A Right.
(5) Q Was your first Board?
(6) A Right. It was the March of '04.
(7) Q And your last one was?
(8) A December 3rd.
(9) Q And do you know who served in your (10) position at the time after 9/11 and, say, the year or (11) 18 months after 9/11?
(12) A I do not. I do know that Kevin Kendrick (13) served in my position. Actually, he was in my (14) position from approximately July of '02 to – through (15) to his – to my arrival. He was the EDSP (16) Administrator, the Section Chief job, from July of '02 (17) until sometime in the spring of '03, when he became (18) the acting DAD, acting Assistant Director. My (19) understanding is that he still maintained his presence (20) because they were short of people, doing what I did, (21) all the way through February of '04, before my (22) arrival.

## Page 60
(1) Q And do you know who had his position right (2) before him?
(3) A No, I don't.
(4) Q And I'm assuming on each of these SES (5) promotional processes – what type of records are kept (6) there? Are the deliberations taped?
(7) A Yes, they are.
(8) Q And those are maintained?
(9) A Yes, they are.
(10) Q Do you know for how long?
(11) A For a very long time.
(12) Q Okay. And then are all the notes, like (13) the voting records and things like that, in other (14) words, are all the documents people submitted for the (15) job there, maintained?
(16) A Yes.
(17) Q And are the notes people take – I'm (18) talking about the voting records and all of that, (19) those are maintained?
(20) A The binders are returned to us, and the (21) paperwork is all put back as part of the binders, and (22) maintained.

## Page 61
(1) Q So when you say "the binders," those are (2) all recycled for each –
(3) A Well, the binders would have – yes. It (4) would be a binder that

would have a particular series (5) of job selections for that SES Board, or the SES (6) Board. The binder would have my name on it and would (7) have the documents in there.
(8) Q And those are all maintained?
(9) A Yes.
(10) Q And do you know where the record of the (11) SES promotions are maintained?
(12) A They are maintained at FBI headquarters. (13) The recent ones are up in EDSP, up on the 10th floor, (14) and then we have a storage area. Actually, we have (15) two storage areas, in which they are maintained.
(16) Q Calling your attention to the 9/11 (17) terrorist attack, and – You're aware that after 9/11, (18) the Bureau increased the size of its Counter Terrorism (19) Division?
(20) A Yes.
(21) Q Were you involved in any of the (22) discussions, directly or indirectly, regarding the

## Page 62
(1) types of qualifications the Bureau was looking for in (2) executive management to deal with post 9/11 issues, (3) Middle Eastern terrorism, for example?
(4) A No.
(5) Q Was there somebody, to the best of your (6) knowledge, who was tasked with looking at personnel (7) issues, in terms of promotions, qualifications, what (8) the Bureau needs, dealing with post 9/11 terrorist (9) issues?
(10) A No, I have no knowledge of that.
(11) Q Do you have knowledge of all of the (12) promotional activities regarding the Counter Terrorism (13) Division for persons who are promoted to the SES since (14) 2001?
(15) A No, I do not.
(16) Q Your knowledge would be the time period (17) you served?
(18) A Correct.
(19) Q While you served in the Career Board, were (20) there any SES Counter Terrorism Positions that opened (21) up or were filled?
(22) A Yes.

## Page 63
(1) Q Which ones?
(2) A The one that Laurie Bennett got, Section (3) Chief Division.
(4) Q What was his name?
(5) A Laurie. Laurie Bennett.
(6) Q Oh. Her?
(7) A Yes.
(8) Q Bennett?
(9) A Bennett, B-e-n-n-e-t-t.
(10) MR. YOUSSEF: She's my boss.

**DEFENDANTS' MOTION FOR PROTECTIVE ORDER
AND TO HOLD RULE 30(b)(6) DEPOSITION IN ABEYANCE**

**EXHIBIT 4**

03/14/05:   YOUSSEF v FBI ET AL. DEPO:   ARTHUR M. CUMMINGS, II

PAGE 1 TO PAGE 158

Neal R. Gross & Co., Inc.

(202) 234-4433

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

Neal R. Gross Co., Inc.
1323 Rhode Island Ave. NW
Washington, DC    20002
Phone:    202-234-4433



### Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - +

IN THE MATTER OF

BASSEM YOUSSEF,          CA No. 1:03cv01551
                        (D.D.C) (CKK)
          Complainant,

          v

FEDERAL BUREAU OF
INVESTIGATION, ET AL,

          Agency.

- - - - - - - - - - - - - - - - - - - - - - - +

                    Monday
                    March 14, 2005
                    Washington, D.C.

DEPOSITION OF
          ARTHUR M CUMMINGS, II
called for examination by Counsel for the Plaintiffs,
at 10:00 a.m. pursuant to notice of deposition, in the
law offices of Kohn, Kohn, and Colapinto, 3233 P
Street, NW, Washington, DC 20007 when were present on
behalf of the respective parties:

### Page 2

APPEARANCES.

     On Behalf of the Complainant:

          STEPHEN KOHN, ESQ.
          MATTHEW SORENSEN, ESQ.
     Of:  Kohn, Kohn, and Colapinto
          3233 P Street, NW
          Washington, DC 20007
          202-342-6984
          (fax) 202-342-6984

     On Behalf of Agency:

          CARLOTTA P. WELLS, ESQ.
     Of:  Federal Programs Branch
          U.S. Department of Justice
          Civil Division
          20 Massachusetts Avenue, NW
          Room 7150
          Washington, DC 20530
          202-514-4522
          (fax) 202-307-0449
          carlotta.wells@usdoj.gov

     ALSO PRESENT:
          Bassem Youssef, Complainant

### Page 3

                    I-N-D-E-X
WITNESS      DIRECT   CROSS  REDIRECT   RECROSS
ARTHUR CUMMINGS   4

### Page 4

(1)  P-R-O-C-E-E-D-I-N-G-S
(2)  10:01 a.m. (3) WHEREUPON, (4) ARTHUR M.
CUMMINGS, II (5) was called for examination by Counsel for
the (6) Complainant, having been first duly sworn, assumed
the (7) witness stand, was examined and testified as follows:
(8)  DIRECT EXAMINATION
(9)  BY MR. KOHN:
(10) Q Mr. Cummings, would you please (11) state your name
and address for the record?
(12) A It's Arthur M. Cummings, II. (13) Address is 14207
Watercress Court, Midlothian, (14) Virginia.
(15) Q Have you ever had your deposition (16) taken before?
(17) A No.
(18) Q Are you represented by counsel?
(19) A Yes.
(20) Q That's the attorney for the (21) Department of Justice?
(22) A And the FBI.  Right.

**05/17/05: Youssef v FBI: Depo: Arthur Cummings**

**PAGE 1 TO PAGE 41**

**Neal R. Gross & Co., Inc.**

**(202) 234-4433**

**CONDENSED TRANSCRIPT AND CONCORDANCE**
PREPARED BY:

*Neal R. Gross Co., Inc.*
*1323 Rhode Island Ave. NW*
*Washington, DC    20005*
*Phone:   202-234-4433*



## Page 1

(1)                UNITED STATES DISTRICT COURT
(2)                 FOR THE DISTRICT OF COLUMBIA
(3)
(4)   BASSEM YOUSSEF.
(5)            Plaintiff.
(6)        v.                   Civil Action No.
                               1:03CV01551(D.D.C)(CKK)
(7)   FEDERAL BUREAU OF
      INVESTIGATION. et al..
(8)
               Defendants.
(9)
(10)
                     Washington. D.C.
(11)                Monday. May 17. 2005
(12)  DEPOSITION OF:
(13)            ARTHUR M. CUMMINGS
(14)  called for examination by counsel for the Plaintiff.
(15)  at 12:00 noon. pursuant to notice of deposition. in
(16)  the law offices of Kohn, Kohn. and Colapinto. 3233 P
(17)  Street. N.W.. Washington. D.C. 20007 when were
(18)  present on behalf of the respective parties:
(19)
(20)
(21)
(22)



## Page 3

(1)                    I N D E X
(2)   WITNESS        DIRECT CROSS REDIRECT RECROSS
(3)
(4)
(5)                  E X H I B I T S
(6)   Exh.
      No.    Description                        Page
(7)
      (None)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

## Page 2

(1)   APPEARANCES:
(2)      On Behalf of the Plaintiff:
            STEPHEN KOHN. ESQ.
(3)         JASON PERKY. ESQ.
         of:   Kohn. Kohn. and Colapinto
(4)            3233 P Street. N.W.
               Washington. D.C. 20007
(5)            (202)342-6980
               (fax) (202)342-6984
(6)
(7)      On Behalf of the Defendants:
(8)         CARLOTTA P. WELLS. ESQ.
         of:   Federal Programs Branch
(9)            U.S. Department of Justice
               Civil Division
(10)           20 Massachusetts Avenue. N.W.
               Room 7150
(11)           Washington. D.C. 20530
               (202)514-4522
(12)           (fax) (202)307-0449
               carlotta.wells@usdoj.gov
(13)
(14)  Also Present:
(15)        BASSEM YOUSSEF. Complainant
            JEANETTE SUN. Law Clerk
(16)
(17)
(18)
(19)
(20)
(21)
(22)

## Page 4

(1)  PROCEEDINGS
(2)  (1:44 p.m.)
(3) Whereupon,
(4)  ARTHUR M. CUMMINGS (5) was called as a witness by counsel for the Plaintiff (6) and, having been first duly sworn, was examined and (7) testified as follows:
(8)  DIRECT EXAMINATION
(9)  MR. KOHN:
(10) Q And Mr. Cummings, you understand that (11) this is a continuation of your earlier deposition, (12) and if you remember, we discussed rules and (13) procedures. You're familiar with all of those. I (14) don't need to repeat that.
(15) A I am.
(16) Q Correct?
(17) A Correct.
(18) Q And I want to go back to these was a (19) time when you were an Acting DAD –
(20) A Right.
(21) Q – in counterterrorism.
(22) A I actually think there were three