### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                            )
**BASSEM YOUSSEF**                          )
                        **Plaintiff,**       )
    **v.**                                   )
                                            )   **Civil Action No. 1:03-cv-1551 (CKK)**
**FEDERAL BUREAU OF**                        )
**INVESTIGATION,** *et al.*                  )
                                            )
                        **Defendant.**       )
—————————————————————)

### JOINT PRETRIAL STATEMENT

Plaintiff Bassem Youssef and Defendant FBI, pursuant to Local Civil Rule 16(b) and this

Court's orders, including its October 6, 2009, Pretrial Scheduling and Procedures Order R-169,

file this Joint Pretrial Statement.

**1.     Parties and Counsel**
        **Plaintiff:**    Bassem Youssef
                        Unit Chief
                        Communications Analysis Unit
                        Federal Bureau of Investigation
                        935 Pennsylvania Avenue, N.W.
                        Washington, D.C. 20535-0001

        **Plaintiff's**
        **Counsel:**     Stephen M. Kohn, sk@kkc.com
                        Richard R. Renner, rr@kkc.com
                        Kohn, Kohn, & Colapinto, LLP
                        3233 P Street, N.W.
                        Washington, D.C. 20007
                        (202) 342-6980

        **Defendant:**   Federal Bureau of Investigation
                        J. Edgar Hoover Building
                        935 Pennsylvania Avenue, N.W.
                        Washington, D.C. 20535-0001

1

Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Eric Holder
United States Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Defendant's**
**Counsel:**      Carlotta P. Wells
Daniel E. Bensing
Vikas Desai
Federal Programs Branch
U.S. Department of Justice, Civil Division
P.O. Box 883
Washington, D.C. 20044

2.      **Neutral Statement of the Case**

A. **Joint Agreed Upon Neutral Statement:**

Plaintiff has brought this action under Title VII of the Civil Rights Act.  Plaintiff claims

that he was retaliated against when his supervisor denied him an employment-related

opportunity.  Defendant asserts that the denial was based on business-related reasons, not

retaliation.

B. **Plaintiff's Proposed Neutral Statement of the Case**

I will briefly describe for you Mr. Youssef's claim and defendant's response.

The Plaintiff in this case is Mr. Youssef Bassem Youssef, a Supervisory Special

Agent employed by the Federal Bureau of Investigation (or "FBI").  The Defendant in this case is

the FBI.  Mr. Youssef brought this action under Title VII of the Civil Rights Act.   This law

prohibits discrimination based on national origin, and permits employees to file discrimination

claims, participate in legal proceedings concerning these claims and to reasonably oppose

discriminatory conduct they believe their employer may have engaged in. Plaintiff Bassem Youssef's protected activity includes (1) meeting with FBI Director Robert Mueller and Congressman Frank Wolf, (2) filing a complaint alleging discrimination based on his national origin, (3) leaving work for depositions, and (4) taking depositions of other FBI employees.

Mr. Youssef claims that he was retaliated against when his supervisor denied him an employment-related opportunity.  Defendant asserts that the denial was based on business-related reasons, not retaliation.

The employment opportunity was Mr. Youssef's ability to become inspection certified. Mr. Youssef alleges that the FBI retaliated against him by refusing to allow him to participate in the inspection of an FBI office.  Completing one additional inspection would have allowed Mr. Youssef to complete requirements for becoming inspection certified.  Mr. Youssef claims that the FBI official who denied his request retaliated against him because Mr. Youssef was participating in a Title VII proceeding and opposed discriminatory conduct.

Mr. Youssef alleges that he was harmed by a two-year delay in completing his final inspection and obtaining inspection certification.

The FBI denies that Mr. Youssef's claim played any part in the denial of his request to participate in inspections.  Rather, the FBI states that it denied Mr. Youssef's requests because, since the FBI transferred him to the position of Unit Chief of the Communications Analysis Unit (CAU) on October 31, 2004, he had been absent from the office for a significant portion of the time for a variety of reasons.   Consequently, Mr. Youssef's supervisors believed that as a newly appointed Unit Chief in CAU who had been absent from work for a significant period during his first months on the job, Mr. Youssef needed to postpone participation in another inspection so that he could devote his time to providing leadership to his Unit.

**C.      Defendants' Proposed Neutral Statement of the Case**

Plaintiff has brought this action under Title VII of the Civil Rights Act.  Plaintiff claims that he

was retaliated against when his supervisor denied him an employment-related opportunity.

Defendant asserts that the denial was based on business-related reasons, not retaliation.

**3.      Statement of Plaintiff's Claims**

**Plaintiff's Statement of the Case**

As explained by this Court in its March 30, 2008 ruling on summary judgment, *Youssef v.*

*FBI*, 541 F.Supp.2d 121 (2008), this is a Title VII retaliation case.   The relevant factual and legal

background for this case was set forth in *Youssef v. FBI* at 128-33, 135-37, 155-61.

The plaintiff, Bassem Youssef, is a Supervisory Special Agent who has worked as a

Special Agent for the FBI since 1988. The defendants are the Federal Bureau of Investigation, the

United States Department of Justice, the United States Attorney General in his official capacity,

and the Director of the Federal Bureau of Investigation in his official capacity.  The real

defendant-in-interest is the FBI.

This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e-16(c) and (d), 42

U.S.C. § 2000e-5, 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4).

**Plaintiff's Statement of the Claims**

Plaintiff Bassem Youssef has a Title VII retaliation claim. As explained by this Court in its

ruling on summary judgment, *Youssef v. FBI*, 541 F.Supp.2d 121, 157 (2008), Mr. Youssef's

protected activity includes (1) meeting with FBI Director Robert Mueller and Congressman Frank

Wolf, (2) filing a complaint alleging discrimination based on his national origin, (3) leaving work

for depositions, and (4) taking depositions of other FBI employees.

Thereafter, defendants denied Mr. Youssef permission to attend the sixth and final "inspection certification" he needed to become "inspection certified" and advance his career. *See Youssef* at 135-37, 155-61 (parts of the summary judgment ruling concerning the specific facts and law relevant to the inspection certification dispute). Mr. Youssef claims these denials were retaliatory in violation of Title VII. *Youssef* at 135 (Youssef alleges that "the FBI has 'systemically denied [him] permission to conduct his last inspection.'"). The denials in question are (a) the specific denial of a request to participate in an inspection of the Los Angeles Division; (b) the specific denial of a request to participate in an inspection in Washington, D.C.; and (c) the generic denial of his right to participate in future inspections until Youssef "ended his EEO-related activities." *Youssef* at 160. As a result, Mr. Youssef's ability to obtain inspection certification was blocked for over two years, and he was not able to obtain the certification until he had a new management chain of command.

The denial of the inspection certification not only objectively deterred other employees from filing discrimination claims, and caused Mr. Youssef direct harm. This harm included emotional distress and loss of reputation, but also resulted in Mr. Youssef being unable to obtain a promotion into SES positions (which in fact do require inspection certification) or other promotions within the FBI. Mr. Youssef's reputation and standing within the FBI has also been damaged.

**4.**       **Statement of Defendant's Defenses to Plaintiff's Claims**

Defendant contends that, in January 2005, it denied plaintiff's request to participate in an inspection of the Los Angeles field office for legitimate, nonretaliatory reasons.

Plaintiff Bassem Youssef is a GS-15 chief of the Communications Analysis Unit (CAU) of the Communications Exploitation Section (CXS) in the FBI's Counterterrorism Division (CTD).   The mission of CXS is to lead law enforcement and counter-intelligence efforts to identify and target terrorist communications to support the FBI's efforts to defeat terrorism.   In particular, CAU is responsible for identifying and analyzing terrorist-related telephone communication patterns, trends, and activities. Plaintiff's position is critical to our nation's defense against international terrorism.   The position demands rapid responses to inquiries from high-level officials, including the White House, long hours working in a demanding and often stressful environment.

The sole issue to be decided at trial is whether John Lewis, then a Deputy Assistant Director ("DAD") in CTD, acted in retaliation for plaintiff's EEO activity when he denied plaintiff's requests to participate in an inspection, one in January 2005 relating to the FBI field office in Los Angeles and the other in February 2005 relating to OPR.  By way of background, the FBI's inspection division conducts periodic inspections of all components of the Bureau by using FBI employees who volunteer to spend time away from their permanent posts conducting such on-site inspections.  By participating, Special Agents obtain important information about the broad spectrum of FBI programs from an administrative as well as substantive perspective. Agents who have conducted six inspections become "inspection certified," a required credential for Special Agents who want to apply for a position as a GS-15 Assistant Special Agent in Charge (ASAC) in an FBI field office.

The LA inspection, which was scheduled to occur in February 2005, would have taken plaintiff out of the office for three weeks.  But in addition, plaintiff also had requested another week of annual leave at the end, for a total of four weeks away from his position as CAU Unit

Chief.  If plaintiff had participated in the LA inspection, he would have completed the inspections he needed to become inspection certified.  DAD Lewis denied plaintiff's request because he believed plaintiff was needed on the job in CAU to oversee the responsibilities of his Unit.  Two weeks later, DAD Lewis denied another request from plaintiff to participate in another inspection, again stating that plaintiff was needed in CAU.

        To fully understand the context of the alleged retaliatory act, additional background information is necessary.  In May 2004, when DAD Lewis assumed his duties in CTD at FBI Headquarters, plaintiff was the Chief of the Document Exploitation Unit (DocEx), another Unit within CES.  DocEx is responsible for extracting information of investigative and intelligence value from materials seized from terrorists.  Shortly after DAD Lewis assumed his position in CTD, plaintiff informed DAD Lewis about his EEO claims.  Plaintiff also told DAD Lewis about a 2002 meeting in Congressman Frank Wolf's office that had been arranged so that plaintiff could talk to FBI Director Mueller about employment-related issues.  Further, plaintiff told DAD Lewis that he was interested in completing the two inspections he needed to become inspection certified.  DAD Lewis assured plaintiff that he would facilitate his completion of the inspections he needed to become certified.

        In August 2004, Laurie Bennett was appointed as the Section Chief (SC) of CXS.  Shortly after her arrival, SC Bennett and DAD Lewis concluded that DocEx was operating on a sub-par basis.  DAD Lewis and SC Bennett learned that DocEx, like other offices within CTD, was chronically understaffed.  In addition, DocEx had a significant backlog in reviewing material received, frayed relationships with other law enforcement and intelligence agencies, and ineffective measures for preserving the evidence seized and analyzed for law enforcement purposes.  Because the performance and operational issues in DocEx preceded the appointment

of DAD Lewis and SC Bennett to their CTD positions, they determined not to make a

performance-related issue for plaintiff due to the deficiencies in DocEx.  Rather, AD Lewis and

SC Bennett decided to laterally transfer plaintiff to the position as Unit Chief of CAU, effective

on October 30, 2004.  Plaintiff has stated that he did not perceive the transfer to be an adverse

action because he believed it increased his job responsibilities.

During the first two weeks in November, with the assistance and encouragement of DAD

Lewis and SC Bennett, plaintiff participated in his fifth inspection, that of the Cincinnati field

office.  Even after plaintiff completed the Cincinnati inspection, plaintiff continued to be absent

from the office over the next several months for a variety of reasons, including sick leave, annual

leave, and administrative leave for attending depositions in this case.  In fact, plaintiff was out of

the office nearly two-thirds of the time during the first three months of his tenure as Unit Chief of

CAU, from October 30, 2004 through January 31, 2005.  Time and attendance records show that

of 21 possible workdays in November 2004, plaintiff was in the office only one day.  In

December, plaintiff was in the office 11 of the 21 possible workdays and in January 2005,

plaintiff was in the office 11 of the 19 possible workdays.

It is against this backdrop that plaintiff's request to participate in the LA inspection must

be evaluated.  Because plaintiff had requested a week of annual leave in addition to the three-

week LA inspection, if approved plaintiff would have been away from his Unit Chief

responsibilities in CAU for *four consecutive weeks*.  Although SC Bennett initially approved

plaintiff's request, DAD Lewis overruled SC Bennett and refused to authorize plaintiff's

participation in the LA inspection.  DAD Lewis took this action because he believed that, as a

newly appointed Unit Chief in CAU who had been absent from work for a significant period

during his first months on the job, plaintiff needed to be at his desk, providing leadership to his

8

Unit.  It was for the same reason that DAD Lewis denied plaintiff's request, two weeks later, to participate in the OPR inspection.  In denying that request, DAD Lewis advised plaintiff that, after plaintiff had the opportunity to become familiar with the CAU and operations in that Unit had improved, he would approve a request from plaintiff to participate in another inspection.  Although opportunities were available throughout the remainder of 2005 and the first seven months of 2006, plaintiff did not elect to participate in another inspection until eighteen months later, in August 2006.  After concluding this inspection, plaintiff achieved his inspection certification effective in February 2007.

Defendant did not retaliate against plaintiff by denying his request to participate in the LA inspection.  Preliminarily, plaintiff did not suffer an adverse action as a result of the denial of his requests either to go to LA or OPR for his final inspection.  Plaintiff has testified that he never intended to apply for a position as an ASAC, which is the only FBI job for which inspection certification is required.  Further, inspection certification, standing alone, does not guarantee an automatic promotion to the Senior Executive Service (SES), the top level for management positions within the FBI.  FBI employees still should comply with the FBI's merit promotion policies and procedures by actually applying for entry-level SES positions.   Very few FBI employees in general, and Special Agents in particular, are appointed to an SES position during their FBI careers.  Indeed, the majority do not achieve the GS-15 rank that plaintiff currently holds as a Unit Chief at FBI Headquarters.

In addition, the FBI had legitimate business reasons for denying plaintiff's request to go to LA for an inspection for three weeks and take another week of leave, for a total absence from the office of four weeks in February 2005, and for taking two weeks away from the office in March 2005 for an OPR inspection.  As plaintiff himself had acknowledged, the CAU position involved

his assumption of significant responsibilities.  Due to his extended absences from the office, the

Unit's performance had suffered from a lack of leadership.  Therefore, defendant had legitimate,

non-retaliatory reasons for denying plaintiff's request to participate in the LA inspection.

This case is not about plaintiff's alleged retaliatory non-selection for a promotion.  Indeed,

plaintiff applied for several promotions during the timeframe encompassed by this lawsuit, none

of which is at issue here.  Consequently, evidence about plaintiff's qualifications for SES

promotions, or speculative testimony about positions that he should have been promoted to (even

in the absence of an actual application), is not relevant and should be excluded.

In summary, defendant's defenses in this case are threefold:

1.  DAD Lewis made the decision to cancel plaintiff's participation in the Los Angeles

inspection and to deny his request to participate in the OPR inspection for legitimate

business reasons and not in retaliation for plaintiff's EEO activity.

2.  DAD Lewis prohibited plaintiff from participating only in these two inspections,

scheduled for February and March 2005.  DAD Lewis did not prevent plaintiff from

participating in other inspections, once plaintiff had devoted sufficient time to become

familiar with his duties and responsibilities as Unit Chief of CAU.  Yet plaintiff did not

complete his requirements and obtain his inspection certification until February 2007.

This two-year delay cannot be attributed to the FBI.

3.  Plaintiff has not suffered any harm to his career prospects by the delays in his self-

guided path to inspection certification.  Inspection certification is required only for

selection as a GS-15 ASAC of an FBI field office.  It is not required for any other position

in the FBI, including any SES position.  Thus, obtaining inspection certification does not

guarantee that an FBI Special Agent will be promoted or otherwise assigned to any

position, including an SES position.  Further, even after obtaining inspection certification

in 2007, plaintiff has never applied, and does not ever intend to apply, for an ASAC

position.

**5.**      **Undisputed Facts and Stipulated Facts**

1.      The plaintiff in this case, Mr. Bassem Youssef, was born in Cairo, Egypt on November 8, 1958.  He is an American citizen.

2.      Mr. Youssef joined the FBI as a Special Agent on March 7, 1988.  He currently works for the FBI as a GS-15 Supervisory Special Agent and Unit Chief within the FBI's Counterterrorism Division at FBI Headquarters, in Washington, DC.

3.      In the 2004-2005 time period, the FBI's Counterterrorism Division (CTD) was comprised of four branches.  Each branch was comprised of Sections and those Sections in turn consisted of a number of Units.

4.      The Communication Exploitation Section (CXS) is a section within the Counterterrorism Division. CXS has responsibility for assisting in the exploitation of for terrorist communications.

5.      The CXS Section is one of three sections within the Operations Branch II of CTD.

6.      The CXS Section is comprised of four units: (1) the Document Exploitation Unit (DocEx); (2) the Communication Analysis Unit (CAU); (3) the Electronic Communications Analysis Unit; and (4) the Electronic Operations Unit.

7.      DocEx is responsible for assisting in the prevention of terrorist acts by extracting information of investigative and intelligence value from materials, including computer hard drives, cell phones and paper documents.

8.      Plaintiff Bassem Youssef became the DocEx Unit Chief on January 27, 2003.

9.      John Lewis became the Deputy Assistant Director (DAD) of CTD's Operations Branch II on May 10, 2004.

12

10.     As DAD, Lewis was plaintiff's third-line supervisor.

11.     Laurie Bennett became the Section Chief (SC) of CXS on August 23, 2004.

12.     As Section Chief, Bennett was plaintiff's second-line supervisor.

13.     Glen Rogers became the Assistant Section Chief of CXS on October 30, 2004.

14.     As Assistant Section Chief, Rogers was plaintiff's direct supervisor.

15.     On October 31, 2004, plaintiff was transferred from the position of Unit Chief of DocEx to the position of Unit Chief of CAU.

16.     The FBI has an inspection certification program that is conducted by the FBI's Inspection Division.  The Inspection Division conducts careful internal audits of FBI programs and offices.

17.     To become inspection certified an agent must obtain six inspection credits.

18.     Supervisory Special Agents at the level of GS-14 or GS-15 may apply to participate in inspections.

19.     From November 1, 2004 to November 12, 2004, plaintiff participated in the inspection of the FBI's Cincinnati field office as part of the inspection team.

20.     This was Mr. Youssef's fifth inspection.

21.     In January 2005, the FBI's Inspection Division informed plaintiff about the opportunity to participate in an inspection of the FBI's Los Angeles field office.

22.     The Los Angeles inspection was to take place in February 2005 and was to last three weeks.

23.     On February 16, 2005, the FBI's Inspection Division informed plaintiff about an opportunity to participate in an inspection of the Office of Professional Responsibility (OPR).

24.     The OPR inspection was to take place in March 2005 and was to last two weeks.

25.     Advancement for FBI Special Agents to positions beyond the GS-13 level is voluntary and requires an agent to apply and compete for positions both at FBI headquarters and in the field offices.

26.     Typically, the initial management position available to an FBI special agent is as a Supervisory Special Agent (SSA), grade GS-14, located at either FBI Headquarters or at a field office.

27.     Typically, FBI agents hold positions in both field offices and FBI Headquarters as they advance through management positions.

28.     Prior to attaining an Assistant Special Agent in Charge (ASAC) position, FBI agents must become inspection certified.

29.     In May, 2006, plaintiff's direct supervisor was Assistant Section Chief Thomas Wall, his second line supervisor was Section Chief Jennifer Love and his third line supervisor was DAD John Lewis.

30.      Mr. Lewis left the DAD position in June, 2006 when he was appointed the Special Agent in Charge of the FBI's Phoenix, Arizona field office.

31.     Mr. Youssef was selected to participate in his sixth and final inspection on August 30, 2006.

32.     Plaintiff completed his sixth and final inspection on February 8, 2007 and became inspection certified on February 9, 2007.

33.     Plaintiff participated in protected activity under Title VII, of which DAD Lewis was aware.

34.     The FBI requires agents to retire at age 57.  Mr. Youssef will be 57 on November 8, 2015
and will be required to retire by November 30, 2015.


**6A.**     **Witnesses to Be Called by Plaintiff**

   **(1)  *  Ed Curran                                        1.5 hours**
             **Department of Law and Public Safety**
             **Office of Counter-Terrorism**
             **Post Office Box 091**
             **Trenton, NJ 08625-0091**

        Ed Curran served as Mr. Youssef's supervisor and was a Chief Inspector for the

FBI.  He is expected to offer direct, opinion and expert testimony that Mr. Youssef could

have and should have been inspection certified, and that nothing in his performance

prevented such certification.  He will offer direct, opinion and expert testimony regarding

the damages incurred or suffered by Mr. Youssef, including (but not limited to) damages

to career and reputation due to lack of such certification.  He may also offer direct,

opinion and expert testimony concerning the harm to career and reputation caused by the

animus of Lewis/impact of retaliation.  As a former chief inspector, the witness has direct,

expert and opinion information regarding the inspection process, the importance of

inspection certification within the FBI and the impact such certification has on career

opportunities.   Mr. Curran will offer testimony on Mr. Youssef's performance and rebut

the assertion that Mr. Youssef was not qualified to be promoted to the highest levels

within the FBI. The witness is not a retained expert.  Mr. Curran will provide testimony to

establish the reasonableness of Mr. Youssef's protected activities.

**(2) *   John Lewis**                                            **45 Minutes**
                                                                  **(deposition)**

**Lawrence Livermore National Laboratory**
**P.O. Box 808 L-503**
**Livermore, CA 94551**

Mr. Lewis is former Deputy Assistant Director, Counterterrorism Division, FBI

Headquarters.  He will testify in plaintiff's case via the sworn deposition taken in this

matter.  The deposition excerpts are included in the appropriate portion of this brief.

**(3) *   Bassem Youssef**                                        **5 hours**
          **c/o Kohn, Kohn & Colapinto, LLC**
          **3233 P St. NW**
          **Washington, D.C. 20007**

Bassem Youssef, the plaintiff in this matter, will testify concerning every element

of this claim.  He had information about his protected activities, the FBI's knowledge of

these activities, the reasonableness of his protected activities, the fact that the FBI

retaliated against him based on these protected activities and the damages he suffered as a

result of this retaliation.  Mr. Youssef has information concerning the damages he

suffered, including compensatory damages, damages to reputation, humiliation, emotional

distress and physical harm. He also has information regarding the impact of the

admissions John Lewis made in his deposition testimony on the plaintiff's career and

reputation and all other damage-related matters relevant to this case. Mr. Youssef will

testify as to the impact of the decision by Mr. Lewis to deny him inspection certification

on his career and reputation, that he could and should have been inspection certified, and

that nothing in his performance prevented such certification. He will offer direct, opinion

and expert testimony regarding the damages incurred or suffered by him, including (but

not limited to) damages to career and reputation due to lack of such certification. He will also offer direct, opinion and expert testimony concerning the harm to his career and reputation caused by the animus of John Lewis/impact of retaliation. Mr. Youssef has direct, expert and opinion information regarding the inspection process, the importance of inspection certification within the FBI and the impact such certification has on career opportunities.   Mr. Youssef shall rebut the testimony of John Lewis.  Mr. Youssef shall testify as to the reasonableness of his filing a Title VII complaint and the reasonableness of his contacts with a Member of Congress and the subsequent meeting he attended with the Member of Congress and the Director of the FBI.  Mr. Youssef shall provide testimony concerning the pretextual nature of the FBI's claims, his protected activity and the causal connection between his protected activity and the adverse FBI actions.

**(4) *   Louis Freeh                           30 Minutes
          PO Box 4083
          Wilmington, Delaware**

As a former director of the Federal Bureau of Investigation, he is expected to offer direct, opinion and expert testimony that Mr. Youssef could have and should have been inspection certified, and that nothing in his performance prevented such certification. He can provide direct, opinion and expert testimony regarding the damages incurred or suffered by Mr. Youssef.   The witness may offer direct, expert and opinion information regarding the inspection process, the importance of inspection certification within the FBI and the impact of such certification on career opportunities.   The witness may provide direct or opinion testimony concerning Mr. Youssef's performance and the important skills he added to the FBI.   The witness will also have testimony relevant to the

17

reasonableness of Mr. Youssef's filing an EEO complaint and his contacts with the

Director of the FBI and a Member of Congress. The witness is not a retained expert.

     **(5)  *  Ed Dickson                                1 Hour**
              **100 Hiram Square, #402**
              **New Brunswick, NJ**
              **08901-1277**

Mr. Dickson served as a Section Chief in the Counterterrorism Division during the

time period that Mr. Lewis was DAD in Counterterrorism.  He is aware that Mr. Youssef

could have and should have been inspection certified, and that nothing in his performance

prevented such certification.  He is aware that while Mr. Lewis served as Mr. Youssef's

DAD, Mr. Youssef could not be inspection certified. He has knowledge of the damages

incurred or suffered by Mr. Youssef, including (but not limited to) damages to career and

reputation due to lack of such certification.  He also has knowledge of harm to career and

reputation caused by the animus of John Lewis/impact of retaliation.  As he once served

on the inspection staff, the witness has direct and opinion information regarding the

inspection certification process, the importance of inspection certification within the FBI

and the impact such certification has on career opportunities—whether SES-level or

otherwise.

     **(6)      Thomas "Tony" Wall                          1.5 hours**
              **Address known to the FBI**

Tony Wall served as Mr. Youssef's Assistant Section Chief and Acting Section

Chief in the CAU. He is aware that Mr. Youssef could have and should have been

inspection certified. He is aware that while John Lewis served as Mr. Youssef's DAD, Mr.

Youssef could not be inspection certified.  The witness also has knowledge of the damages

18

incurred or suffered by Mr. Youssef, including (but not limited to) damages to career and reputation due to lack of such certification, and knowledge of the harm to career and reputation caused by the impact of retaliation.   The witness will testify to the retaliatory motive of the FBI.  The witness will testify about the circumstances surrounding Mr. Youssef's sixth and final inspection.  The witness will testify concerning the reasonable nature of Mr. Youssef's attempts to obtain promotions within the FBI.  The witness had knowledge of Mr. Youssef's performance and reputation within the FBI. He also had direct and opinion information regarding the inspection process, the importance of inspection certification within the FBI, the impact such certification has on career opportunities and the culture of retaliation within the FBI.

**(7)     Jennifer Love                              1 hour**
**Special Agent in Charge**
**Richmond Field Office**
**Federal Bureau of Investigation**
**1970 East Parham Road**
**Richmond, VA 23228**

Ms. Jennifer Love served as Youssef's Section Chief in the CAU. She is aware that Mr. Youssef could have and should have been inspection certified, and that nothing in his performance prevented such certification. She is aware that while Mr. Lewis served as Mr. Youssef's DAD, Mr. Youssef could not be inspection certified.  The witness also has knowledge of the damages incurred or suffered by Mr. Youssef, including (but not limited to) damages to career and reputation due to lack of such certification, and knowledge of the harm to career and reputation caused by the animus of Mr. Lewis/impact of retaliation. The witness had knowledge of Mr. Youssef's performance and reputation.

**(8) *   Paul W. Vick                                1.5  hours**
**15941 W. 65th St., 303**
**Shawnee, KS**

Mr. Vick was employed as a Special Agent with the Federal Bureau of

Investigation for twenty-one years, and came to know Mr. Youssef while at the National

Counterintelligence Center (NCIC) as a Supervisory Special Agent. Mr. Youssef also

served as Vick's Unit Chief in the Document Exploitation Unit. The witness can offer

evidence of the crucial nature of inspection certification in an agent's promotion to more

senior positions at the FBI.   The witness also has direct information regarding the reasons

why William Chornyak had a negative opinion of Mr. Youssef, including the role that Mr.

Youssef's national origin played in the formation of those negative opinions. Mr. Vick can

testify as to the overall reasonableness of Mr. Youssef's EEO complaint and his contact

with Director Mueller and a Member of Congress.

**(8) *   Michael Fedarcyk                          15 minutes**
**Address Known to FBI**
**If outside of the subpoena limit, deposition excerpts will be utilized.**

Mr. Fedarcyk can testify that Mr. Youssef had no performance problems in his Unit before

Lewis was named DAD and Bennett became the Section Chief.

**(9) *   Robert Mueller                             1.5 hours**
**c/o Federal Bureau of Investigation**
**935 Pennsylvania Ave, NW**
**Washington, DC 20535**

Director Mueller is the hiring official for any ASAC or SES position that Mr.

Youssef would have applied for, the witness is expected to offer direct, opinion and expert

testimony that Mr. Youssef could have and should have been inspection certified, and that

nothing in his performance prevented such certification.  He will also offer direct, opinion and expert testimony regarding the importance of inspection certification, damages incurred or suffered by Mr. Youssef, including (but not limited to) damages to career and reputation due to lack of such certification.  The witness may also provide direct, opinion and expert testimony concerning the harm to career and reputation caused by animus of John Lewis/impact of retaliation.  The witness has direct opinion and expert testimony regarding the inspection process, including the crucial role that inspection certification plays in attaining SES-level employment, and the impact such certification has on career opportunities within the FBI overall. Director Mueller can also provide direct testimony impeaching Mr. Lewis' concerns that Mr. Youssef's meeting with Director Mueller and Congressman Wolf demonstrated judgment that "would be way down into the negatives" on a scale of one to 100. The witness is not a retained expert.  Director Mueller will provide testimony that the concerns raised by Mr. Youssef at the meeting with Wolf were reasonable, and the vicious attack on these concerns testified to by Lewis were misplaced and wrong.  Director Mueller will testify that inspection certification is required of any person he selects for the Senior Executive Service.  Director Mueller will testify that Mr. Youssef's background, experience and expertise in operational counterterrorism would have been considered during any promotional process.


**(10)    John Pikus                                   Deposition**
**Albany FBI Field Office**
**200 McCarty Aveune**
**Albany, NY 12209**
Mr. Pikus will testify by deposition.  The excerpts are separately marked.

**(11) *  Dr. James Sharf**                                    **2 hours**
      **SHARF & Associates, Inc.**
      **211 North Union Street, Suite 100**
      **Alexandria, VA 22314**

Dr. Sharf, Ph. D., is a previously disclosed witness who was deposed. All prior information contained in his deposition and/or in any prior disclosure is hereby incorporated by reference. The witness is an employment risk advisor whom the Court previously ordered to submit a report regarding the vocational effects of the failure to authorize Mr. Youssef to complete his inspection certifications. He will testify concerning the findings and basis for the two reports that he submitted in this case.   Dr. Sharf will testify to the vocational harm and monetary damages caused by Mr. Lewis' decision to block Mr. Youssef from completing his sixth and final inspection.  Dr. Sharf is a paid expert.

**(12) *  Dr. Amy McCarthy**                              **1 Hour**
      **McCarthy Consulting**
      **P.O. Box 878**
      **Edgewater, MD 21037**

Dr. Amy McCarthy, Ph.D., will also testify as to damages incurred by the plaintiff in her capacity as economist.  Dr. McCarthy has been deposed.  She will testify to the specific monetary damages caused by Mr. Lewis' decision to block Mr. Youssef from completing his sixth and final inspection.  She will testify concerning the report she issued in this matter.  Dr. McCarthy is a paid expert.

**(13) *  Daniel Byman**                                   **1 hour**
      **4613 Norwood Dr.**
      **Chevy Chase, MD  20815**

Mr. Byman is a retained expert in this case who will testify concerning the career prospects and promotional potential of Mr. Youssef.  He will provide testimony concerning the reasonableness of the concerns raised to the Director of the FBI and a Member of Congress by Mr. Youssef.  He will testify concerning the contents of the report he issued.

**(14)*    Dr. Edwin Carter, Ph.D.                    2 hours**
**            Associated Clinical Services**
**            8134 Keene Mill Rd. Suite 101**
**            Springfield, VA 22152,**

Dr. Edwin Carter, Ph.D is a clinical psychologist previously deposed by the parties. All prior information contained in his deposition and/or in any prior disclosure is hereby incorporated by reference. The witness counseled plaintiff intermittently between 2005 and 2007. He will testify as to his supplemental report on the mental state of plaintiff, especially as related to plaintiff's employment experiences during that time period. He will also testify as to the extent to which plaintiff's claims for damages derive form work-related issues, or from other factors. The witness has also reviewed Dr. Mitchell Hugonnet's report on the plaintiff's psyche, and may offer his opinions on said evaluation.  The report and findings of Dr. Hugonnet have now been incorporated into Dr. Carter's expert opinion, and he will rely upon the Hugonnet report during his testimony. Dr. Carter will testify that the denial of inspection certification caused Mr. Youssef emotional distress for which Mr. Youssef should be compensated.  Dr. Carter is a paid witness.

**(15)    William Chornyak                    30 Minutes**
**          1000 Omega Dr.                        (Deposition)**
**          Pittsburgh, PA 15205**

Mr. Chornyak will testify by deposition.  The excerpts are identified in this Brief.

Mr. Chornayak's testimony is relevant to the good faith and reasonableness of Mr.

Youssef's opposition to discriminatory conduct concerning Mr. Youssef's contacts with a

Member of Congress and his participation in a meeting with the Director of the FBI and a

Member of Congress.  His testimony is also relevant to the reasonableness of Mr.

Youssef's filing a Title VII complaint.

As part of his testimony, Exhibits 2 or 3 used in his depositions may also be used

when reading his deposition testimony to the jury.

| | | |
|---|---|---|
| **(16)** | **Ellen Knowlton** | **30 Minutes** |
| | **700 East Charleston Blvd.** | **(Deposition)** |
| | **Las Vegas, NV** | |

Ms. Knowlton will testify by deposition.  The excerpts are identified in this Brief.

Ms. Knowlton's testimony is relevant to the good faith and reasonableness of Mr.

Youssef's opposition to discriminatory conduct concerning Mr. Youssef's contacts with a

Member of Congress and his participation in a meeting with the Director of the FBI and a

Member of Congress.  His testimony is also relevant to the reasonableness of Mr.

Youssef's filing a Title VII complaint.

**Other Witnesses**:  Plaintiff reserves the right to call any witness necessary to

introduce a document into evidence.  Plaintiff also reserves the right to call any witness on

the defendants' witness list.

## 6B.   Witnesses to Be Called by Defendant

| | | |
|---|---|---|
| **(1)** | **John Lewis** | (Estimated direct: 3 hours) |
| | **Lawrence Livermore National Laboratory** | |

**P.O. Box 808 L-503**
**Livermore, CA 94551**

Mr. Lewis is a former Deputy Assistant Director, Counterterrorism Division (CTD), FBI Headquarters, who retired from the FBI in early 2009.  He will testify about the responsibilities, operations and workload of the CTD and the roles within CTD of the Communications Exploitation Section (CXS), the Document Exploitation Unit (DocEx), and the Communications Analysis Unit (CAU).  He further will testify about his observations and knowledge of plaintiff's performance as a Unit Chief in the CXS, first in DocEx and then in CAU.  Mr. Lewis also will testify about the reasons for his decision to deny plaintiff's request to participate in the Los Angeles and OPR inspections in January and February 2005 as well as plaintiff's ability to participate in future inspections.

    **(2)**    **Laurie Bennett**           (Estimated direct: 2 hours)
            **FBI**
            **935 Pennsylvania Avenue, NW**
            **Washington, D.C.  20535**

Ms. Bennett is a Deputy Assistant Director, Weapons of Mass Destruction Directorate, FBI Headquarters and a former Section Chief, CXS, CTD, FBI Headquarters.  She will testify about the responsibilities, operations and workload of the CXS, DocEx, and the CAU.  She also will testify about her observations and knowledge of plaintiff's performance as a Unit Chief in the CXS, first in DocEx and then in CAU.  Ms. Bennett also will testify about her what she knows about the circumstances relating to the denial of plaintiff's request to participate in the Los Angeles and OPR inspections in January and February 2005 as well as plaintiff's ability to participate in future inspections.

    **(3)**    **Glenn Rogers**          (Estimated direct: 1.5 hours)
            **8085 Rogues Road**
            **Catlett, VA 20119**

Mr. Rogers is a former Assistant Section Chief in CXS; prior to serving as Assistant Section Chief he was the Unit Chief of CAU.  He will testify about plaintiff's performance as a Unit Chief in CAU.  Mr. Rogers also will testify about his review of plaintiff's time and attendance records for the period from November 2004 through March 2005 and his communications with Ms. Bennett and Mr. Lewis about those records.  He further will testify about what he knows about the circumstances relating to the denial of plaintiff's request to participate in the Los Angeles and OPR inspections in January and February 2005 as well as plaintiff's ability to participate in future inspections.

(4)     **Valerie Parlave**+[1](Estimated direct: 2 hours)

**FBI**
**935 Pennsylvania Avenue, NW**
**Washington, D.C.  20535**

Ms. Parlave is the Section Chief of the Executive Development Selection Program in the FBI's Human Resources Division.  Ms. Parlave will provide fact testimony about the typical career path and promotion opportunities for FBI special agents, including promotions to management positions at FBI headquarters and in field offices.  She also will testify about the inspection certification process, the significance of the inspection certification credential for promotion to management positions, and the effect of the delay in plaintiff's participating in one more inspection had on his career opportunities within the FBI.  With respect to the issue of equitable remedies, in addition to the foregoing testimony, Ms. Parlave will describe the qualities and skills needed for management positions and the

---

[1]  The symbol "+" is used to indicate those witnesses whose testimony is relevant to claims for injunctive relief.

process for making selections.  She will offer opinion testimony about plaintiff's

qualifications for promotion to an SES position.

> **(5)    *Dr. Mitchell Hugonnet**          (Estimated direct: 2.5 hours)
> **5840 MacArthur Boulevard**
> **Washington, D.C.  20016**

Dr. Hugonnet is a clinical psychologist who, based on his independent

medical examination of plaintiff, will offer testimony about plaintiff's

psychological and emotional state, both before and after the alleged act of

retaliation.  He also will testify about the extent to which plaintiff's claims for

damages derives from issues relating to the denial of plaintiff's request to

participate in the LA inspection, or from other factors.

> **(6)    Dr. Rodrigo Hurtado**          (Estimated direct: 1 hour)
> **3450 N Beauregard Street**
> **Alexandria, VA 22302**

Dr. Hurtado is one of plaintiff's treating physicians and will testify about

plaintiff's medical condition both before and after the alleged act of retaliation and

in particular about the allergies that plaintiff suffers, including their physical

manifestations and possible causes.

> **(7)    Dr. Diane H. Browne**          (Estimated direct: 45 minutes)
> **15732 Crabbs Branch Way**
> **Rockville, MD 20855**

Dr. Browne treated plaintiff from March to November 2001.  She will

testify as to the reasons why plaintiff sought treatment and the nature of the

treatment she provided to him during this time.

> **(8)    Patrick Maley**          (Estimated direct: 45 minutes)
> **FBI**
> **Special Agent in Charge**

**Birmingham Field Office**
**Birmingham, AL**

Mr. Maley is the former Chief Inspector, Inspection Division, FBI.  Mr.

Maley will testify about the inspection certification process and the extent to which

plaintiff was canvassed about participating in inspections during the period from

February 2005 to January 2007.

> **(9)    Michael J. Heimbach**          (Estimated direct: 1 hour)
> **FBI**
> **935 Pennsylvania Avenue, NW**
> **Washington, D.C.  20535**

Mr. Heimbach is the Assistant Director of the Counterterrorism Division

(CTD), FBI.  If called, Mr. Heimbach will testify about the nature of the work

performed in CTD during the period from 2004-2005 and the extent, if any, to

which knowledge of Arabic or Middle East culture is necessary for an SES

position in the FBI.  Mr. Heimbach will testify about his career, his claimed

accomplishments relating to counterterrorism cases or investigations, and his

qualifications for an SES position.

**Witnesses Defendant May Call**

> **(10)   Don Robinson**          (Estimated direct: 45 minutes)
> **FBI**
> **Senior Supervisory Resident Agent**
> **Salt Lake City Field Office**

Mr. Robinson is an FBI Special Agent who, during the time when plaintiff

transferred to CAU on November 1, 2004 through the time when plaintiff's request

to participate in the LA inspection was denied in January 2005, was a Supervisory

Special Agent in CAU and one of plaintiff's subordinates.  He can testify to the

operations of and office morale in CAU during the period related to plaintiff's

claim of retaliation.

      **(11)**    **\*Joel Lesch**+          (Estimated direct: 1 hour)
                    **517 South Washington Street**
                    **Alexandria, VA 22314**

Mr. Lesch is an accountant who will provide expert testimony about the

amount of monetary harm experienced by plaintiff if the Court finds that he should

have been promoted from a GS-15 to an SES position in 2005.  His testimony will

address all components of plaintiff's alleged monetary injury, including back pay,

benefits, overtime, performance bonuses and any impact on plaintiff's pension.

Mr. Lesch will also present testimony in rebuttal to plaintiff's economic expert,

Amy McCarthy.

      **(12)**    **\*Suzanne Tsacoumis**+    (Estimated direct: 2 hours)
                    **66 Canal Center Plaza**
                    **Alexandria, VA 22314**

Dr. Tsacoumis will present testimony in rebuttal to plaintiff's expert, James

Sharf, related to the promotional practices and policies of the FBI and their effect

on the plaintiff.  In addition, she will testify about the relationship between

inspection certification and promotions to SES positions.

      **(13)**    **Stephen C. Kauffman**    (Estimated direct: 30
                                            minutes)

                    **3450 N Beauregard Street**
                    **Alexandria, VA 22302**

Dr. Kauffman is one of plaintiff's treating physicians and will testify about plaintiff's medical condition both before and after the alleged act of retaliation.

**(14)   Andre G. Khoury#**[2]                    (Estimated direct: 30 minutes)

       **FBI**
       **Special Agent**
       **Boston Field Office**
       **One Center Plaza**
       **Boston, MA 02108**

Mr. Khoury is a Special Agent of the FBI, currently assigned to the field office in Boston, Massachusetts.  If called, he will testify about his similar tenure and status within the FBI as plaintiff and his knowledge of the Arabic language. Mr. Khoury will be called if plaintiff is permitted to testify about his career, his claimed accomplishments relating to counterterrorism cases or investigations, and his qualifications for a Senior Executive Service (SES) position.

**(15)   Andrew A. Apollony#**            (Estimated direct: 30 minutes)
       **Senior Director**
       **ManTech International**
       **Fairfax, VA**

Mr. Appollony is a former Special Agent for the FBI.  If called, he will testify about his knowledge of plaintiff's role in the counterterrorism investigation relating to the Warrayat group.  Mr. Appollony will be called if plaintiff is permitted to testify about his career, his claimed accomplishments relating to counterterrorism cases or investigations, and his qualifications for an SES position.

**(16)   M. Chris Briese#**            (Estimated direct: 30 minutes)
       **FBI**
       **935 Pennsylvania Avenue, NW**

---

[2]  The symbol "#" is used to indicate those witnesses whose testimony is relevant to rebut plaintiff's claims of his qualifications.

**Washington, D.C.  20535**

Mr. Briese is a Deputy Assistant Director, Critical Incident Response Group, FBI Headquarters.  If called, Mr. Briese will testify about his knowledge of the counterterrorism cases handled by Special Agents in the Los Angeles field office during the period from1992 to 1996.   Mr. Briese will be called if plaintiff is permitted to testify about his career, his claimed accomplishments relating to counterterrorism cases or investigations, and his qualifications for an SES position.

(17)   **James Van Rhein#**                    (Estimated direct: 30 minutes)
       **1612 Beaucaire Drive**
       **Warson Woods, MO 63122**

Mr. Van Rhein is a former Special Agent for the FBI.  If called, Mr. Van Rhein will testify about his knowledge of plaintiff's role in counterterrorism cases in St. Louis during the period beginning in 1988.  Mr. Van Rhein will be called if plaintiff is permitted to testify about his career, his claimed accomplishments relating to counterterrorism cases or investigations, and his qualifications for an SES position.

(18)   **Scott G. Jessee#**                    (Estimated direct: 30 minutes)
      **FBI**
      **935 Pennsylvania Avenue, NW**
      **Washington, D.C.  20535**

Mr. Jessee is a Supervisory Special Agent for the FBI, assigned to the Counterterrorism Division at FBI Headquarters.  If called, Mr. Jessee will testify about his knowledge of plaintiff's role in the PAKNAP case, on which he worked when assigned to the Washington field office starting in 1991.  Mr. Jessee will be called if plaintiff is permitted to testify about his career, his claimed accomplishments relating to counterterrorism cases or investigations, and his qualifications for an SES position.

(19)   **Mary Deborah Doran#**                (Estimated direct: 30 minutes)
      **FBI**
      **Paris Legal Attache**
      **American Embassy**
      **Paris, France**

Ms. Doran is the Assistant Legal Attache for the FBI in Paris, France.  If called, Ms. Doran will testify about her knowledge of "document exploitation" after the 9/11 terrorist attacks, her interactions with plaintiff when she was assigned to DocEx in 2002, and the significance of the work DocEx was performing in connection with the 9/11 investigation.  Ms. Doran will be called if plaintiff is permitted to testify about his career, his claimed accomplishments relating to counterterrorism cases or investigations, and his qualifications for an SES position.

(20)   **William Hooten**                      (Estimated direct: 1 hour)
      **FBI**
      **935 Pennsylvania Avenue, NW**
      **Washington, D.C.  20535**

Mr. Hooten is the Assistant Director, Records Management Division, FBI. As part of his responsibilities, Mr. Hooten is the Custodian of Records for the FBI. If called, Mr. Hooten will testify about records kept by the FBI in the normal course of business.

> **(21)   John Pistole**+                    (Estimated direct: 1 hour)
> **FBI**
> **935 Pennsylvania Avenue, NW**
> **Washington, D.C.  20535**

Mr. Pistole is the Deputy Director of the FBI.  If called, Mr. Pistole will testify about his knowledge of promotions to the SES, as derived from his career in the FBI and tenure as Chair of the SES Career Board since 2004.  Mr. Pistole also has knowledge about the entry-level SES selections made in March 2005, which have been identified and discussed by plaintiff's witness, Dr. Sharf.

> **(22)   Michael Fowler**                    (Estimated direct: 45 minutes)
> **FBI**
> **935 Pennsylvania Avenue, NW**
> **Washington, D.C.  20535**

Mr. Fowler is an FBI Special Agent who, during the time when plaintiff transferred to CAU on November 1, 2004 through the time when plaintiff's request to participate in the LA inspection was denied in January 2005, was a Supervisory Special Agent in CAU and one of plaintiff's subordinates.  He can testify to the operations of and office morale in CAU during the period related to plaintiff's claim of retaliation.

Defendant reserves the right to call any witness listed by plaintiff.

33

**6C.**   **Objections to Witnesses**

The parties shall file any objections to the jury instructions as set forth in the Court's Pre-Trial Scheduling Order on or before December 4, 2009.

**7.**   **Exhibits:**

   **A.**   **Joint Exhibits**:  The Joint exhibits are attached hereto as Attachment 1 (R-171-3).

   **B.**   **Plaintiff's Exhibits**:

   Plaintiff's list of exhibits is attached hereto as Attachment 2 (R-171-4).   Plaintiff reserves the right to mark and have admitted into evidence additional exhibits for purposes of impeachment or rebuttal and the right to use blow-ups and other demonstrative exhibits derived from testimony or other evidence at trial that are not identified in Attachment 2.  Plaintiff also reserves the right to move into evidence any of defendant's exhibits.  Plaintiff also intends to utilize and introduce into evidence Exhibit  3 to the deposition testimony of William Chornyak in the manner consistent with the use of the exhibit during the deposition.

   **C.**   **Defendants' Exhibits**:

   Defendant's list of exhibits is attached hereto as Attachment 3 (R-171-5).   Defendant reserves the right to mark and have admitted into evidence additional exhibits for purposes of impeachment or rebuttal and the right to use blow-ups and other demonstrative exhibits derived from testimony or other evidence at trial that are not identified in Attachment 3.  Defendant also reserves the right to move into evidence any of plaintiff's exhibits.

### D.      Objections to Exhibits

The parties shall file any objections to the exhibits as set forth in the Court's Pre-Trial

Scheduling Order on or before December 4, 2009.

**8.      Demonstrative Evidence, Physical Evidence, Videotapes:**

**Plaintiff:**  Demonstrative Aids:  The plaintiff has not yet created any demonstrative aids.

If created for use at trial, the demonstrative aids would consist of enlargements of exhibits or

testimony.  Plaintiff intends to utilize the technology available to the parties in the courtroom.

Physical Evidence:  A copy of the book by Louis Freeh, "My FBI."  Videotapes:   Plaintiff may

use the videotape or audiotape of witness depositions and audiotapes from Career Board

meetings.  Plaintiff reserves the right to enlarge any exhibit on defendant or plaintiff's exhibit list

or the deposition testimony of a witness.

**Defendant:**  Defendant's demonstrative exhibits are attached hereto as Exhibit 4 (R-171-

6).  Defendant reserves the right to enlarge any exhibit on defendant or plaintiff's exhibit list.

**Objections to Demonstrative Aids:**

The parties shall file any objections to the demonstrative aids as set forth in the Court's

Pre-Trial Scheduling Order on or before December 4, 2009.

**9.      Deposition Designations**

A. Plaintiff's Designations:

John Lewis

4:10 – 11
4:14 – 15
4:21 – 22
5:1 – 6

35

7:14-20
8:7 – 22
9:1 – 5
10:20-21
38: 20-22
46:1 – 48:14
49:13 – 50:15
60: 6-8
65:2 – 67:11
74:17 – 74:19
74:22
75:2-9
76:10 – 80:18
125:20 – 126:8
127:5 – 130:9
131:6 – 22
132:1 – 5
142:3 – 146:21
147:6 - 149:8
149:21 – 153:20
165:18 – 169:4
180:8 – 183:5

Re-Direct of John Lewis

13:12-22
14: 1-4
20:8 – 21:15
25:13 – 26:20
67:22
68:1 – 69:15
73:1-3.6-12
73:22 – 74:5
154: 9-15
161:4 – 162:10
163:18 – 165:15
184:14-185:14
186: 4-9

John Pikus

5:2 – 5
8:7 – 10
124:5 – 21

126:6 – 19

Ellen Knowlton

4:10-15
8:3-6
9:5-13, 19-22
10:1 – 12:1
13:3-7
14:3 – 16:17
19:10-20
20: 6-13
21:11-18
30:18-22
31:1-20
32: 12-22
33: 1-15
34: 4-10
35:13-22
36:1-11

William Chornyak

7:7-15
14:14-22
15:9-22
16:1-7, 14
18:7-22
19:1-2, 5-22
20:1-2, 4-7
22:7-18

Counter-Designations:  Plaintiff's counter-designations shall be filed in accordance with local rule 16.5(b)(7).

B.    Defendants' Designations

Gary Bald:

6:2 – 6: 12
21:12 – 22:5
34:4 – 34:10
35:1 – 36:13
70:20 – 71:8
77:4 – 78:2

93:4 – 94:10

Defendant's Counter-designations:

John Pikus:

124:21 – 126:5
126:20 – 128:12

John Lewis:

7:14 – 9:5
10"10 – 13:11
22:3 – 25:11
56:19 – 59:7
67:12 – 67:21
75:10 – 76:8
130:10 – 130:21
153:21 – 154:9
183:6 – 184:14


10.  **Damages Itemization**

   A.    **Plaintiff's Itemization of Damages**

   1.    Lost Wages and Benefits

   According to the report of retained expert Amy McCarthy, Plaintiff suffered a back

pay loss of $117,079 from April 1, 2005 (estimated date of what would have been

Plaintiff's promotion) through April 30, 2009. However, Ms. McCarthy noted in her

deposition that she inadvertently excluded an average of $2,700 in pre-tax health

insurance premiums from Plaintiff's actual wages from the years 2005-2008. This would

alter pre-interest back pay losses to $106,279. Ms. McCarthy intends to update interest

rates closer to the trial date in order to provide a more accurate representation of annual

net losses plus interest.

Though Ms. McCarthy intends on adjusting the time separating back and front pay before trial, her report found front compensation through October 31, 2015 (estimated date of Plaintiff's retirement) to be $99,282. However, Ms. McCarthy will use updated 1- to 5-year Treasury constant maturities rates closer to trial. Therefore, before back pay and front pay losses re adjusted to reflect the accrual of interest and their discounted present value, respectively, Plaintiff suffered total net lost earnings from 2005 through 2015 of $205,561.

2.      <u>Compensatory Damages for Emotional Distress, Humiliation and Loss of Professional Reputation</u>.

Plaintiff has suffered emotional distress, physical pain, humiliation, embarrassment, and damage to professional reputation as a result of the discrimination alleged in his complaint.  Plaintiff estimates the monetary value attached to the compensatory damages he suffered is $300,000 or the legal maximum permitted under Title VII of the Civil Rights Act of 1964, *as amended*, whichever is larger.

3.      <u>Equitable Relief</u>

Plaintiff will ask for equitable relief pursuant to Title VII §2000e-5.   Based on the jury verdict, plaintiff would submit a request for equitable relief post-trial.

**B.**     **Defendant's position**:  The jury only should be asked to assess compensatory damages, if appropriate.  Defendant will move the Court for a ruling that, if liability is established, the Court will conduct a separate hearing to determine issues relating to equitable relief, such as back pay or instatement to a position.

**11.**     **Relief Sought by Plaintiff**

Plaintiff seeks relief for:

39

1.       Monetary Damages

2.       Compensatory Damages for Emotional Distress, Humiliation and Loss of

Professional Reputation

3.       Equitable Relief Pursuant to Title VII §2000e-5.

**12.**    **Motions to be Decided / Unusual Issues of Fact or Evidence**

None at this time.  Parties are expected to file motions *in limine* and objections to portions of the

pretrial brief on or before December 4, 2009

**13.**    **Estimate of Trial Time**

The parties estimate that the trial in this case will last approximately seven (7) days.

**14.**    **Jury Voir Dire**

A. **Joint Proposed Jury Voir Dire**

1.  Are you or a close family member personally acquainted with any of the following

parties, lawyers, paralegals and witnesses in this case?

> Laurie Bennett
> Daniel Bensing
> Dr. Edwin Carter
> Katie Cheng
> Dave K. Colapinto
> Vikas Deseai
> Louis Freeh
> Dr. Mitchell R. Hugonnet
> Dr. Rodrigo Hurtado
> Stephen M. Kohn
> John Lewis
> Jennifer Love
> Robert Mueller
> Helen Nissan

Richard Renner
Glen Rodgers
James Sharf
Suzanne Tsacoumis
Thomas (Tony) Wall
Carlotta P. Wells
Bassem Youssef

[List any other witness who may be called.]

2.  What is your current occupation, of, if you are retired, what was your occupation before you retired?

3. Have you ever been employed by the FBI, sought employment with the FBI or had any contact with an FBI employee?

4.  Have you or a close family member ever been the victim of retaliation by an employer for acts taken to protest employment discrimination?  If so, what were the circumstances?

5.  Have you ever been a party to a lawsuit, either as a plaintiff or defendant?  If so, what type of lawsuit was it and what was the outcome?

6.  Have you or a close family member ever been criticized or disciplined for being absent from work for too long, either due to sick leave, vacation leave or any other reason?  If so, how was the matter resolved?

7.  Given your work experiences, would you tend to disbelieve the testimony of someone who was a supervisor just because he or she was a supervisor?

8.  Given your work experiences, would you tend to believe the testimony of someone who claimed that they suffered discrimination at work?

9.  Do you have any formal training or education in the law or law enforcement?

10.  Have you or a close family member ever been arrested or convicted of a crime?  If so, what were the circumstances?

11.  Has the federal government ever taken any action against you, a member of your family, or a close friend that you thought was wrongful?  If so, what were the circumstances?

12.  Is there anything about the facts of this case as they have been explained to you that bothers you in any way that might affect your judgment if you are selected to be on the jury?

13.  Have you heard anything about this case or the plaintiff in the press?

14.  Do you feel sympathetic or supportive of people who publically criticize the United States government in the courts or in the press or before Congress?

15.  Do you believe that because a case has gotten to trial, rather than been dismissed by the Court, it must have some merit?

16.  Have you ever served as a juror?  If so, what type of case was it and what was the outcome of the trial?

17.  Is there any reason that you could not be a fair and impartial juror in this case?

**B.  Plaintiff's Proposed Jury Voir Dire**

1. This trial is expected to last for seven (7) days.  Is there anything about the length or scheduling of the trial that would interfere with your ability to serve?

2. Do you have any medical, personal or financial problem that would prevent you from serving on this jury?

3. A plaintiff is a person who has initiated a lawsuit. Do you have a bias for or against a plaintiff simply because he or she has brought a lawsuit?

4. Have you ever been a witness in a civil matter, regardless of whether it went to trial?

5. Have you ever testified in any court proceeding?

6. Have you or a close family member ever had to fire or discipline an employee for being absent from work for too long, either due to sick leave, vacation leave or any other reason?  If so, how was the matter resolved?

7. Has an employee ever filed a grievance or lawsuit against you or a close family member? If so, how was the matter resolved?

8. Given your work experiences, would you tend to believe the testimony of someone who

was a supervisor, just because he or she was a supervisor?

9. Do you have any formal training in human resources or management?

10. Do you believe that employees sue their companies to often?  If so, explain your answer.

11. Do you feel that United States government employees should not publicly criticize their

    employers in the courts or in the press or before Congress?

12. Did you have any relatives or close friends who die or were injured in the terrorist attacks

    of September 11, 2001 or any terrorist attack?

13. Do you believe that there should be any extra restrictions or security reviews concerning

    Arab-Americans who wish to hold positions in sensitive counterterrorism law

    enforcement agencies?

14. Should the fact that an American citizen was born in a Middle Eastern country ever be

    taken into consideration when evaluating whether that person should hold a job

    investigating terrorists?  If so, explain your answer?

15. Do you believe that U.S. citizens born in Middle Eastern countries who work in

    terrorism-related security jobs should be treated any differently than non-Arab American

    citizens?

16. Do you believe that employees often sue their companies even though their claims have

    no merit.  Please explain your answer.

17. Have you ever supervised other employees?          If so, how many?

18. Have you ever owned a business?    What type?

19. Have you ever been the plaintiff (the party suing) in a lawsuit? If yes, please explain.

20.  Have you ever been the defendant (the party who was sued) in a lawsuit?   If yes, please

    explain.

44

21. Can you award substantial damages to a plaintiff, even if he was not fired from his job and suffered no physical injury?

22. Do you believe that money damages in a lawsuit should be <u>limited</u> to out-of-pocket losses?

23. Do you believe that damages should <u>not</u> be awarded for non-physical injuries such as "emotional distress" or "loss of reputation?"

24. Do you believe that when it comes to jury verdicts, juries generally tend to award too much money based on the circumstances.

25. Have you or a close family member ever been accused of discriminating against an employee?  If so, in what circumstances?

**15.    <u>Jury Instructions</u>**

**I.      Joint Proposed Standard Instructions from the Standardized Civil Jury Instructions for the District of Columbia (2009 ed.)**

**A.      Standard Civil Jury Instructions the parties agree should be given.**

§ 1.01  Function of the Court
§ 1.02  Function of the Jury
§ 1.03  Significance of Party Designations
§ 1.04  Jury's Duty to Deliberate
§ 1.05  Attitude and Conduct of Jurors
§ 1.06  Instructions to be considered as a Whole
§ 1.07  Court's Commenting on the Evidence
§ 1.08  Court's Questioning to Witnesses
§ 1.09  Jury Not to Take Cues from Judge
§ 1.10  Rulings on Objections
§ 1.11  Equality of Litigants (replace "corporation" with "government agency")
§ 2.01  Evidence in the Case
§ 2.03  Inferences
§ 2.04  Inadmissible and Stricken Evidence
§ 2.05  Statements of Counsel
§ 2.06  Jury's Recollection Controls
§ 2.08  Burden of Proof
§ 2.09  Evidence Produced by Adversary

§ 2.10  Direct and Circumstantial Evidence
§ 3.01  Jury to Determine Credibility of Witness
§ 3.02  Number of Witnesses
§ 3.03  Expert Opinion
§ 3.05  Depositions as Evidence
§ 3.10  Charts and Summaries
§12.02 Extent of Damages - Proximate Cause


**B.      Standard Civil Jury Instructions to be given only if it is determined that the evidence at trial warrants them.**

§ 3.04 Failure to Produce Stronger Available Evidence
§ 3.08  Impeachment by Prior Inconsistent Statement
§ 3.09 Adopting Prior Inconsistent Statements

**C.      Agreed Non-Standard Civil Jury.**

**1.      Foreperson / Verdict Form / Communications / Unanimous Verdict**

When you go to the jury room, you should first select one of your members to act as your foreperson.  The foreperson will preside over your deliberations and will speak for you here in court.1

A form of verdict has been prepared for your convenience.  You will take this form to the jury room, and when you have reached unanimous agreement, you will have your foreperson fill in, date and sign the form that sets forth the verdict upon which you unanimously agree.  Then you will return with your verdict to the courtroom.2 As you will note from the instructions on the verdict form, depending on how you answer a question, it may or may not be necessary to answer the next question. Follow the instructions provided.

If you need to communicate with me during your deliberations, you may send a note to me through the marshal or bailiff, signed by one or more jurors. No member of the jury should ever attempt to communicate with me by any means other than a signed writing, and I will not communicate with any member of the jury on any subject touching the merits of this case other than in writing, or orally here in open court.  I will respond as soon as possible either in writing or orally in open court.  Remember that you should not tell anyone - including me - how your votes stand numerically.3

Your verdict must be based solely on the evidence and on the law that I have given to you in my instructions.  In order to return a verdict, it is necessary that each juror agree. Your verdict must be unanimous.

46

### 2.    Bias

In deciding whether to believe a witness, you should specifically note any
evidence of hostility or affection that the witness may have towards one of the parties.
Likewise, you should consider evidence of other interest or motive that the witness may
have in cooperating with a particular party.
It is your duty to consider whether the witness has permitted any such bias or interest to
color his testimony. In short, if you find that a witness is biased, you should view his
testimony with caution, weigh it with care and subject it to close and searching scrutiny.

**Authority:** 76-2 in Modern Federal Jury Instructions No. 76-3.

### 3.    Intent

The plaintiff must show that the defendant intentionally retaliated against him.
Plaintiff is not required to produce direct evidence of intentional discrimination.
Intentional discrimination may be inferred from the existence of other facts, but whether
the evidence is direct or inferential, the plaintiff must prove by a preponderance of the
evidence that the defendant intended to retaliate.

## II.    **Plaintiff's Proposed Jury Instructions**

See Attachment 5 (R-171-7)

## III.    **Defendants' Proposed Jury Instructions**

See Attachment 6 (R-171-8)

## IV.    **Objections**

The parties shall file any objections to the jury instructions as set forth in the Court's Pre-

Trial Scheduling Order on or before December 4, 2009.

## 16.    **Proposed Verdict Form**

Plaintiff's proposed verdict form is attached as Attachment 7 (R-171-9).

Defendants' proposed verdict form is attached as Attachment 8 (R-171-10).

## 17.    **Proposed Amendments to the Pleadings**

Plaintiff's Position:  The complaint should be considered supplemented as necessary in

order to bring the claim up-to-date concerning the events that occurred (related to the inspection

certification) since the time the complaint was last supplemented/amended.  The supplemental complaint would indicate that Mr. Youssef's denial of an opportunity to participate in his sixth and final inspection lasted two years.  He completed his sixth inspection on February 8, 2007.  He became certified on February 9, 2007.   He applied for (but did not obtain) five promotions since certification. The delay in inspection certification reflected a decision to stymie his career.  The request for relief and damages should be supplemented in a manner consistent with the expert testimony of plaintiff's expert witnesses.

**18.      No Waiver of Jury Trial**

The plaintiff does <u>not</u> waive his right to a jury trial.  In accordance with Federal Rule of Civil Procedure 38 and 48, he continues to demand a jury trial on <u>all</u> issues.

**19.      Miscellaneous Matters**

The parties intend to file a motion to remove and/or modify the Privacy Act Protection Order as it relates to exhibits and testimony.   Plaintiff may seek to obtain access to sworn testimony concerning Mr. Youssef given by various witnesses in this case to the Department of Justice and the FBI.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Richard R. Renner
Stephen M. Kohn, D.C. Bar No. 411513
Richard R. Renner, D.C. Bar No. 987624
Kohn, Kohn, & Colapinto, LLP
3233 P Street, N.W.
Washington, D.C. 20007
(202) 342-6980
sk@kkc.com
rr@kkc.com

</div>