**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
BASSEM YOUSSEF,                                         )
                                                        )
                         Plaintiff,                     )
                                                        )
v.                                                      )   Civil Action No.  1:03CV01551(CKK)
                                                        )
FEDERAL BUREAU OF                                       )
INVESTIGATION, *et al.,*                                )
                                                        )
                         Defendants.                    )
_____)


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION IN**
**LIMINE AND MOTION TO BIFURCATE (R-172)**

Defendants' Motion *In Limine* and the memorandum in support fail to consider this

Court's prior orders, and a reject the development of anti-discrimination and anti-retaliation law

since *National Railroad Passenger Corp. v. Margan*, 536 U.S. 101, 113 (2002).

To prevail at trial, Mr. Youssef must persuade the jury that the FBI's denial of his

requests to complete his inspection certification was retaliation for protected conduct.  *Lathram*

*v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Reeves v. Sanderson Plumbing Prods.*,

530 U.S. 133, 142-43 (2000).  To do so, Mr. Youssef must have the opportunity to present to the

jury all of the relevant circumstances in evidence, including the strength of the prima facie case,

any direct evidence of discrimination, any circumstantial evidence that defendants' proffered

explanation is false, including independent evidence of discriminatory or retaliatory statements

or attitudes on the part of the employer. *Reeves*, 530 U.S. at 147-48; *see also Teneyck v. Omni*

*Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004); *Waterhouse v. Dist. of Columbia*, 298

F.3d 989, 993 (D.C. Cir. 2002).

Defendants primarily rely on two unsupportable arguments to attempt to limit the evidence that Mr. Youssef may present to the jury.  First, defendants attempt to improperly narrow the protected conduct and adverse actions at issue in this case.  Defendants then attempt to argue that, simply because evidence is relevant to a claim that the Court has dismissed, it cannot be also relevant to any remaining claims and must therefore be excluded.  *See* def. memo. (R-172-1), pp. 2-13, 16-21.  These positions are wholly without merit.

At the bottom of page 1 (R-172-1), defendants' memorandum seeks to exclude significant probative evidence by limiting the adverse actions at issue in this case as follows: "Deputy Assistant Director John Lewis temporarily denied plaintiff's request to go on another inspection during January and February 2005 . . . ." The jury may find that Mr. Lewis not only denied Mr. Youssef's two requests for leave to attend his last inspection, but he also instructed Mr. Youssef not to apply for any further inspections until Mr. Lewis gave him permission to do so.  *See Youssef v. FBI*, 541 F. Supp. 2d 121, 159 (D.D.C. 2008); Lewis Depo. Tr. (R-82-40), pp. 79:1 - 80:9; Youssef Affidavit (R-98-1), ¶ 229.  There is no evidence that Mr. Lewis ever relented from this directive blocking Mr. Youssef's career.  Mr. Youssef could not get his final inspection until Mr. Lewis left the FBI.  Wall Depo. Tr. (R-164-3), pp. 28-29, 51-51, 81.  The defendants' attempt to limit the scope of the trial is not supported by the evidence.

Defendants' narrow view of the issues also prevents defendants from seeing the relevance of some of the evidence they seek to exclude.  This memorandum will address defendants' arguments in sequence.  Moreover, as many issues discussed herein are also raised by defendants' objections to Mr. Youssef's pre-trial statement, Mr. Youssef incorporates by reference his arguments on each issue as set forth in his concurrently-filed reply to defendants' objections to his pre-trial statement.

**A-C.   Evidence Relating to Mr. Youssef's Claims of Discrimination and Retaliation is Relevant to this Trial, Even if It is also Relevant to Dismissed Claims.**

Evidence of defendants' past discrimination against Mr. Youssef is relevant to show that Mr. Youssef had a reasonable basis for his remarks to Director Mueller and Congressman Wolf. Defendants persist in contending that Mr. Youssef's only protected activity is his filing of official EEO complaints. This Court clearly rejected that contention in its opinion on summary judgment.  In *Youssef v. FBI*, 541 F.Supp.2d 121, 157-58 (D.D.C. 2008), this Court explained as follows:

> The FBI's argument is unpersuasive because Youssef engaged in statutorily-protected activities beyond filing a complaint, such as meeting with Director Mueller, leaving work for depositions, and taking the depositions of other FBI employees. *See Lemmons, 431 F. Supp. 2d at 91* ("An activity is 'protected' for purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'") (quoting *Coleman, 422 F. Supp. 2d at 212*). Lewis' testimony above expressly refers to the "EEO process," not just the filing of Youssef's complaint. Because Youssef has set forth numerous instances of protected conduct and Lewis' knowledge of the same, Lewis' testimony is sufficient to establish the requisite causal link. *See Harding v. Gray, 9 F.3d 150, 152 (D.C. Cir. 1993)* (holding that a plaintiff's burden of establishing a *prima facie* case is "not onerous").

The jury will need to consider the full scope of Mr. Youssef's protected activities to determine if they caused the denial of his requests for his last inspection. One of the elements of opposition-clause protected activity is that the plaintiff must have an objectively reasonable basis to believe that the conduct constituted unlawful discrimination. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). Additionally, evidence showing defendants' past discrimination against Mr. Youssef on account of his Middle Eastern national origin are probative of defendants' intent, motive, plan, knowledge and opportunity.  *See, e.g., National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (holding that Title VII permits a

plaintiff to use "prior acts [of discrimination] as background evidence in support of a timely claim."); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 993 (D.C. Cir. 2002) (holding that evidence of actual discrimination, as well as evidence of "discriminatory statements or attitudes on the part of the employer", were relevant); *cf Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (holding that "evidence of a strong track record in equal opportunity employment" is relevant).[1]

Although plaintiff has no intention of introducing evidence of the defendants' plan to transfer Mr. Youssef to ITOS, and then failing to implement that transfer, evidence of the meeting with Director Mueller and Congressman Wolf is necessary to establish defendants' motive. Probative evidence permits the jury to find that Mr. Youssef's meeting with Director Mueller and Congressman Wolf made the defendants mad at Mr. Youssef for going outside the chain of command and complaining that FBI management was breaking the law. *Waterhouse*, 298 F.3d at 993. Indeed, this is precisely what upset Mr. Lewis, the decision maker for the adverse actions at issue here. This Court's summary judgment decision focused on Mr. Lewis' deposition testimony on precisely this point before holding that the jury could make inferences for either side. In *Youssef*, 541 F.Supp.2d at 160, this Court quoted the following section of that deposition, and commented as follows:

> A: . . . As I think about it here and now and as I have a couple of other times since he told me, I can hardly fathom what would bring someone to cause a [Congressman] to call the FBI Director and pull him away from his duties and to surprise him with some sort of, the best term I can use is, ambush and questions . . . I'm still amazed that he had the wherewithal, and maybe there's pieces of this I don't fully understand, so I don't know what

---

[1] Under Title VII, the principals that apply to claims of discrimination also apply and control cases of retaliation. *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (citing *Wiley v. Glassman*, 511 F.3d 151, 155-56 (D.C. Cir. 2007).

happened exactly right but the Director was truly appalled, a surprise visit and hit with questions upon his arrival not knowing why he was walking into [] Congressman [Wolf's] office. On a scale of one to 100, the judgment factor there would be way down into the negatives as far as I'm concerned.

* * *

Q: And you then testified that you still think, in other words, you still have a negative opinion about it today?

A: Holy mackerel. I mean absolutely. I couldn't imagine being more disloyal and discourteous putting the director of the FBI in that position. It surprised me . . . I don't think anyone in the history of our organization has ever done that to the director . . .

* * *

A: It shows a tremendous disloyalty to the director. It shows me that at least at that time he was far more interested in Bassem Youssef than he was serving this government or the FBI. Those things concern me a great deal.

Pl.'s Mot. for Partial Summ. J., Ex. 40, Tr. 180:20 - 181:17; 131:13-18; 129:16-19 (Deposition of John Lewis). Youssef implies that Lewis' reaction to his requests for leave to perform his final inspection may have been related to how Lewis perceived Youssef's treatment of the Director. Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 36.

Not only is the meeting with Director Mueller and Congressman Wolf relevant to Mr. Lewis' motive, it is also evidence of damages.  Mr. Lewis' statements caused reputational damage to Mr. Youssef, and caused him distress over the future of his career.  In this context, Mr. Youssef's prior career trajectory is evidence of his personal investment in his FBI career, and is therefore evidence of the devastation he suffered as a result of Mr. Lewis' words and actions.  That is actual harm to Mr. Youssef, and Mr. Youssef needs enough leeway to explain that to the jury, and to support his claim with corroboration from other witnesses and exhibits.

Additionally, the importance of the meeting with Director Mueller and Congressman Wolf will raise questions about what caused Mr. Youssef to contact his representative and arrange for the meeting.  If defendants are successful in this motion, they will be able to mock Mr. Youssef for breaching protocol by raising his concerns as such high levels.  The jury cannot understand why Mr. Youssef would engage in such protected activities unless they also understand the personal and professional investment Mr. Youssef had made in his counterterrorism career to that point.

Defendants have repeatedly, and erroneously, argued that since some evidence relates to one claim, it cannot be relevant to the claim at hand.  In its May 18, 2009, order (R-156, page 2), this Court recognized, for example, that "issues concerning liability and damages may overlap." Similarly, issues of liability for one claim may overlap with those of another.

Furthermore, evidence that defendants seek to impose a culture of intimidation that deters its agents from going outside the chain of command or from making official complaints is probative of defendants' motive for the adverse actions at issue here.  *Waterhouse*, 298 F.3d at 993.  The Civil Rights Act prohibits law enforcement agencies from maintaining a "code of silence" as it relates to matters of discrimination or retaliation.

On page 3 of its memorandum (R-172-1), defendants make the conclusory assertion that they would be prejudiced if Mr. Youssef could, "advance claims of discrimination and retaliation which are not the subject of this action under the guise of presenting 'background' information." This statement is apparently the defendants' rejection of undersigned's contention at the "meet and confer" that *Morgan*, 536 U.S. at 113, explicitly noted that employees could use "prior acts as background evidence in support of a timely claim." Defendants' memorandum buries its reference to *Morgan* in a footnote on page 13, under the third branch of their motion.  That

footnote distinguishes *Morgan* on a basis (repeated adverse actions as opposed to a single incident) that is not applicable and makes no difference. Mr. Lewis' actions may be viewed by the jury as a series of adverse actions, or as a single action, and it makes no legal difference which of these ways they might find best suited to the evidence. Even if this was a single incident case, *Morgan* would still support the introduction of background evidence to support his contentions about motive, intent, opportunity and a pattern of circumstances that supports a finding of pretext and retaliation. On the first branch of their motion, defendants ignore the Supreme Court decision undersigned raised at the "meet and confer" as being directly contrary to their claim.  The *Morgan* holding is a natural extension of case law that recognizes the difficulties of proving unlawful motive by decision-makers who know enough to refrain from admitting it.

Judicial fact-finding must be based on consideration of the totality of circumstances. By breaking Mr. Youssef's evidence into seven categories, defendants are asking this Court to consider each in isolation. That is not correct. The decision about defendants' true motive must be determined from the totality. Although *United States v. Arzivu*, 534 U.S. 266 (2002), is a criminal case, the Court's determination of whether a stop was reasonable under the Fourth Amendment was based on a similar consideration of multiple circumstances. The Supreme Court's position is equally applicable in civil cases where liability may turn on motive or intent. In this case, Justice Rehnquist admonishes the lower courts for examining the facts surrounding the investigatory stop in isolation. In doing so, he emphasized the totality of circumstances as a necessary prerequisite to understanding the question of reasonable suspicion for an investigatory stop. Specifically, Justice Rehnquist noted that by considering each factor "in isolation from each other," the Ninth Circuit had failed to take into account the totality of the circumstances that led

the officer to form his opinion. Only by viewing the totality of the circumstances could the court give due weight to the factual inferences drawn by the border patrol agent in deciding to conduct the stop. Just as we allow police officers to make judgments based on their experience and their perception of all the surrounding circumstances, we must allow jurors to determine if adverse actions were caused by unlawful motivations based on their own day-to-day experiences as applied to the totality of circumstances.

In *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75 (1998), the Supreme Court made clear that the same totality of circumstances doctrine applies to employment discrimination law. Justice Scalia wrote the opinion of the Court and explained that: "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id*. at 82; see also *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir.1990)("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario"). Therefore, it would be incorrect to assess any one of the branches of defendants' motion without considering the context of all the evidence, and its cumulative power to reveal defendants' motives and thought processes.

In *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074 (3d Cir. 1996), the court articulates a fact of life: "It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality

discriminatory behavior. In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind." *Id*. at 1081-82. In *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003), Justice Thomas said that "[t]he reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" As such, the evidentiary standard for relevance under F.R.E. 401 tends to be "extremely liberal" in employment cases. *Douglass v. Eaton Corp*., 956 F.2d 1339, 1344 (6th Cir. 1992); *Parker v. Secretary, U.S. Dept. of Housing and Urban Dev*., 891 F.2d 316, 322 (D.C. Cir. 1989). Per se rules of relevance or discoverability are improper. The Supreme Court recently made clear that categorical limits on relevant evidence are improper in discrimination cases. *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 128 S.Ct. 1140, 1146 -47, (2008) (Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules. See Advisory Committee's Notes on Fed. Rule Evid. 401, 28 U. S. C. App., p. 864).

Defendants have made some choices in the authorities they cite in their attempt to have this Court exclude relevant admissible evidence. The first case they cite is this Court's opinion in *Desmond v. Ashcroft*, No. 03-01729 (D.D.C. Nov. 15, 2006) (R-95, p. 7). Defendants cite this decision without noting that there was an appellate decision, *Desmond v. Mukasey*, 530 F.3d 944, 955 (D.C. Cir. 2008). There, the Circuit Court of Appeals held that the admission of "the Cochran report" was permissible, notwithstanding a challenge under Fed. R. Evid. 403, given that it was admitted to show defendants' state of mind and not for the truth of the matters it asserted, and the Court gave a limiting instruction. The Desmond Court also held that, "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' " 530 F.3d at 955 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The only appellate decision defendants cite (*Easley v. Amer. Greetings Corp.*, 158 F.3d 974, 976 (8th Cir. 1998)) pre-dates the *Morgan* opinion.

In a Title VII opposition clause case, evidence of the underlying discrimination will necessarily be at issue because the plaintiff must establish a reasonable belief of unlawful discrimination.   The jury should be instructed that the existence of the underlying discrimination is immaterial, but what is at issue is whether the plaintiff had a reasonable basis.  For this, the jury must understand the plaintiff's reasons. Defendants complain that if evidence about the underlying discrimination claims is admitted, the Fed. R. Evid. 404(a) "would cease to be meaningful . . .." Citing *White v. U.S. Catholic Conference*, No. 97-1253, 1998 U.S. Dist. LEXIS 11832, at *16 (D.D.C. May 26, 1998). Defendants ignore Fed. R. Evid. 404(b) which similarly prohibits evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith" but permits such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The D.C. Circuit noticed the effect of Rule 404(b) in *United States v. Tchibassa*, 452 F.3d 918, 928 (D.C. Cir. 2006), *cert. denied*, 549 U.S. 1298 (2007) (concluding that if evidence was erroneously admitted, such error was harmless).  "Rule 404(b) is a rule of inclusion rather than exclusion," *United States v. Bowie*, 344 U.S. App. D.C. 34, 232 F.3d 923, 929 (D.C. Cir. 2000), and it is "quite permissive," excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character. *Id*. at 929-30

(quotation and citations omitted); *United States v. Long*, 328 F.3d 655, 660-61 (D.C. Cir. 2003),

cert. denied, 540 U.S. 1075.

Mr. Youssef's evidence about why he went to Congressman Wolf and Director Mueller is

not prejudicial because it is an element of his claim to show that he had a reasonable basis to

perceive unlawful discrimination, and that he undertook his opposition through reasonable

means. The defendants are free to introduce evidence that plaintiff's meeting and the concerns he

raised were not reasonable.  Defendants may choose to defend Mr. Lewis' statement that, for

example, "On a scale of one to 100, the judgment factor there would be way down into the

negatives as far as I'm concerned." Lewis deposition, 180:20 - 181:17; 131:13-18; 129:16-19

(Ex. 40 to Plaintiff's Motion for Summary Judgment; quoted at *Youssef v. FBI*, 541 F.Supp.2d

121, 160 (D.D.C. 2008)).  Defendants cannot strike Mr. Lewis' statements or ignore them as they

are a part of Mr. Lewis' thought process, and that is the heart of this retaliation case.  That

defendants' evidence in support of their contention is weak does not make it prejudicial.  That is

just the state of the evidence.  Further, any prejudice can be cured with a limiting instruction to

the jury that they are not to weigh the merits of the underlying discrimination claim as this is a

trial of a retaliation case. See *Goodman v. Pa. Tpk. Comm.*, 293 F.3d 655, 670 (3d Cir. 2002)

("[T]he fact that probative evidence helps one side prove its case obviously is not grounds for

excluding it under Rule 403. Excluded evidence must be unfairly prejudicial, not just

prejudicial.").

### 2-3.  Documentary Evidence and Witness Testimony Concerning Mr. Youssef's Background and Performance Are Relevant

On page 10 of its memorandum (R-172-1), defendants contend that testimony related to

Mr. Youssef's qualifications and past performance "is far attenuated in time and circumstance

from the alleged act of retaliation [and] should be excluded as irrelevant."  However, evidence of

Mr. Youssef's qualifications and past performance is extremely relevant to rebutting defendant's proffered explanation for its actions. *See, e.g., Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir. 2006) (considering plaintiff's qualifications and past performance as evidence relevant to plaintiff's claims of discrimination and retaliation); *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 72 (D.D.C. 2006) (finding that "plaintiff's stellar performance reviews [and] her substantial experience" were factors that led the Court to conclude that there was "a genuine issue of material fact about whether defendant's proffered rationale was the real reason defendant declined to select plaintiff for the position."); *see also Bundy v. Jackson*, 641 F.2d 934, 940 (D.C. Cir. 1981) (finding evidence that plaintiff received poor performance reviews only after objecting to supervisors' conduct "directly belies" lower court's finding of nondiscriminatory motive.); *Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir. 1987) (holding plaintiff's evidence that, before engaging in protected activities, he "had always received performance ratings of average and above average", was relevant to whether defendants' explanations were pretextual); *Watson v. Nationwide Insurance Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (holding that evidence that plaintiff "had previously always received excellent employment ratings" rebutted defendants' "trumped up charges of inadequate job performance.").

In *Parker v. Secretary, U.S. Dep't of Housing & Urban Dev.*, 891 F.2d 316, 322 (D.C. Cir. 1989), the Court stated:

> The court's pronouncement as to the immateriality of Parker's evidence on the merits of her work has no basis in the law. The court claimed that Parker's evidence of her work performance-more appropriately, her attempt to show that she was singled out for adverse treatment "would only be material if there were evidence to prove that the managers were so clearly wrong that they, in fact, knew that they were." The Supreme Court, however, has imposed no such materiality standard on plaintiff's attempted showings of pretext. Thus, the evidence offered by Ms. Parker is entitled to the full consideration of the trial court for the purpose of

determining whether HUD's reasons for its actions were a pretext
or whether they in fact deserved credence.

Defendants raise issues related to the performance of the DocEx unit while Mr. Youssef
was chief. See Statement of Defendants' Defense, R-171, pp. 7-8, 10.  On page 25, defendants
state that Mr. Lewis will testify about, "his observations and knowledge of plaintiff's
performance as a Unit Chief in the CXS, first in DocEx and then in CAU." Defendants also state
that witnesses Bennett and Rogers will testify about plaintiff's job performance.  Certainly, this
Court cannot allow defendants to present negative evidence of Mr. Youssef's performance, and
prohibit him from presenting positive evidence.

Mr. Youssef's job performance is also relevant to the issue of causation.  The contrast
between high work performance ratings before the protected activity and low ratings or other
"problems" thereafter is an indicator of discriminatory motive.  *Ellis Fischel State Cancer Hosp.*
*v. Marshall*, 629 F.2d 563, 566 (8th Cir. 1980); *Brown & Root-Northrop*, 174 NLRB 1048, 1050-
51 (1969). The jury instructions, as proposed by either side, are sufficiently clear to inform the
jury that it should award damages for the unlawful retaliation, and not for other reasons.  The
jury should makes its liability decision based on all the relevant evidence, including evidence
that compares management's assessment of his work performance before and after the protected
activities.

Similarly, in assessing damages, it will be for the jury to determine the pecuniary and
reputational impact of any unlawful retaliation it finds. To make this determination, the jury will
need to hear the testimony of the experts retained by both sides, the testimony of lay witnesses
familiar with FBI promotional and other career advancement practices, and the background
necessary to evaluate all this testimony.  See this Court's order (R-167) overruling defendants'
motion to strike Dr. Sharf's report.

4.     **Defendants' Other Acts of Discrimination and Retaliation Tend to Make It More Likely that Defendants' Retaliated Against Mr. Youssef.**

Plaintiff's witness, Mr. Tony Wall, worked for the FBI from 1992 to 2008. Wall Deposition (R-164-3), p. 9. From 2002 to 2005, he was a supervisor with the Bureau's Mobile Intelligence Management and Development Unit. Id., P. 9-10. His last three years with the FBI were spent at its headquarters. P. 10. There, he worked as Assistant Section Chief (ASC) of the Communications Exploitation Section. P. 12. At FBI headquarters, his work crossed paths with Mr. Youssef's in a way that highlighted Mr. Youssef's reputation as a Special Agent who had sued the Bureau. P. 15-16. As ASC, Mr. Wall directly supervised Mr. Youssef. P. 17-18. In this capacity, he received complaints from Mr. Youssef's subordinates about this very lawsuit. P. 22-23. Like Mr. Youssef, Mr. Wall worked under the authority of Mr. John Lewis. P. 28

Mr. Wall's testimony is necessary to provide the jury a basis to compare Mr. Youssef's performance before and after his protected activity. Plaintiff concedes that Mr. Wall's personal experience with discrimination or retaliation at the FBI may be excluded.[2]

On page 29, Mr. Wall reports that his Section Chief, "Jennifer [Love] was very concerned about promoting Bassem because of what would happen to her if she did under Mr.

---

[2] Through this concession, plaintiff is foregoing significant and powerful evidence. At p. 28, Mr. Wall recounts the following statement from Mr. Lewis after Mr. Lewis learned that Mr. Wall had conveyed a concern about a racial remark to the Assistant Director:

> Lewis came to me and said, "You know, you really screwed up by going to the assistant director." And basically, he -- the reason I didn't get to work for Lauri Bennett was because he made sure that I stayed under Michael Morehart, and refused to let me work under Lauri Bennett.

That Mr. Lewis would make this remark, tends to make it more likely that he would retaliate against Mr. Youssef for the meeting with Director Mueller and Congressman Wolf. Mr. Wall is a necessary witness, however, for his role as Mr. Youssef's supervisor after the protected activity, not for his own personal experience. Evidence of disparate treatment of other employees who engaged in similar protected activities tends to make it more likely that the employer's motive was to retaliate against the protected activity. *Sumner v. U.S.P.S.*, 899 F.2d 203, 209 (2d Cir. 1990); *Housing Works, Inc. v. City of N.Y.*, 72 F. Supp. 2d 402, 422 (S.D.N.Y. 1999).

Lewis." When questioned on the next page, he explained:

> 3 Q Was it that she was concerned that
> 4 Mr. Lewis would somehow be vindictive against
> 5 her if she promoted Mr. Youssef?
> 6 A That was definitely the impression
> 7 that I got.
> 8 Q From Ms. Love?
> 9 A Yes.

These and other incidents led Mr. Wall to conclude that Mr. Lewis was a "vindictive manager." P. 32, line 16. Mr. Wall was terminated from the FBI, but the Office of Professional Responsibility (OPR) found that the grounds for termination were inappropriate and ordered that Mr. Wall be rehired.  P. 36. Mr. Wall is also a witness to the damages Mr. Youssef suffered, his emotional distress and his being left out of the loop of the FBI's management circles. PP. 43-47, 56-57.

After Mr. Lewis left the FBI, it fell to Mr. Wall and his Section Chief Ms. Love to determine if Mr. Youssef should be approved for his sixth inspection (the last one he needed to become inspection certified). Mr. Wall was aware that while Mr. Lewis was with the FBI, Mr. Youssef could not become inspection certified. P. 81. Mr. Wall testifies at p. 51 that, "supervisors who were subordinates of Mr. Youssef were allowed to go on the inspections. So, when he asked me for authority to go on the inspections, being inspections certified is paramount to promotion in the FBI. You have to have it." Mr. Wall testifies that he discussed Mr. Youssef's request with Ms. Love who was reluctant due to this pending lawsuit. P. 52. The decision itself was, "really a no-brainer." P. 52, line 13. He and Ms. Love approved the request. P. 52-53. At pp 55-56, Mr. Wall discussed Mr. Youssef's qualifications and experience:

> 14 Bassem was more qualified to be
> 15 the assistant section chief than I was because
> 16 of his experiences in counterterrorism, and
> 17 matter of fact, he was more qualified than

18 almost, if not everybody else, even the
19 executive management. Everybody -- you have
20 to understand, prior to 9/11, the criminal
21 division was the big, quote, "Gorilla on the
22 block."
Page 56
1 If you didn't go through the
2 criminal division, you didn't get promoted.
3 So, everybody's career went through the
4 criminal division. Bassem's career was
5 counterterrorism prior to 9/11. Post 9/11,
6 everybody switched over to counterterrorism.
7 No one really had experience in
8 counterterrorism. Bassem had extreme
9 experience in counterterrorism.

Mr. Wall clearly has the foundation to speak about the work environment that he and Mr.

Youssef shared.  He has a foundation to speak about the inspection certification process, and his

own role in approving Mr. Youssef's last request for an inspection.

The defendants' memorandum acknowledges (at p. 14) that the most recent Supreme

Court decision on the subject rejected the type of per se exclusion of evidence that defendants are

seeking here. *Mendelsohn*, 552 U.S. 379, 128 S.Ct. at 1146 -47.  The 1998 *White* case defendants

rely upon long pre-dates both *Mendelsohn* and *Morgan* (2002), and was less than fully attentive

to the prevailing Title VII case law. In *Abramson v. American University*, 1988 U.S. Dist. LEXIS

15818, 48 CCH EPD 38,439 (D.D.C. 1988) (J. Green), the Court explained:

> As the Supreme Court has made abundantly clear, the "ultimate
> question" in every Title VII lawsuit is whether the defendant
> intentionally discriminated against the plaintiff.  In *McDonnell
> Douglas Corporation v. Green*, Justice Powell recognized that
> '[o]ther evidence that may be relevant to any showing of pretext
> includes . . . [the employer's] general policy and practice with
> respect to minority employment."
> * * *
> Although it is true that plaintiff's witnesses are neither Jewish nor
> of Eastern European background, evidence that Peters
> discriminated against other minority groups is surely relevant
> towards the issue of his discriminatory intent in general, since

> relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

(emphasis added, citations omitted).

As to Fed. R. Evid. 404(b), in *Huddleston v. United States*, 485 U.S. 681, 685 (1988), the Court held that:

> Federal Rule of Evidence 404(b) -- which applies in both civil and criminal cases -- generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

The D.C. Circuit has embraced this holding, stating most recently in *United States v. Douglas*, 482 F.3d 591, 598 (D.C. Cir. 2007) (citing *Huddleston*, 485 U.S. at 685), "Indeed, proof of intent is one of the core bases for admitting evidence of other crimes or bad acts."

Mr. Wall's testimony speaks to the words and actions of the decision makers at issue in this case.  Indeed, he himself is one of those decision makers.  His testimony does not establish "guilt by association" (referring to racist behavior by other employees in *Morgan v. Fed. Home Loan Mortgage Corp*., 197 F.R.D. 12, 17 (D.D.C. 2000)).  His testimony tends to establish Mr. Lewis' guilt by virtue of Mr. Lewis' own words and actions.  This may be prejudicial, but it is not *unfairly* prejudicial.

**5.      Experts Dr. Sharf and Dr. Byman Have Relevant Testimony to Give to the Jury.**

The reports of Drs. Sharf and Byman are relevant to how the jury might quantify Mr. Youssef's loss of reputation from Mr. Lewis' statements and actions.  They support Mr.

Youssef's testimony about how the retaliation impacted his career, and how his emotions are affected by thinking of how the value of his personal and professional sacrifices to that point were at stake.

Defendants have written this branch of their motion completely ignoring this Court's prior ruling on precisely this issue. On June 26, 2009, this Court issued an order (R-167) overruling defendants' motion to strike the reports of plaintiff's expert, Dr. James Sharf.  This Court directly stated that the experts on Mr. Youssef's vocational consequences would present their opinions to the jury:

> That Defendants may disagree with Dr. Sharf's conclusions, or may draw different inferences from the evidence in the record, is not a basis to exclude Dr. Sharf's opinions in this case. Rather, Defendants may present their arguments to the finder of fact based on the evidence in the record and through their own rebuttal expert designated for this purpose. See Notice at 1 & Ex. A (Defendants' Disclosure of Rebuttal Expert Witnesses on Damages) (May 8, 2009) (designating Dr. Suzanne Tsacoumis to rebut the testimony of Dr. Sharf). Whether the finder of fact will ultimately agree with Plaintiff or Defendants is not for this Court to decide. See *Ferebee v. Chevron Chem. Co*., 736 F.2d 1529, 1535 (D.C. Cir. 1986) (referring to the "classic battle of the experts, a battle in which the jury must decide the victor").

Now the defendants seek to relitigate this issue, ignoring how this Court has already ruled on it.  Mr. Youssef set out his objections to defendants' repeated efforts to strike Dr. Sharf's report at R-154 and R-164 and he incorporates those objections here.

As to Dr. Byman, his report was most recently filed in the record at R-172-5. To the extent that defense counsel complains that the description of his testimony is general or vague, the entire report is available so they may know what he can say, in detail. Defendants object that his testimony is "speculative" about SES promotions. Defendants fail to appreciate the argument plaintiff's counsel is making about how management can create, structure and restructure

positions and promotional opportunities to match the career goals of those who respect the chain of command and the culture that suppresses criticism and official complaints. This, too, is part of the argument "to the finder of fact."

      **6.**    **The Contents of the June 2002 Meeting with Mr. Youssef, Director Mueller and Congressman Wolf is Relevant and Admissible.**

Given the prominent and unavoidable role of Mr. Youssef's meeting with Director Mueller and Congressman Wolf, a major question on the jury's mind will be why Mr. Youssef called on his representative, went to the meeting with the Director and said what he did about his concerns of unlawful discrimination. Defendant's want to harp on how Mr. Youssef went six levels above his own in raising his concerns to the Director, but want to deprive Mr. Youssef of the ability to explain what exactly he said at the meeting, what led him to this meeting, and what support he had for his beliefs and actions. Especially in light of Mr. Lewis' strong reaction to this meeting, Mr. Youssef will need to explain his basis, and will need to establish that his basis was objectively reasonable. The jury's role, in part, is to assess if Mr. Lewis' reaction to learning about this meeting was part of his motivation for blocking Mr. Youssef's inspection certification. The jury cannot just hear Mr. Lewis' side, nor can it hear from no one on this important issue. This is among the most important evidence in this case, as this Court noted at *Youssef v. FBI*, 541 F.Supp.2d 121, 157-58 (D.D.C. 2008).

Defendants appear to argue that while the meeting and its subject matter is relevant, the statements made by the participants is not. R-172-1, p. 20-21. Since the subject matter of the meeting is determined from evidence of what was said at the meeting, those statements are relevant. Defendants concede, finally, that this meeting constitutes protected activity. Plaintiff needs to explain what was said because it tends to make it more likely that Director Mueller told others about Mr. Youssef's participation in the meeting in a way that led to the adverse actions.

Even if Mr. Mueller and Mr. Lewis deny that they had any such discussion, the jury may infer

otherwise from the totality of the circumstances.  A key circumstance on this point is what each

the participants said at the meeting itself.  That defendant will stipulate to the protected nature of

the meeting, and to Mr. Lewis' knowledge of it, does not alter the nature of the statements as

relevant to this case.  As the statements made at the meeting go to defendants' reactions and

feelings about Mr. Youssef's protected activity, they are not *unfairly* prejudicial.

### 7.    Director Mueller is an Appropriate Witness.

Contrary to defendants' assertions on page 21 of their brief, Director Mueller has

personal knowledge of several relevant issues that are central to this litigation, and no lower-

level official can provide equivalent testimony.  Director Mueller is the decision making official

for all SES officials, and inasmuch as he has testified that inspection certification is a critical

element for promotion to the SES, a fact to which defendants have been unwilling to stipulate, he

must be produced.  Exhibit 1, Mueller Depo. Tr., pp. 93-94.  Moreover, Director Mueller's

testimony on the importance of inspection certification to promotion runs directly counter to

testimony by defendant's other witnesses.  Director Mueller's testimony is thus critical to prove

Mr. Youssef's prima facie case and damages, and is equally important for impeachment of

defendants' witnesses.

Furthermore, the decision making official in this case, John Lewis, testified that Mr.

Youssef's judgment in raising concerns to director Mueller and Congressman Wolf: "On a scale

of one to 100, the judgment factor there would be way down into the negatives as far as I'm

concerned."  Lewis Depo. Tr. (R-82-40), pp. 180 - 181.  Mr. Lewis further testified that "the

Director was truly appalled" by the meeting with Congressman Wolf.  *Id*.  Even if defendants

were to stipulate that Mr. Youssef's conduct was protected, such testimony, left unrebutted,

would be extremely prejudicial to a jury, who would be left with the impression that Mr. Youssef had exercised bad judgment.  Mr. Youssef must have the opportunity to rebut this testimony with evidence that his judgment under the circumstances was both reasonable and appropriate, evidence that only Director Mueller can provide.

Finally, defendants have predicated their argument on the assertion that Mr. Youssef's highly specialized skills and outstanding reputation as an expert in counterterrorism are not central factors to this case.  However, the career board tapes of the discussions regarding promotions into the SES demonstrate otherwise, some of which Mueller attended and spoke at. Mr. Youssef must have the opportunity to present and substantiate evidence regarding the value of his reputation and professional standing, and how it was impacted by the retaliation.

Mr. Youssef is not, however, unsympathetic to the demands and importance of Director Mueller's position and schedule.  If defendants will stipulate that inspection certification is a required element for promotion into the SES, that Mr. Youssef exercised reasonable and appropriate judgment in meeting with Congressman Wolf and Director Mueller, and will agree not to present evidence that could create a contrary inference, then Mr. Youssef is more than willing to reconsider calling Director Mueller as a witness.  Defendants, however, cannot have it both ways.  Defendants cannot call witnesses to testify, even by inference, that inspection certification is not required for promotion to the SES and that Mr. Youssef exercised poor judgment and then claim that Mr. Youssef cannot call rebuttal witnesses.

Undersigned hopes that counsel will be able to reach a stipulation on evidence that will avoid the need for Director Mueller to testify personally at the trial of this matter. As such, undersigned request that the Court defer ruling on this branch of the motion in limine until after the final pre-trial conference presently scheduled for January 29, 2010.  This will allow counsel

addition time to seek a resolution of this issue through stipulation.  As undersigned is still

obligated to provide the points of authority relied upon for their position at this time, it is

provided as follows.

While "litigants should ordinarily be required to depose those individuals with the most

knowledge of the relevant facts before taking the depositions of high-ranking government

officials," *Alexander v. FBI*, 186 F.R.D. 1, 3 (D.D.C. 1998), a busy schedule is not sufficient

grounds to quash a subpoena, *Alexander v. FBI*, 186 F.R.D. 60, 64 (D.D.C. 1998).  Similarly, an

order that completely prohibits testimony by a senior government official "should be granted

only as an extraordinary measure which should be resorted to only in rare occasions."  *Byrd v.

District of Columbia*, 259 F.R.D. 1, 7 (D.D.C. 2009).

The policy behind limiting the circumstances under which high-ranking government

officials can be required to provide testimony is simple: there is no reason to force such officials

to testify regarding the daily activities of their respective agencies when less prominent officers

can provide identical testimony.  The instant case is distinct from the authority cited by

defendants in several key ways.  First and foremost, Mr. Youssef is not calling on the Director to

appear to testify solely regarding agency policy or the ordinary decision making process.  This is

not a case where the plaintiff is a private individual affected by an agency rulemaking, who then

subpoenas the official ultimately responsible for the decision.  In such a case, the decision is not

directed at a particular individual and the personal intent of the official is irrelevant -- any

necessary testimony could easily be provided by a less prominent officer familiar with the

process.

Indeed, unlike any of the authority cited by defendants, Mr. Youssef is a public employee

alleging retaliatory animus by his superiors, including the Director.  Director Mueller was

personally involved in some of the events and decisions relevant to Mr. Youssef's suit, was personally involved in prior adverse employment actions against Mr. Youssef, and would have been personally involved in any future personnel decisions.  Director Mueller is the only official who can provide testimony about his personal reaction to his meeting with Mr. Youssef in Congressman Wolf's office, and is the only adverse witness to have provided testimony corroborating Mr. Youssef's argument that denial of inspection certification amounted to denial of promotional opportunities.  *See* Mueller Depo Tr. 93-94.  Because of the nature of Mr. Youssef's suit – an employee challenging the actions and motivations of his superiors – and because of Director Muller's personal involvement in decisions directed specifically at one of his subordinates, the usual policy limiting the circumstances under which prominent officials may be called to testify does not apply.  Quite to the contrary, live testimony by Director Mueller would allow the jury to gauge his credibility in a way that the simple submission of his deposition transcript would not.

### 8.     Back Pay is Appropriate for Jury Determination and Bifurcation Is Neither Necessary Nor Helpful.

Plaintiff's objections to the pre-trial statement argued at length about Mr. Youssef's Seventh Amendment right to a trial by jury on the amount of pecuniary damages, including back pay.  See R-175, pp. 11-22, and *Crocker v. Piedmont Aviation*, 49 F.3d 735, 744-49 (D.C. Cir. 1995). Just because back pay is available as an equitable remedy does not exclude the possibility that back pay is also a legal remedy for which Mr. Youssef is entitled to a trial by jury. Undersigned incorporates that argument here by reference.

Even if Mr. Youssef did not have a right to trial by jury, this Court may have the jury determine the amount of back pay in the capacity of an advisory jury. Rule 39(c)(1) of the Federal Rules of Civil Procedure.  Doing so would serve the interests of judicial economy in that

the jury would render a verdict on the amount sooner than if this Court were to determine the

amount after a post-trial hearing.  Moreover, as the jury will need to consider so much of the

evidence to determine liability and non-actual compensatory damages, it is logical to allow the

jury to hear the evidence on back pay as well.  Indeed, this Court anticipated a jury evaluation of

the competing experts on this issue when it overruled the defendants' motion to strike Dr. Sharf's

report.  R-167.

<div style="margin-left: 40%">

Respectfully submitted,


/s/ Richard R. Renner
Stephen M. Kohn
Richard R. Renner, Bar No. OH0021
KOHN, KOHN, COLAPINTO, LLP.
3233 P Street, N.W.
Washington, DC 20007
Phone: (202) 342-6980
Fax:    (202) 342-6984
sk@kkc.com, rr@kkc.com
Attorneys for Plaintiff

</div>

December 11, 2009

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing memorandum is filed electronically and will be

made available to all counsel of record through this Court's electronic case filing system.

By:     /s/ Richard R. Renner_____
        Richard R. Renner

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

BASSEM YOUSSEF,                          )
                                         )
                           Plaintiff,    )
                                         )
v.                                       )   Civil Action No.  1:03CV01551(CKK)
                                         )
FEDERAL BUREAU OF                        )
INVESTIGATION, *et al.,*                 )
                                         )
                           Defendants.   )
_____)

## ORDER

This matter comes before the Court on the defendants' motion in limine and motion to bifurcate (R- 172 and R-176), and the plaintiff's memorandum in opposition.  Defendants' motions are overruled.

IT IS SO ORDERED.


                              _____
                              COLLEEN KOLLAR-KOTELLY
                              UNITED STATES DISTRICT JUDGE