**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BASSEM YOUSSEF,

Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION, *et al.*,

Defendants.

Civil Action No. 1:03CV01551(CKK)

**PLAINTIFF'S CORRECTED REPORT REGARDING EXPERT TESTIMONY**

Due to urgent work responsibilities associated with the recent terrorist attack in New York City, the plaintiff did not have an opportunity to review R-207, the original version of this report, before it was filed late on its due date, May 14, 2010. He has now had that opportunity, and this report corrects writing errors, an error about Mr. Curran's position at the FBI, and the length of a work day during inspections. Plaintiff asks that this corrected report be used in place of R-207.

## I. INTRODUCTION.

During the pretrial conference on April 27, 2010, this Court directed Mr. Youssef's counsel to submit a modified report about the opinions and the bases for those opinions of witnesses Bassem Youssef, Louis Freeh and Edward Curran. The Court's minute order states as follows:

> The Court ordered Plaintiff to file a report regarding the expert testimony that will be offered by Ed Curran, Louis Freeh, Bassem Youssef, and any other witnesses who will give expert testimony who did not produce a report pursuant to Fed. R. Civ. P. 26(a)(2)(B). The report shall include a statement of the witness's area of

> expertise and specialized knowledge and a complete statement of all opinions that the witness will express and the basis and reasons for them. The report shall be filed by May 14, 2010. The Court shall hold a continued Pretrial Hearing on May 26, 2010, at 9:00 A.M.

This document is the plaintiff's report required by this order.

This report, as required, provides known opinions of Mr. Youssef and Mr. Curran, that undersigned either concluded may be expert opinions, or may be in the gray area between expert and lay opinions, as set forth under the Federal Rules of Evidence. [1] The report does not include some expected testimony that counsel believes are firmly within the realm of lay opinion.

Undersigned counsel have determined that opinion testimony expected to be presented by Mr. Freeh will be within that realm of lay opinion testimony under FRE 701. Consequently, no report concerning his opinion testimony is presented.

## II. LEGAL STANDARD

The determination of whether testimony is an expert opinion under FRE 702 or a lay opinion under FRE 701 depends on whether the testimony is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." This determination is subjective but draws on the history and traditional usage of expert witnesses. Under Rule 701 lay witnesses are still permitted to provide lay opinion testimony, so long as it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Given the context o the proposed testimony, and the fact that much of the testimony may be admissible under FRE 701, some of the objections to the testimony may be better offered during trial, in the context of the witnesses actual testimony. *See*, *DAG Enterprises v. Exxon Mobil*, 2003 U.S. Dist. LEXIS 26406 (D.C.D.C. 2003).

[1] Plaintiff's counsel believes that the majority (if not all) of the opinion testimony that Mr. Youssef and/or Mr. Curran may give is admissible under FRE 701. Consequently, including proffered testimony in this Memorandum should not be construed as a contention that the testimony is in fact covered under FRE 702.

Lay opinion testimony can be admitted on a wide variety of subject matters. For example, in *U.S. v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008), the court held a witness could testify as a lay witness about the meaning of conversations between conspirators, derived solely from the witness's insider perceptions as a member of that conspiracy.

FRE 701 and 702 distinguish between lay and expert testimony, not lay and expert witnesses. A witness may provide both lay and expert opinions in the same case. *U.S. v. Freeman*, 498 F.3d 893, 903-04 (9th Cir. 2007).

## II. MR. CURRAN'S QUALIFICATIONS, BASES AND OPINIONS.

Mr. Curran worked for 38 years for the FBI. Most of his experience is in counterintelligence and intelligence. *See* Exhibit 1, Resume of Edward J. Curran (R-207-1). Mr. Curran supervised Mr. Youssef during the period of time both worked in Los Angeles, and served as Mr. Youssef's ASAC. Mr. Curran has stayed familiar with Mr. Youssef's career ever since. Mr. Curran also supervised Mr. Art Cummings when Cummings and Youssef both worked in the Los Angeles Division.

Mr. Curran served on the FBI's inspection staff for over one year, and did 26 inspections. Ex. 1, p. 6 ("My assignment as Inspector at FBIHQ enabled me to visit 26 different field offices in order to review their programs, write reports on findings and make specific recommendations for improvement."). Mr. Curran became a GS-15 Unit Chief after 17 years with the FBI. He was promoted to an ASAC position in 1992 and was further promoted into the Senior Executive Service in 1994. He retired from the FBI in December, 2000 as an SES Level 4.

Mr. Curran has remained active in law enforcement since retiring from the FBI. Ex. 1. In 2002, he was named the Deputy Director of Office of Counter-Terrorism, State of New Jersey. In this capacity, he worked closely with FBI officials, primarily through the Joint Terrorism Task

Force. In February 2006 Mr. Curran became the Director of the International and Domestic Liaison, New York City Police Department (NYPD), Intelligence Division. He continues to hold this position today. In this position, Mr. Curran works with FBI officials on an operational level concerning ongoing counterterrorism investigations.

In regard to his direct work on inspections, Mr. Curran was a Unit Chief[2] assigned to work in the Inspection Division for over one year. His responsibilities included conducting 26 inspections. During that time period he became completely familiar with the FBI's inspection process and the role of inspections in the career development process. Mr. Curran served on various career boards for the FBI and was very familiar with the inspection and promotional process within the FBI. After retiring from the FBI he has maintained contacts with various FBI officials, and remains familiar with the FBI's promotional and inspection process. This knowledge is also based on a review of documents and information obtained from Mr. Youssef which establish both time tables for employees within the counterterrorism division completing inspections during the time period relevant to this case, the promotional policies of the FBI and documents related to the inspection process. *See* Joint Exhibits 1 and 2 (discussing changes in inspection process); Joint Exhibit 36 (rules concerning promotions), Joint Exhibits 14 and 37 (requests for inspectors issued by the Inspection Division) and documents produced by the FBI in discovery which set forth the amount of time it took for FBI employees within the counterterrorism division to obtain inspection certification in the 2001-2005 time frame.

Plaintiff proposes that Mr. Curran be qualified as an expert on the following:

1. *The inspection certification process is a key aspect of the FBI's career development program.* Mr. Currant will testify as follows: The role of inspection certification as

[2] In preparing this report, counsel has learned that prior representations of Mr. Curran's position has chief inspector were incorrect. He was a Unit Chief of the National Security Division and an Assistant Inspector, not chief of the Inspection Division.

a requirement for advancement has not changed since Mr. Curran retired. *See* Joint Exhibit 36; Plaintiff's Exhibit 111. Inspections are a critical component of the FBI's career program. An agent's performance on inspections will have a "make or break" effect on their career. Inspections are an opportunity for agents to demonstrate their qualifications for promotion, along with an opportunity to obtain knowledge about FBI programs and the management of said programs. Agents who desire to participate in the career development program within the FBI must voluntarily participate in the inspection program.

Inspections are hard work and provide an invaluable training opportunity for agents. A typical schedule for an inspection begins at 7:00 am and can run to 10:00 pm, every day, seven days a week. Inspections require a thorough investigation and review of every facet of the management of FBI programs. It is an intense process for both the program under review, and for those conducting the inspection. They are essential, both for the evaluation of current FBI programs, and also for the evaluation and training of the agents participating in the inspection.

2. *The inspection process is typically completed within 18 months, unless an employee voluntarily removes him or herself from the process and/or has poor performance during an inspection.* The average time periods for completing inspections has not changed from the time Mr. Curran worked with the FBI. Mr. Curran is very familiar with the time period typically needed to complete inspections based on his work as an Inspector and his serving in management positions within the FBI for over fifteen years. Mr. Curran also has access to the discovery materials produced in this case that set forth the average amount of time persons obtained inspection certification in the Counterterrorism Division between 2000 and 2005.

The basic rules of inspection certification, and its role in program assessment and management training, and the normal times for completing inspection certification have

remained unchanged since Mr. Curran left the FBI.

Based on his experience and knowledge, and his exposure to information from this case, Mr. Curran believes that the normal time for agents to complete inspection certification is about 18 months. It can be completed more quickly if the agent is eager to complete them, and performs well enough on the inspections so that he or she is sought after to participate in inspections in rapid succession.

3. *Mr. Youssef had the qualifications necessary to be inspection certified in January of 2005*. Plaintiff's Exhibit 106 (Youssef's inspection evaluations). The witness has access to all of Mr. Youssef's performance evaluations concerning his performance as an inspection. Mr. Curran has knowledge of how these evaluations demonstrate both that Mr. Youssef would qualify for certification had he been permitted to complete his last inspection in 2005 and how these evaluations further explain why Mr. Youssef was being asked to participate in inspections during the 2004-05 time period.

4. *Based on Mr. Youssef's inspection performance evaluations, there would be a high demand to use Mr. Youssef on an inspection in early 2005 and throughout the 2005-2007-time period.* Plaintiff's Ex. 106 (Youssef's inspection evaluations). *See* anticipated testimony for number 3.

Mr. Curran will testify that when an agent conducts an inspection his or her performance is carefully evaluated. If the participant's performance is rated well, that participant becomes sought after for future inspections. If the participant's performance were rated poorly, then that participant would typically be removed from the inspection program and would not qualify for career advancement. When an agent has completed four or five inspections, and is near the end of completing inspection certification, then that agent becomes highly sought after for

participation in upcoming inspections.

The completion of four or five inspections means that each of those inspections must have been well rated. Thus, unless an agent has voluntarily delayed or declined to proceed with inspections, the inspections tend to accelerate toward the completion of inspection certification.

5. *It is unheard of for a Deputy Assistant Director to block the ability of a Unit Chief of participate in an inspection and it is unheard of for a manager to block an employee who successfully completed 4 or 5 inspections from completing his or her last inspection in an expeditious manner. Any such conduct would deviate from routine and indicate retaliation.* Other than Mr. Youssef's experience, Mr. Curran is unaware of a Deputy Assistant Director (DAD) ever blocking an agent's participating in an inspection. Based on Mr. Curran's knowledge of Mr. Youssef's capabilities, his review of Mr. Youssef's performance information, his review of the various requests for inspectors issued from the Inspection Division during the 2005-07 time period, Mr. Curran will render an opinion as to whether the actions related to Mr. Youssef deviated from routine procedure and whether these actions would indicate retaliation. See, FRE 704(a).

6. *The inability to complete inspections and obtain certification would stall an employee's ability to obtain promotions within the FBI and harm an employee's career and reputation. This is especially true in the context of an employee with an exceptionally strong performance record, like Mr. Youssef.*

This opinion is based on the information referenced in numbered para. 1 above. This impact is especially true related to Mr. Youssef, given his management potential within the FBI. Mr. Curran believes that Bassem Youssef is conscientious, productive and professional. Bassem Youssef showed excellent initiative and judgment and had made real accomplishments in

counterterrorism. Youssef was one of the brightest and most qualified agents the FBI had in counterterrorism. Mr. Youssef's expertise and ability to become inspection certified is reflected in the inspection-related performance evaluations conducted by the Inspection Division concerning Mr. Youssef's conduct on each of the inspections he performed.

7. *Mr. Youssef's inspection during his tenure in Saudi Arabia demonstrated his qualifications for advancement within the FBI. The contents of that report, compared to other inspection reports, were extremely complementary to Mr. Youssef.* The Legat Riyadh inspection report was completed during the time period Mr. Curran still worked at the FBI. Based on his work within the inspection division, the fact that Mr. Curran personally inspected Legat offices (including Bonn, Brussels ) and his review of numerous inspection reports as a manager for the FBI, Mr. Curran is qualified to render an opinion on the relative merits of the Legat Riyadh inspection report, and how that inspection report speaks extremely well of Mr. Youssef's abilities to successfully participate in the FBI's promotional process.

**III. MR. YOUSSEF'S QUALIFICATIONS, BASES AND OPINIONS.**

Mr. Youssef has now worked in FBI for over 22 years, and in management for over a decade. Since 2000 he has had an opportunity to fully understand the FBI's inspection program as a manager who approves employees for participation in inspections, as a direct and very successful participant in the inspection program, a manager who chairs Career Board meetings and is able to review applications that contain information about an employee's inspection history and as an FBI employee who has observed, first hand, the inspection certification process among many of his colleagues. Furthermore, Mr. Youssef has reviewed materials produced during discovery in this case, including rules or proposed changes to the inspection process, rules related to promotions, and the personnel histories/records of comparable

employees within the Counterterrorism Division. These records included information that permitted Mr. Youssef to review specific personnel files and conclude the precise amount of time it took other employees to complete the inspection process.

Mr. Youssef has chaired approximately twelve FBI career boards, and has been a member of a number of other career boards. Each Career Board reviews the application packages of the candidates to make a selection for promotion. These packages often include information about the timing and results of the candidate's participation in inspections, including the date of inspection certification. Based upon his review of these materials, Mr. Youssef has been able to determine when various applicants commenced and completed their certification process.

Additionally, Mr. Youssef has participated in the inspection certification program, and successfully completed that program. As a participant in the inspection process he was able to learn about the training and educational opportunities afforded agents who participate in inspections, and gain a full understanding of the role inspection certification plays in the promotional process. Moreover, he has worked with numerous colleagues who were, like him, seeking certification. He has a firm understanding of how long it has taken his colleagues to obtain certification, and knows the positions these colleagues were eventually promoted into after certification. For example, in Mr. Youssef's first inspection, Mr. Art Cummings was also participating in his first inspection. Mr. Cummings completed the certification process in a timely manner, and was promoted to a number of positions within the Counterterrorism Division, and was eventually named the Executive Assistant Director for Counterintelligence and Counterterrorism. Other colleagues who participated in inspections along with Mr. Youssef, but who were permitted to complete their inspections in a timely manner, were also promoted into

the Senior Executive Service.

As Unit Chief of DocEx and then CAU, Mr. Youssef gave permission to about half a dozen subordinates to commence participation in the inspection program. He knows how long it has taken these subordinates to complete their certification process, and the decision making process engaged in by the FBI to approve these inspections. Of those, the longest any one of them needed to complete inspection certification was approximately two and one-half years. Two former subordinates for whom Mr. Youssef approved participation in the inspection program have now been promoted to Senior Executive Service (SES) positions after having become inspection certified while working in Mr. Youssef's Unit.

Information provided by the FBI in discovery also documents the amount of time it took comparable employees within the counterterrorism program to become inspection certified. The documents demonstrate that it took these agents the following amount of time to become certified during the time period relevant to this case. These documents also form a basis for Mr. Youssef's opinion as to the average amount of time it would take an agent to obtain certification.

Plaintiff proposes that Mr. Youssef be qualified as an expert on the following:

1. *The inspection certification process is a key aspect of the FBI's career development program.* Mr. Youssef will testify as follows. Inspections are a critical component of the FBI's career program. Mr. Youssef will provide testimony on the FBI's promotional rules, including testimony concerning Joint Exhibit 36, and the role of inspection certification in promotions governed under that FBI work rule. He will also testify that an agent's performance on inspections will have a "make or break" effect on their career. Inspections are an opportunity for agents to demonstrate their qualifications for promotion, along with an opportunity to obtain knowledge about FBI programs and the management of said programs. Agents who desire to

participate in the career development program within the FBI must voluntarily participate in the inspection program.

Inspections are hard work and provide an invaluable training opportunity for agents. A typical schedule for his inspections is from 7:00 am to midnight or later, seven days a week. Inspections require a thorough investigation and review of every facet of the management of FBI programs. It is an intense process for both the program under review, and for those conducting the inspection. They are essential, both for the evaluation of current FBI programs, and also for the evaluation and training of the agents participating in the inspection.

2. *The inspection process is typically completed within 18 months, unless an employee voluntarily removes him or herself from the process and/or has poor performance during an inspection.* As set forth above, Mr. Youssef is very familiar with the time period typically needed to complete inspections.

Based on his experience and knowledge, and his exposure to information from this case, Mr. Youssef believes that the normal time for agents to complete inspection certification is about 18 months. It can be completed more quickly if the agent is eager to complete them, and performs well enough on the inspections so that he or she is sought after to participate in inspections in rapid succession. After Mr. Youssef received positive reviews on his earlier inspections, the Inspection Division asked him to serve as Team Leader (TL) for his fifth inspection in Cincinnati during November 2004.

3. *Mr. Youssef had the qualifications necessary to be inspection certified in January of 2005*. Plaintiff's Exhibit 106 (Youssef's inspection evaluations). This is fact testimony, however, he will offer an opinion as to whether, based on his performance in inspections prior to January, 2005, he would have successfully completed the Los Angeles inspection and/or the

OPR inspection and/or any of the other inspections that he was aware of between January of 2005 and the date of his final certification.

4. *Based on Mr. Youssef's inspection performance evaluations, there would be a high demand to use Mr. Youssef on an inspection in early 2005 and throughout the 2005-2007- time period.* Plaintiff's Ex. 106 (Youssef's inspection evaluations). *See* anticipated testimony for number 3.

Mr. Youssef will provide fact testimony and FRE 701 testimony setting forth his opinion as to the high demand for him to work on inspections during the time period relevant to this case.

5. *It is unheard of for a Deputy Assistant Director to block the ability of a Unit Chief to participate in an inspection and it is unheard of for a manager to block an employee who successfully completed 4-5 inspections from completing his or her last inspection in an expeditious manner. Any such conduct would deviate from routine and indicate retaliation.* Other than Mr. Youssef's experience, Mr. Youssef is unaware of a Deputy Assistant Director (DAD) ever blocking an agent's participating in an inspection. He is unaware of any agent ever being pulled from an inspection, after approved for participation. Again, this testimony, along with Mr. Youssef's opinion that the actions of Mr. Lewis were retaliatory and harmful, constitutes permissible opinion testimony under FRE 701. However, this testimony would also be permissible under FRE 702 and 704 based on Mr. Youssef's qualifications as an expert.

6. *The inability to complete inspections and obtain certification would stall an employee's ability to obtain promotions within the FBI and harm an employee's career and reputation. This is especially true in the context of an employee with an exceptionally strong performance record, like Mr. Youssef.*

This opinion is based on the information referenced in numbered para. 1 above.

## CONCLUSION

Mr. Youssef asks this Court to overrule defendants' objections to expert testimony by himself and Mr. Curran.

Respectfully submitted,

/s/ Richard R. Renner
Stephen M. Kohn
Richard R. Renner, Bar No. OH0021
KOHN, KOHN, COLAPINTO, LLP.
3233 P Street, N.W.
Washington, DC 20007
Phone: (202) 342-6980
Fax: (202) 342-6984
sk@kkc.com, rr@kkc.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing memorandum is filed electronically and will be made available to all counsel of record through this Court's electronic case filing system.

By: /s/ Richard R. Renner________
Richard R. Renner