# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BASSEM YOUSSEF

    Plaintiff,

      v.

ERIC H. HOLDER, JR., United States
Attorney General, U.S. DEPARTMENT OF
JUSTICE, *et al.*

    Defendants.

**Civil Action No. 03-1551 (CKK)**

## MEMORANDUM OPINION
(December 2, 2014)

Plaintiff Bassem Youssef ("Youssef") brought the above-captioned action alleging, among other claims, that his employer, the Federal Bureau of Investigation ("FBI"), discriminated against him on the basis of his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, after the terrorist attacks of September 11, 2001, by not placing him in a substantive position dealing with counterterrorism and instead transferring him to a job for which he was overqualified. Youssef also complained that the FBI retaliated against him when he filed a complaint and spoke to his superiors about his predicament. On March 30, 2008, the Court granted-in-part and denied-in-part Defendants' Motion for Summary Judgment, *see Youssef v. FBI*, 541 F. Supp. 2d 121 (D.D.C. 2008), specifically granting Defendants' request for summary judgment as to Plaintiff's discrimination claim, but denying summary judgment as to Plaintiff's retaliation claim. The Court then proceeded to try Plaintiff's remaining claim of retaliation before a jury. The jury returned a verdict against Plaintiff and the Court denied Plaintiff's motion for a new trial. *See* Judgment,

ECF No. [247].  Plaintiff subsequently appealed to the United States Court of Appeals for the District of Columbia Circuit, which affirmed the Court's refusal to grant a new trial on the retaliation claim, but reversed the Court's judgment against Plaintiff's discrimination claim and remanded the claim for further proceedings.  Presently before the Court is Defendants' Motion for Summary Judgment on Plaintiff's claim that the FBI discriminated against him in transferring him to the Document Exploitation Unit ("DocEx").  Upon careful consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court finds that while certain evidence and arguments raised by Youssef are either inadmissible or legally flawed,  the inferences that a reasonable trier of fact could draw from Youssef's remaining evidence could either support a finding that discrimination occurred or that it did not and, thus, the ultimate question of whether Youssef's transfer to DocEx was motivated by national origin discrimination is best left to a jury.  Accordingly, the Court DENIES Defendants' Motion for Summary Judgment.

## I.      BACKGROUND

### A. The Scope of this Action

Among the several national origin discrimination claims that this Court dismissed in its March 30, 2008, Memorandum Opinion was Youssef's claim that he was discriminated against

---

[1]    While the Court bases its decision on the record as a whole, its consideration has focused on the following documents: Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem."), ECF No. [315]; Defs.' Stmt. of Material Facts Not in Genuine Dispute ("Defs.' Stmt."), ECF No. [315-4]; Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), ECF  No. [317]; Pl.'s Opp'n. to Defs.' Stmt. of Material Facts Not in Genuine Dispute and Pl.'s Stmt. of Material Facts in Dispute ("Pl.'s Stmt."), ECF  No. [317-2], [317-3]; Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply"), ECF  No. [321]; Defs.' Resp. to Pl.'s Stmt. of Material Facts in Dispute ("Defs.' Resp. Stmt."), ECF  No. [322].  The motion is fully briefed and ripe for adjudication.  In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision.  *See* LCvR 7(f).

when he was assigned to DocEx.  The Court found that Youssef had shown only that he was not permitted to "perform the work he desired," which fell short of a claim that the transfer constituted a materially adverse employment action necessary to support a Title VII discrimination claim.  *Youssef v. FBI*, 541 F. Supp. 2d at 164.  Considering Youssef's claims on appeal, the D.C. Circuit Court of Appeals held that a reasonable juror could find that Youssef, in being transferred to DocEx, "experience[d] an extraordinary reduction in responsibilities" constituting a materially adverse action under Title VII.  *Youssef*, 687 F.3d 397, 402 (D.C. Cir. 2012).  As this Court had not previously had a need to consider whether the FBI's explanation for Youssef's transfer to DocEx was pretextual, the D.C. Circuit remanded this case "for further examination of the FBI's reason for *[Youssef's] transfer to [DocEx]*" and Youssef's proffered evidence of discriminatory motive.  *Id.* at 402-403 (emphasis added).

In his Opposition, Youssef now appears to bring an additional claim based on the FBI's "failure to utilize his expertise" immediately following the 9/11 attacks and up until early March 2002.  Pl.'s Opp'n at 39-40.  Youssef explains that during this time period he "was denied a meaningful position within [Counterterrorism] based on the failure of the managers in Counterintelligence to arrange a meaningful placement." *Id.* at 40.  Defendants respond that this claim should be dismissed by the Court because it relates to events that occurred immediately following September 11, 2001, that are time-barred.  Defs.' Reply at 22-24.  Youssef challenges Defendants' timing argument and also argues that since "the FBI raised no defense [in its Motion] regarding" the failure to assign specifically during the period of January 26, 2002 to early March 2002, "summary judgment on this matter must be denied as a matter of law."  Pl.'s Opp'n at 40.  Regardless of the merits of Defendants' timing argument, the Court will not consider Youssef's new "failure to assign" claim for either time period because this is not the

claim on which the D.C. Circuit Court of Appeals reversed and remanded this case for further consideration.  The claim remanded to this Court is limited to Youssef's transfer to DocEx.  *See Youssef*, 687 F.3d at 402-03.  The complaint that was considered by the D.C. Circuit Court of Appeals is still the complaint presently before the Court since Youssef did not seek to amend his complaint following the remand of this case to this Court.  As such, the sole claim that this Court will address is whether Youssef's transfer to DocEx was motivated by national origin discrimination.  The Court will consider, however, Youssef's evidence about his attempts to find a position in Counterterrorism immediately after the 9/11 attacks to the extent that it has been offered as evidence of pretext for discrimination with respect to Youssef's transfer to DocEx.

### B. Youssef's Employment Background

Youssef began working as a GS-10 level Special Agent for the FBI in 1988.  Pl.'s Stmt. ¶ 3.[2]  Over the next fifteen years, Youssef held numerous counterterrorism and counterintelligence assignments throughout the United States and across the globe.  *See          id.*    ¶¶    16-215.  Youssef received various assignments utilizing his Arabic speaking capabilities during this period and received several awards and high praise for his work.  *Id.*  In 1996, Youssef applied for and was promoted to the position of Legal Attache ("Legat") in Riyadh, Saudi Arabia.  *Id.* ¶ 106.    Youssef helped to improve relations between the FBI and the Mabahith (the FBI's counterpart in Saudi Arabia) and his performance was assessed by his supervisors as "exceptional."  *Id.* ¶¶ 162, 179.

---

[2] In most instances the Court shall cite only to Plaintiff's Statement of Material Facts ("Pl's. Stmt.") or Defendants' Statement of Material Facts ("Defs.' Stmt.") unless a statement is contradicted by the opposing party. Where a party objects to relevant aspects of an opposing party's proffered material fact, the Court shall cite to Plaintiff's Response to Defs.' Stmt. ("Pl's Resp. Stmt.") or Defendant's Response to Pl.'s Stmt. ("Defs.' Resp. Stmt."), as necessary. The Court shall also cite directly to evidence in the record, where appropriate, to provide additional information not covered in either of the parties' Statements.

In July 2000, Youssef left his position as Legat in Saudi Arabia and returned to the United States to work as the Chief of the Executive Secretariat Office at the National Counterintelligence Center ("NACIC") of the Central Intelligence Agency ("CIA"). *Id.* ¶ 137. Although the FBI formally reassigned Youssef from the Legat Office to the Counterintelligence Division of the FBI, the NACIC position was a detail to another agency, and consequently, Youssef was not stationed at the FBI's Headquarters ("FBIHQ"). Defs.' Stmt. ¶ 35. Youssef's responsibilities in his NACIC position included coordinating liaison activities with representatives from various agencies in the United States government associated with counterintelligence issues, and acting as the Executive Secretary for a number of multi-agency groups that developed policy and other initiatives in support of the counterintelligence community at large. Pl.'s Stmt. ¶ 146. Robert Thompson, Youssef's supervisor during this period, considered Youssef's performance in this role "excellent." *Id.* ¶ 148.

Youssef's detail to the NACIC was expected to last two years, but in February 2001, the President issued a Presidential Decision Directive that dismantled the NACIC and created a new organization in its place called the National Counterintelligence Executive ("NCIX"). *Id.* ¶ 150; Defs.' Stmt. ¶ 36. Youssef's position was abolished during this reorganization. Pl.'s Stmt. ¶ 152. Youssef was reassigned to a position in the NCIX, but began looking for a new position back within FBI headquarters. *Id.*

### C. Youssef's Employment Post-9/11 Attacks

Youssef was employed at the NCIX at a GS-15 level when the 9/11 attacks occurred. Pl.'s Stmt. ¶¶ 152, 352. The attacks galvanized the FBI to divert a significant number of resources and personnel to counterterrorism. *Id.* ¶ 220; Defs.' Stmt. ¶ 3. Youssef believes that the FBI should have immediately moved him into a critical role related to the 9/11 attacks,

5

including one that would allow him to use his Arabic-speaking skills and be assigned substantive counterterrorism duties.  Pl.'s Stmt. ¶¶ 216, 240.  In seeking out such a position for himself, Youssef called or left messages for several FBI managers to offer assistance following the attacks.  *See id.* ¶¶ 241, 246-47.

In or around mid to late February 2002, Youssef spoke to William Chornyak, Deputy Assistant Director in the Counterintelligence Division at FBIHQ, concerning placement opportunities.  *Id.* ¶ 254.  Chornyak viewed it as one of his roles to try to assist agents who were working outside of the Bureau to locate positions back in the FBI once their details expired.  *Id.* ¶ 257.  Youssef and Chornyak had a meeting during which they discussed various positions within the Counterintelligence Division and Youssef's interest in working in the Counterterrorism Division.  *Id.* ¶¶ 259-60.  Chornyak agreed to "see or search out" any openings over in the Counterterrorism Division.   *Id.* ¶ 267; Pl.'s Ex. 36 (Chornyak Depo.), at 70.  Chornyak made several phone contacts to Assistant Director of the Counterterrorism Division Tim Caruso's office and FBI Deputy Director Dale Watson's office, but "there were no real responses."  Pl.'s Stmt. ¶¶ 268, 270 (citing Pl.'s Ex. 36 (Chornyak Depo.), at 70).  Chornyak did see Watson at a café one day and informed him that Youssef was interested in coming back to the Bureau, that Youssef had an "Arabic background" and "was a former legal attaché," and that he thought the FBI "ought to pick him up and use him in some capability or his skills."[3]  *Id.* ¶ 273.

---

[3] In his Statement of Facts, Youssef notes that Watson, in his June 26, 2003, interview with the Equal Employment Opportunity investigator claimed to have "never discussed Youssef's reassignment back to FBIHQ with . . . anyone else including William Chornyak." Pl.'s Stmt. ¶ 274.  The FBI disputes this fact on the basis that it is taken from a written summary by an EEO investigator, not a sworn statement, and thus the statement attributed to Watson is inadmissible hearsay under Federal Rule of Evidence 802. Defs.' Resp. Stmt. ¶ 274.  As the

On or about March 1, 2002, Chornyak and Assistant Director for the Counterintelligence Division Ellen Knowlton advised Youssef that he would be placed in the Counterintelligence Division's Budget Office. *Id.* ¶¶ 276, 281. The work Youssef would have performed in the Budget Unit would have been below his GS-15 level.[4] *Id*. ¶ 277. Youssef sought to block this transfer by speaking with "managers and executives within the FBI," specifically Caruso, and by initiating a proceeding under Title VII of the Civil Rights Act of 1964. *Id.* ¶¶ 292; Defs.' Ex. J (Youssef Depo.), at 19. On March 14, 2002, Youssef contacted the FBI's Equal Employment Opportunity ("EEO") office and formally alleged that the FBI was discriminating against him based on his Middle Eastern national origin by failing "to properly assign him to counterterrorism work after the 9/11 attacks." Pl.'s Stmt. ¶ 292.

In or about this time, Caruso had a short meeting with Watson concerning Youssef. *Id.* ¶ 293. This was the first time Caruso had heard of Youssef. *Id.* ¶ 295. Watson asked Caruso to place Youssef in the Counterterrorism Division. *Id.* ¶ 293. Shortly thereafter, Caruso was contacted by Youssef and met with Youssef. *Id.* ¶ 300. During their meeting, Youssef complained about his assignment to the Budget Unit and explained to Caruso that he was looking to lend a hand in the counterterrorism area. Pl.'s Ex. 38 (Caruso Depo.), at 53. Caruso then explained to Youssef that the FBI needed assistance in a temporary duty, or "TDY," position at the DocEx project in the Counterterrorism Division. *Id.* at 54, 64. Later in March 2002, Youssef

---

parties do not dispute Chornyak's testimony that he spoke to Watson, the Court will accept Chornyak's testimony that he spoke with Watson at a café as an undisputed fact for the purposes of resolving this motion for summary judgment.

[4] Although the FBI disputes this fact, it does so only on the basis that the position "would have provided plaintiff with important skills and, in the long run, could have enhanced his career prospects." Defs.' Resp. Stmt. ¶ 277.

was transferred from NCIX to DocEx and, specifically, the DocEx offsite project. *Id.* at 54, 66-67; Pl.'s Ex. 41 (Kinnally Depo.), at 21.

Youssef was not satisfied with the work he was asked to perform at DocEx offsite. According to Youssef, he was responsible for "cataloging [documents], i.e. as [in] putting an identifying number or serial number on a document before storing the document as original evidence." Pl.'s Stmt. ¶ 332. As a result, Youssef brought this action in June 2003 broadly alleging "that the FBI discriminated against him following the September 11, 2001 attacks by excluding him from positions associated with counterterrorism [based on his national origin] and by retaliating against him after he filed an [EEO] complaint." *Youssef*, 541 F. Supp. 2d at 127. On Defendants' Motion for Summary Judgment, the Court granted summary judgment for Defendants on Plaintiff's national origin discrimination claims, but denied summary judgment as to Plaintiff's retaliation claim allowing the claim to be tried by a jury. Plaintiff's national origin discrimination claim as it relates to his transfer to DocEx was reversed and remanded by the D.C. Circuit Court of Appeals and is again before the Court on Defendants' Motion for Summary Judgment.

## II.     LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to

the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).

If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

Importantly, "[w]hile summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortg. Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd,* 328 F.3d 647 (D.C. Cir. 2003).   Accordingly, the Court reviews the Defendants' Motion for Summary Judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 880 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

## III.   DISCUSSION

Pursuant to Title VII, all personnel actions affecting employees of the federal government "shall be made free from any discrimination based on race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–16(a).   To prove a violation of Title VII, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted).   Furthermore, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Brady v. Livingood,* 456 F. Supp. 2d 1, 6 (D.D.C. 2006) (quoting *Kalekiristos v. CTF Hotel Mgmt. Corp.,* 958 F. Supp. 641, 665 (D.D.C. 1997)).   Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework.   *Cones v. Shalala,* 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas*).

Under the *McDonnell Douglas* paradigm, Youssef has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas,* 411

U.S. at 802.   If he succeeds, the burden shifts to the FBI to articulate some legitimate, nondiscriminatory reason for Youssef's transfer to DocEx, and to produce credible evidence supporting its claim.  *Id.*  The FBI's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254; *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").  As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.,* 328 F.3d 647, 651 (D.C. Cir. 2003) (internal quotations and citation omitted), *cert. denied,* 540 U.S. 881 (2003); *see also Burdine,* 450 U.S. at 253.  If the FBI is successful, the burden then shifts back to Youssef to prove that the FBI's proffered motive "was not its true reason, but was a pretext for discrimination." *Barnette v. Chertoff,* 453 F.3d 513, 516 (D.C. Cir. 2006) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000)).

At the summary judgment stage, however, the D.C. Circuit has instructed that, once an employer provides a legitimate, nondiscriminatory basis for its decision, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  Rather, the central question for the Court to resolve is whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin."

*Id.* Effectively, "[t]his boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory motives?" *Murray v. Gilmore,* 406 F.3d 708, 713 (D.C. Cir. 2005).

### 1. *The FBI's Proffered Legitimate, Nondiscriminatory Reasons*

The Court must first assess whether the FBI has produced evidence that Youssef was transferred to DocEx for one or more "legitimate, nondiscriminatory reason[s]." *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 254). In its Motion for Summary Judgment, the FBI cites to deposition testimony from the FBI officials involved in Youssef's placement post-9/11. From this testimony, the FBI explains the reason Youssef was transferred to DocEx: "[S]enior management officials determined to place plaintiff in the DocEx project, on a TDY basis, because that office had a critical and overwhelming need to exploit very large quantities of information in connection with the Bureau's counterterrorism efforts and plaintiff not only had the skills [a background in counterterrorism investigations and a knowledge of the Arabic language] necessary to ensure the success of the mission DocEx was to accomplish but also had expressed an interest in working in [the Counterterrorism Division]." Defs.' Mem. at 7-8. The FBI further explains that "Caruso determined that DocEx was the appropriate place to assign plaintiff on a TDY basis because, at about the same time that the FBI managers learned of plaintiff's interest in working in [the Counterterrorism Division], the official responsible for setting up the DocEx program, Section Chief Thomas Kinnally, had informed them that he sought an Arabic speaking Special Agent to assist in the offsite location of DocEx in analyzing the information that the United States was retrieving from terrorist enclaves overseas." *Id.* at 9-10. "[B]ecause of this coincidence, FBI officials did not consider in February-March 2002 whether plaintiff should be placed in an alternative TDY position." *Id.* at 11 n.5.

The FBI also explains that "the managers responsible for plaintiff's TDY assignment intended that plaintiff would serve an important function in the FBI's offsite facility for the new DocEx project.  Plaintiff was the senior management FBI official assigned to the DocEx project at its offsite location and, as such, was the FBI's go to guy, the senior official responsible for accomplishing the FBI's mission for DocEx there."  *Id.* at 12.  Furthermore, the FBI explains that Youssef did serve in a leadership role at the DocEx offsite facility and was credited with establishing FBI policies and procedures at that facility.  *Id*.  In sum, the FBI claims to have transferred Youssef to DocEx because "[t]he FBI urgently needed a person with [counterterrorism and Arabic] skills to serve in an important role at the offsite facility of DocEx, plaintiff was seeking an opportunity to work in [the Counterterrorism Division] on a non-competitive basis, and FBI managers determined he could best be used in this particular position on a temporary basis."  *Id.* at 14.

As the deposition testimony on which the FBI relies is admissible evidence, the Court finds the FBI has met its burden of production and established a legitimate, nondiscriminatory reason for Youssef's transfer.  *Burdine*, 450 U.S. at 255 ("the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.").

## 2. *Evidence of Discrimination, Vel Non*

Since the FBI has presented legitimate, nondiscriminatory reasons justifying Youssef's transfer, the Court therefore proceeds directly to considering the ultimate question of "discrimination *vel non*"—whether Youssef has adduced sufficient evidence for a reasonable jury to conclude that the FBI's proffered reason for its decision is pretextual, and that its real motivation was discrimination based on Youssef's national origin.  *Reeves*, 530 U.S. at 142–43. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation

13

is unworthy of credence." *Burdine,* 450 U.S. at 256; *see also Reeves,* 530 U.S. at 143. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves,* 530 U.S. at 147 (citing *St. Mary's Honor Ctr.,* 509 U.S. at 517) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka,* 156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight."). Youssef can also attempt to "avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination," such as "discriminatory statements by the employer," "other attitudes suggesting the decision maker harbors discriminatory animus," and/or other "data" concerning his protected class. *Holcomb v. Powell,* 433 F.3d 889, 899 (D.C. Cir. 2006) (internal citations omitted).

As always, Youssef retains the "ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. At this point, a court reviewing summary judgment looks to whether a reasonable [fact-finder] could infer intentional discrimination or retaliation from all the evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer). *Carter v. George Washington Univ*., 387 F.3d 872, 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted).

Youssef points to four categories of evidence that he contends reveal that his transfer to DocEx was motivated by discriminatory animus: (1) evidence of rumors about Youssef that

stereotype him based on his Egyptian heritage; (2) evidence that Youssef was grossly overqualified for the DocEx position; (3) evidence that other agents were called into high-level Counterterrorism positions while Youssef was overlooked; and (4) twelve specific pieces of evidence, which Youssef contends show that certain aspects of the FBI's nondiscriminatory reason for transferring Youssef to DocEx are unworthy of credence.  While the Court finds that the evidence of the alleged rumors is inadmissible and that Youssef's argument regarding the inferences that can be drawn from his relatively superior qualifications is legally flawed, the Court ultimately finds that the inferences that a reasonable trier of fact could draw from Youssef's remaining evidence could support a finding of national origin discrimination when viewed in the light most favorable to Youssef.  Accordingly, the Court shall deny Defendants' Motion for Summary Judgment and leave to a jury the ultimate question of whether Youssef has proved his transfer to DocEx was motivated by national origin discrimination.

### a. *Discriminatory Rumors*

The most direct evidence of national origin discrimination that Youssef presents is evidence that certain individuals within the FBI heard a false and derogatory rumor about Youssef that stereotyped him based on his Egyptian heritage.  Specifically, it was rumored that Youssef had been investigated for insubordination related to his Muslim faith however, Youssef is a Coptic Christian and the investigation actually related to a different FBI agent with a "similar-sounding" name.  Pl.'s Ex. 1 (Youssef Affidavit), at ¶ 101-103; *Youssef*, 541 F.Supp.2d at 131.  Youssef contends that this rumor led him to be considered *persona non grata* within the Counterterrorism Division and was a reason he was not able to be placed in a better position within the division.  Pl.'s Opp'n at 22.

This alleged rumor is relevant only to the extent that it can be linked to those involved in

the decision to transfer Youssef to DocEx.  Youssef, however, fails to provide any evidence that this rumor was heard or otherwise known by anyone who was involved in his transfer to DocEx. As evidence of the rumor, Youssef points to an EEO Investigative Report and an EEO statement taken from Chornyak which cite Chornyak as stating that he "heard from a third party that an Office [of] Professional Responsibility (OPR) investigation [into allegations of insubordination] was conducted while Youssef was assigned as the Legat in Riyadh" and that "this may have been the reason that Youssef was considered *persona non grata* in the [Counterterrorism] area."  Pl.'s Ex. 30 (Chornyak EEO Statement); Pl.'s Ex. 37 (EEO Investigative Report).  Youssef also points to an affidavit by former FBI GS-14 Supervisory Special Agent Paul Vick in which Vick avers that FBI Section Chief[5] Jim Olsen informed him of the rumor in August 2003, Pl.'s Ex. 39 (Vick Affidavit), at ¶ 21, and that GS-14 FBI analyst Mary Roustom informed him of the rumor in June 2004, *id.* ¶¶ 24-25.  As for Vick, Olsen, and Roustom, Youssef presents no evidence and makes no allegation that these individuals were in a position to place him in a Counterterrorism Division position, were in any way involved in his transfer to DocEx, or communicated these rumors to those who could place Youssef in Counterterrorism or were involved in his transfer to DocEx.  *See Youssef*, 541 F. Supp. 2d at 165 (finding that the Vick affidavit "offers nothing to support the idea that such rumors, if they existed, were known to those who Youssef believes discriminated or retaliated against him.").  More importantly, Vick's affidavit only avers to these three individuals having knowledge of the derogatory rumors several years *after* Youssef was transferred to DocEx.[6]

---

[5] The record does not indicate for which section Jim Olsen served as Section Chief.

[6] In his affidavit, Vick states that Roustom told him that the rumor was "common place knowledge," however, Roustom made that comment to Vick over two years after Youssef was

As for Chornyak's statement, Chornyak only references an unidentified third party as the source of the rumor.  As such, this evidence cannot support an inference that someone involved in the decision to transfer Youssef to DocEx was affected by the rumor.  While Youssef *suggests* that Chornyak himself was aware of the rumor around the time that Youssef was transferred to DocEx, he offers no evidence that Chornyak knew of the rumor or had the opinion that Youssef was *persona non grata* at the time he was assisting Youssef in his job search.  Chornyak's EEO statement was taken after Youssef was transferred to DocEx and does not indicate when Chornyak learned of the rumor or developed the opinion that the rumor may have made Youssef *persona non grata* in the Counterterrorism Division.  Even if the Court were to accept Youssef's suggestion that Chornyak learned of the rumor during his search, the evidence Youssef presents does not show that Chornyak was negatively affected by this rumor.  Instead, Youssef's undisputed evidence only shows that Chornyak continued to advocate for Youssef's return to FBI headquarters and continued to speak highly of Youssef to those FBI officials who had the authority to place Youssef in a Counterterrorism position.  Moreover, Chornyak—who was employed in the *Counterintelligence* Division—did not have the authority to place Youssef in a *Counterterrorism* Division position and was not involved in Youssef's placement in DocEx other than positively recommending Youssef to the Counterterrorism Division in general at Youssef's request.

To the extent that Youssef is alleging that this rumor was widely known throughout the Counterterrorism Division and rendered him *persona non grata* within the division, the evidence on which he relies for such a proposition is inadmissible.  Youssef alleges that "Mr. Chornyak

transferred to DocEx and Vick's affidavit provides no further information indicating that the rumor was common knowledge during the time period at issue in this case. *See* Pl.'s Ex. 39 (Vick Affidavit), at ¶ 25.

admitted that after talking with the [Counterterrorism] officials directly and after trying to locate a position in [Counterterrorism] for Youssef, he concluded that Youssef was *persona non grata* in the [Counterterrorism] division."   Pl.'s Opp'n at 36-37.   However, in support of this allegation, Youssef cites to the EEO Investigative Report and an EEO statement which state only that:

> Chornyak *had no personal knowledge* of [t]his issue [the allegation that Youssef was excluded from work assignments in the area of counterterrorism since September 11, 2001].  However, he *speculated* that this may have been possible, but had no factual data to support his opinion. . . . Chornyak *speculated* that [the rumor] may have been the reason that Youssef was considered *persona non grata* in the [Counterterrorism] area.

Pl.'s Ex. 30 (Chornyak EEO Statement) (emphasis added); *see also* Pl.'s Ex. 37 (EEO Investigative Report), at 3; Pl.'s Ex. 38 (Chornyak Depo.), Tr. 19.   In other words, Chornyak's opinion about Youssef's *persona non grata* status and his opinion that the rumor was the reason for Youssef's disfavored status were purely speculative and not based on his discussions with Counterterrorism officials, as Youssef alleges, or any other personal knowledge.   Indeed, in his deposition testimony, Chornyak states that he spoke to only Watson and Caruso about Youssef, that Watson responded positively to Chornyak's recommendation of Youssef, and that Caruso stated that he appreciated Chornyak's recommendation of Youssef.   Chornyak did not testify that either FBI official mentioned the rumor or knew of the rumor.   The Federal Rules of Evidence require a witness testifying to a matter to have personal knowledge of the matter.   *See* FRE 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").   Accordingly, the Court finds that Chornyak's opinion about the effect of the rumor and Youssef's *persona non grata* status is inadmissible speculation under Federal Rule of Evidence 602.

18

Even if Youssef had presented admissible evidence that the rumor was widely known, it is undisputed that the individuals whom all parties agree were responsible for Youssef's placement in DocEx—Watson and Caruso[7]—were not aware of the rumors.  Youssef states in his own Statement of Material Facts that "Caruso had never heard of Bassem Youssef prior to the time Dale Watson informed Caruso of the need to place him" and that Caruso decided to place Youssef in DocEx during his meeting with Watson.  Pl.'s Stmt. ¶ 295.  As for Watson, the rumor about Youssef's insubordination stemmed from an investigation into another employee, with whom Youssef was confused, who had allegedly been insubordinate to Watson.  Pl.'s Ex. 1 (Youssef Affidavit), ¶ 103.  As Watson was the source of the insubordination investigation, Watson would be aware of the falsity of the derogatory rumor.  Accordingly, since Youssef fails to produce evidence that the FBI officials involved in transferring Youssef to DocEx were aware of the alleged rumor or were unaware of its falsity, the Court finds that the rumors evidence fails to raise an inference of discriminatory motive with respect to Youssef's transfer to DocEx.

### b.  Disparity in Qualifications

Youssef's next category of evidence relates to the apparent "disparity in qualifications" between Youssef and the other two employees with whom he was assigned to work in the DocEx

---

[7]   The parties agree that Caruso was "the official who made the decision to assign Plaintiff to DocEx."  Defs.' Reply at 12.  Defendants do also allege that Watson informed Assistant Director for Counterterrorism Pasquale D'Amuro that Youssef could be useful in helping set up DocEx, especially given his language ability, and that D'Amuro "didn't disagree with him."  Defs.' Stmt. ¶ 48; Defs.' Ex. E (D'Amuro Depo.), at 37, 39.  Youssef claims that this conversation never took place but, in support of his claim, relies on an inadmissible hearsay statement summarizing Watson's testimony to an EEO officer and on the simple absence of any reference to Watson's discussion with D'Amuro in Watson's deposition testimony.  Pl.'s Resp. Stmt. ¶ 48.  In any event, even if the Court were to consider D'Amuro as another individual responsible for Youssef's transfer to DocEx, Youssef has not presented any evidence that D'Amuro had any knowledge of the rumor and, indeed, D'Amuro specifically denied knowledge of the rumor in his deposition testimony.  *See* Def.'s Reply Ex. 31 (D'Amuro Depo.), at 71-72.

offsite, and between Youssef's qualifications and the qualifications that were necessary to complete the work he was assigned in DocEx. Youssef argues that the "disparity in qualifications" in each scenario is "great enough to be inherently indicative of discrimination." Pl.'s Opp'n at 4. The Court finds that Youssef's argument regarding the inferences to be drawn from the disparity in qualifications between Youssef and his colleagues rests on a legally flawed foundation.

Youssef contends that a reasonable trier of fact could infer that discrimination motivated his transfer to DocEx by the fact that he was assigned to work "side by side" with a GS-9 and a GS-13 ranked employee. *Id.* at 8. Youssef devotes several pages of his Opposition to comparing his qualifications to those of Deborah Doran, the GS-13 Special Agent at the offsite DocEx location. *See* Pl.'s Opp'n at 9-13. Even accepting Youssef's characterization of his experience and skills as superior to Doran's—which, indeed, her undisputed lower grade level would suggest—the fact that either Doran or the GS-9 level employee at the DocEx offsite location were less qualified than Youssef does not by itself allow an inference of discrimination. Youssef cites to *Hamilton v. Geithner* where the D.C. Circuit Court of Appeals held that "a disparity in qualifications, standing alone, can support an inference of discrimination [under Title VII] . . . when the qualifications gap is 'great enough to be inherently indicative of discrimination.' " *Hamilton*, 666 F.3d 1344, 1352 (D.C. Cir. 2012). However, *Hamilton* involved disparately qualified candidates competing for the same, singular position. The principles in *Hamilton* might arguably be informative to the extent that Youssef and either of the other two DocEx offsite employees were doing the same work; however, Youssef does not present any evidence that he and the other employees were employed in the same position other than pointing to deposition testimony by DocEx Section Chief Thomas Kinnally stating that Youssef and Doran

were working as a "team."   Pl.'s Stmt. ¶ 333 (citing Pl.'s Ex. 41 (Kinnally Depo.), at 21).

However, it is common knowledge that teams are often comprised of individuals holding

different levels of responsibility and undertaking different tasks.

Moreover, even assuming Youssef and Doran were working in the same position,

Youssef's application of *Hamilton* to the present case would create a rule whereby a reasonable

trier of fact could infer discrimination any time individuals with disparate qualifications are hired

to perform the same or similar tasks.   Yet employers hiring for several positions at the same level

frequently hire individuals who all meet the minimum qualifications for a position but exceed the

qualifications by differing degrees.   That is the nature of an applicant pool and hiring to fill

several positions.   The comparative qualifications of the candidates selected for several positions

at the same level are irrelevant to the validity of each candidate's selection.   Unlike a situation

where a more qualified candidate is passed over for a less qualified candidate, there is nothing

inherently suspect about two disparately qualified candidates being hired for two open positions.

Accordingly, the Court rejects Youssef's argument that a reasonable trier of fact could infer

discrimination from the disparity between his qualifications and those of his colleagues at the

DocEx offsite location.

As for Youssef's separate argument about his over-qualification for the tasks he was

assigned at DocEx offsite, the Court will allow this argument to be presented to the jury

alongside Youssef's remaining evidence, as discussed in the following section.

### c.  *Youssef's Remaining Evidence*

While none of the remaining evidence that Youssef proffers to show that his transfer to

DocEx was motivated by national origin discrimination is a silver bullet individually or

collectively, the Court finds that a reasonable trier of fact could draw inferences either way from

the varying testimony and evidence to which the parties point.  Specifically, Youssef points to the fact that, despite his counterterrorism experience, Arabic language skills, and expressed interest in serving in the Counterterrorism Division, he was not called into service in the Counterterrorism Division immediately after the 9/11 attacks while many agents at his grade level were called into service.  Youssef also points to the fact that, once transferred to DocEx, he was not selected as the Acting Unit Chief for the overall DocEx project, while a lower GS-14 agent was selected for the position.  Finally, Youssef, proffers twelve pieces of evidence, *see* Pl.'s Opp'n, Part III, A-K & M, which he alleges reveal the false and thus pretextual nature of the FBI's supposed legitimate, nondiscriminatory reason for Youssef's transfer to DocEx. *Reeves,* 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").  The parties point to varying testimony and evidence to support or rebut Youssef's arguments that a discriminatory motive could be inferred from this remaining evidence.  The Court finds that the testimony and evidence to which the parties point could be characterized differently by reasonable triers of fact and differing, yet reasonable, inferences could be drawn therefrom.  Accordingly, the Court finds it most appropriate to allow a jury to determine whether the FBI's proffered legitimate, nondiscriminatory reason for Youssef's transfer to DocEx was motivated by national origin discrimination.

## IV.   CONCLUSION

For the reasons set forth above, the Court DENIES Defendants' Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.

_____*/s/*_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE
